**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
-------------------------------------------------------
REICHHOLD, INC.,                        :
                                        :
                    Plaintiff,          :          Civ. No. 03-453 (DRD)
                                        :
          v.                            :
                                        :
UNITED STATES METALS REFINING           :              O P I N I O N
COMPANY, et al.,                        :
                                        :
                    Defendants.         :
                                        :
-------------------------------------------------------
```

EPSTEIN BECKER & GREEN, P.C.
William A. Ruskin, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003

*Attorneys for Plaintiff Reichhold, Inc.*


McCARTER & ENGLISH, LLP
William S. Greenberg, Esq.
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07101-0652

*Attorneys for Defendants United States Metal Refining Company, et al.*


**DEBEVOISE, Senior District Judge**

## I.  BACKGROUND AND PROCEDURAL HISTORY

**A.      The Claims**

1

The initial complaint in this action was instituted by Reichhold, Inc. ("Reichhold" or "Plaintiff") against United States Metals Refining Company on January 31, 2003[1], alleging violations of the Comprehensive Environmental Response, Compensation and Liability Act (hereinafter "CERCLA"), 42 U.S.C. §§ 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. 99-499; and the New Jersey Spill Compensation and Control Act (hereinafter "Spill Act"), N.J. Stat. Ann. §§ 58:10-23.11 et seq.

The Complaint seeks recovery for damages suffered, and response costs incurred to correct and mitigate releases or threatened releases of hazardous substances from properties in or near Carteret, New Jersey; contribution from Defendants for their share of response costs expended and that will be expended in the future at the former Reichhold property (the "Site"); and declaratory judgment finding Defendants liable for future cleanup costs incurred at the Site.[2]

On May 17, 2004, USMR brought a counterclaim against Reichhold for contribution and a declaration of rights under CERCLA and the Spill Act and filed a third-party complaint for contribution against Port Reading-Carteret ("PRC"), Bayer Corporation ("Bayer/Lanxess")[3], CP Hall Company ("CP Hall"), C.P.H. Sub. II, Inc. ("CPH II"), and Staflex Specialty Esters, Inc.

---

[1] The initial action only included United States Metals Refining Company, and an amended complaint filed in May 2004 (the "Complaint") added several entities affiliated with United States Metals Refining Company, including Cyprus Amax Minerals Company ("Cyprus Amax"). United States Metals Refining Company and those entities will be collectively referred to as "USMR" or "Defendants".

[2] A detailed account of the Site and Plaintiff's claims are set forth in the court's February 22, 2007 opinion (the "Daubert Opinion") and need not be repeated here.

[3] Lanxess Corporation, as successor-in-interest to Staflex Specialty Esters, Inc., states that it was misidentified in USMR's Third Party Complaint as "Bayer Corporation".

("Staflex") (collectively, "Third Party Defendants").  By orders dated October 27, 2004 and

December 7, 2004, the court dismissed USMR's third-party complaint against the Third Party

Defendants.

**B.     The Events Leading Up to the Present Disputes[4]**

Since Plaintiff filed its complaint over four years ago,  this case has required a significant

amount of judicial attention.  Discovery has not proceeded along a smooth trajectory.  The first

scheduling order to set a fact discovery end date was signed on November 19, 2004 (Docket

Entry # 54).  Since then, the court entered a total of **eight** orders extending deadlines set in this

November 19, 2004 Scheduling Order.  This group of eight orders includes an October 7, 2005

Amended Pretrial Scheduling Order (Docket Entry # 74) setting a fact discovery end date of

November 15, 2005.

This November 15, 2005 fact discovery end date remained in place until the court entered

the September 20, 2006 Order that is the subject of the current dispute.  Beginning with an

October 7, 2005 Amended Scheduling Order, the court extended deadlines for submission of

expert reports, with no mention of fact discovery.  (See e.g., Am. Scheduling Order, November

21, 2005).  The court's February 10, 2006 Amended Scheduling Order (Docket Entry #78) set an

expert discovery deadline of June 30, 2006.  Said deadline was never extended.

Nonetheless, fact discovery continued after the November 15, 2005 deadline and after

expert discovery already commenced.  In fact, the genesis of the dispute before the Magistrate

---

[4]As the parties do not contest the procedural history set forth in the Magistrate Judge's
February 8, 2007 memorandum and order (the "Magistrate's Order"), the court adopts this
recitation.

Judge was Defendants' production of a single document in April 2006 in response to Plaintiff's Seventh Request for Production of Documents. (Letter from William A. Ruskin, counsel for Plaintiff, to court (October 30, 2006) (hereinafter "Plaintiff's October 30, 2006 Letter")). This document – entitled "A Brief History of the United States Metals Refining Company" (hereinafter "the Brief History Document") reveals that a lead plant operated on or adjacent to the Site from 1931 until the early 1950s. (Filiaci Dep. at 27-31, October 26, 2006).

After receiving the Brief History Document in the spring of 2006, Plaintiff launched an aggressive campaign to re-open fact discovery. Through a June 9, 2006 letter to the court, Plaintiff argued that Defendants' "lax interpretation of their diligence obligations under the Federal Rules," compelled this court to re-open fact discovery. (Letter from William A. Ruskin, counsel for Plaintiff, to court (June 9, 2006) (hereinafter "Plaintiff's June 9, 2006 Letter")). To this end, Plaintiff sought judicial intervention to compel Defendants to: (1) conduct a comprehensive review of its files; and (2) to provide Plaintiff with a complete list of every employee who worked at the Site prior to 1970. (Plaintiff's June 9, 2006 Letter at 3-4).

Defendants submitted a June 22, 2006 letter taking exception to Plaintiff's characterization of both the Brief History Document and the events leading up to its disclosure. (Letter from Joseph R. Scholz, counsel for Defendants, to court (June 22, 2006) (hereinafter "Defendants' June 22, 2006 Letter")). First, Defendants downplay the significance of the Brief History Document by pointing to other documents that revealed the existence of the lead plant. (*See* Defendants' June 22, 2006 Letter at 2). Next, Defendants proceed to explain the late disclosure of the Brief History Document. (Id.). According to Defendants, Plaintiff's first specific request for documents regarding the lead plant came in Plaintiff's Seventh Request for

4

Production of Documents served on November 8, 2005.  (Id.).

On September 13, 2006, the court heard oral argument on the issues raised in Plaintiff's and Defendants' respective letters.  Said proceeding culminated in Magistrate Judge Arleo's September 20, 2006 Order (Docket Entry # 85) (the "September 20, 2006 Order")  that opened fact discovery with respect to a single issue – the lead plant.  This Order also compelled Defendants to produce a witness pursuant to Rule 30(b)(6) to testify about this single issue and the search for documents related to it.

In addition to the rulings embodied in the September 20, 2006 Order, the court made several unambiguous findings on the record.  First, the court found that this case should be moving forward toward trial and not backwards into fact discovery.  (Hr'g Tr. at 4:17-18, September 13, 2006 ("And here we are in September '06, in a case that should really be getting trial ready.")).  Next, the court refused to order a "wholesale reopening of discovery."  (Id. at 6:4-7 ("I'm not inviting a wholesale reopening of discovery as – as if this case was first filed.  But if there's a limited way to get reasonable discovery, I'll hear what you have to say.")).  Finally, the court acknowledged Plaintiff's decision to forego questioning regarding the lead plant in prior depositions.  (Id. at 21:16-25 ("And frankly, there was no follow up by the questioning lawyer about [the lead plant] issue at all.  He said, yeah, it appeared to be from the map, I don't know anything about it . . .")).

The court also gave unequivocal instructions regarding how the Rule 30(b)(6) deposition should proceed:

> I don't want – other than privilege, I don't want any objections, unless
> either side believes, or the lawyer deposing, or the lawyer defending

5

> believes that the lawyer is being so abusive, and so off the charts on
> relevancy, they have to call me in, and I'll decide.  And if I think a
> lawyer's acting abusive, I'll sanction them.

(Hr'g Tr. at 24:6-11, September 13, 2006).

Finally, the court reserved decision on at least two other discovery disputes.  After expressing an inclination to grant Plaintiff's request to supplement its expert reports– in the event that the Rule 30(b)(6) deposition uncovered new information – the court ultimately reserved. (Hr'g Tr. at 25:23-25, September 13, 2006 ("I want to reserve – I'm inclined to allow it based on if there's a new document and there's new deposition testimony that is going to supplement – that is relevant to the conclusions about the presence of lead on the site.")).  The court also reserved decision on Defendants' claim that Plaintiff's discovery responses were deficient.  (Id. at 29:6-8).

Contemporaneous with the court's consideration of the discovery dispute, the parties were in the process of submitting Daubert[5] motions.

**C.**     **The Present Discovery Disputes**

   **1.**     **Defendants' Compliance with the Court's September 20, 2006 Order**

In the dispute before the Magistrate Judge, Plaintiff claimed that Defendants failed to comply with the September 20, 2006 Order.  (See generally Plaintiff's October 30, 2006 Letter). According to Plaintiff, Defendants' Rule 30(b)(6) witness  – Mr. Anthony Filiaci ("Filiaci") of Amax Realty Development, Inc. – was not prepared to testify about the lead plant.   (Plaintiff's

---

[5] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)

6

October 30, 2006 Letter at 2).  In support of its position that Filiaci "knew nothing," Plaintiff cited portions of Filiaci's October 26, 2006 deposition transcript and recounted a litany of things Filiaci did not do to prepare for his deposition.  (Id. at 2).  Plaintiff proceeded to request sanctions against Defendants and an order compelling further diligence into the lead plant issue. (Id. at  4-5).  Plaintiff also sought leave to conduct additional depositions and to review certain databases maintained by Defendants and other non-party entities affiliated with Defendants.  (Id.).

Defendants characterized Plaintiff's October 30, 2006 Letter as "utterly disingenuous, inaccurate, and misleading."  (Letter from William S. Greenberg, counsel for Defendants, to court (November 1, 2006) (hereinafter "Defendants' November 1, 2006 Letter")).  To rebut Plaintiff's contention that Filiaci was unprepared, Defendants included a bullet point summary of their extensive efforts to prepare Filiaci.  (Id. at 2).  While Defendants took exception to Plaintiff's claim that Filiaci was not adequately prepared to testify concerning the lead plant, they conceded that Filiaci's testimony offered almost no new information.  (Id. at 6).  Defendants attributed this lack of information to the passage of time coupled with lack of information about the lead plant – as opposed to Filiaci's lack of preparation.  (Id.).

### 2.     The January 25, 2007 Oral Argument

On January 25, 2007, both parties appeared for oral argument before the Magistrate Judge regarding the pending discovery disputes.  At the outset, the court advised the parties that it considered the following issues, fully briefed, and ripe for adjudication: (1) Plaintiff's request to compel Defendants' compliance with the September 20, 2006 Order; and (2) Plaintiff's objection to Defendants' speaking objections at the October 26, 2006 deposition of Anthony Filiaci.  The

court further advised that it was not prepared to discuss certain other discovery disputes raised in the parties respective papers, including: (1) Plaintiff's request to supplement its expert reports; and (2) Defendants' allegations regarding Plaintiff's discovery deficiencies.

### 3.    Plaintiff's Request to Supplement Expert Reports

The court entered a January 25, 2007 Letter Order (Docket Entry #94) setting up a briefing schedule to facilitate disposition of Plaintiff's request to supplement expert reports in advance of the oral argument on the parties respective <u>Daubert</u> motions.  Said Letter Order also advised the parties that the court would entertain Defendants' request to supplement expert reports after ruling on Plaintiff's motion.

Pursuant to this January 25, 2007 Letter Order, Plaintiff sought to "supplement" the expert reports of Scott Stoldt, Kelly Stynes, Richard Cawley, and Robert Pearson.  (Letter from William A. Ruskin, counsel for Plaintiff, to court (February 1, 2007) (hereinafter "Plaintiff's February 1, 2007 Letter")).  Plaintiff further argued that new information uncovered at the Filiaci and Dittrich depositions coupled with Defendant's alleged failure to comply with this court's September 20, 2006 Order justified supplementation of the expert reports.  (<u>Id.</u> at 1-2).  Next, Plaintiff also pointed out that the October 24, 2003 Scheduling Order contemplated rebuttal expert reports upon a showing of good cause.  (<u>Id.</u> at 4).  Plaintiff also argued that supplementation would not delay the progress of this action toward trial.  (<u>Id.</u>).

With respect to expert Scott Stoldt, Plaintiff proposed extensive "supplementation." (Plaintiff's February 1, 2007 Letter at 2-3).  First, Plaintiff sought to "supplement, correct, and explain" a spreadsheet known as the Remediation Cost Table.  (<u>Id.</u> at 2).  Next, Plaintiff also

8

sought to supplement the Stoldt expert report to rebut statements made by Defendants' expert Rhodes.  (Id.).  Finally, Plaintiff sought to supplement Stoldt's expert report with expanded discussions of substantive areas like groundwater and aerial deposition.  (Id.).

With respect to the other four experts, Plaintiff proposed supplemental expert reports that rebut opinions expressed by Defendants' experts.  (Id. at 3-4).  Plaintiff proposed supplemental expert reports from Stynes and Cawley that rebut opinions expressed by Defendant's expert Rhodes regarding the presence of slag on the Site.  (Id. at 3).  Finally, Plaintiff proposed a supplemental expert report from Pearson that rebuts Defendant's expert Winges' opinion and includes an opinion regarding contamination of the Arthur Kill.  (Id. at 5).

For the most part, Defendants opposed Plaintiff's request to supplement.  (Letter from Joseph R. Scholz, counsel for Defendants, to court (February 6, 2007) (hereinafter "Defendants' February 6, 2007 Letter")).  In an apparent attempt to amicably resolve this discovery dispute, Defendants consented to limited supplementation.  (Id. at 2).  First, Defendants consented to Plaintiff's request to supplement Stoldt's expert report to include costs incurred by Plaintiff since January 2006.  (Id.).  Furthermore, Defendants also consented to supplemental expert reports  that discuss how newly disclosed evidence (namely certain NJDEP inspection reports and the testimony of Mr. Dittrich) provide further support for specific opinions already expressed in the prior expert reports.  (Id.).

In opposition to any further supplementation, Defendants identified the disconnect between Plaintiff's apparent basis for supplementation and the proposed supplemental reports. (Defendants' February 6, 2007 Letter at 3).  For example, Defendants pointed out that Plaintiff

cited the late disclosure of the Brief History Document as a development the compels "the issuance of a panoply of new expert opinions having nothing to do with the lead plant." (Id.). Finally, Defendants also discussed how allowing Plaintiff to issue supplemental expert opinions at this stage in the litigation would inflict great prejudice upon it by forcing it to re-depose Plaintiff's experts and re-file the pending Daubert motions. (Id. at 3-4).

After consideration of the parties' written submissions and oral argument on January 25, 2007[6], the Magistrate Judge, by memorandum and order dated February 8, 2007, denied Reichhold's informal motion to sanction Defendants and compel their compliance with the September 20, 2006 Order and granted, in part, Reichhold's request to re-open expert discovery to allow Reichhold to file a supplemental expert report of Scott Stoldt.

On February 9, 2007, the court held a Daubert hearing with respect to several motions by the parties seeking to preclude certain opinion and expert testimony. By opinion and order dated February 22, 2007, the court granted in part and denied in part, the motions.

Plaintiff now appeals that portion of the Magistrate's Order that denied Plaintiff's request for further discovery and to supplement its expert reports. Additionally, Plaintiff has filed a motion for leave to file a motion for reconsideration of certain rulings in the Daubert Opinion. For the reasons stated below, the Magistrate's Order will be affirmed in part and reversed in part, and Plaintiff's motion for leave to file a motion for reconsideration will be denied.

---

[6] At the January 25, 2007 oral argument, the Magistrate Judge only considered Reichhold's request to re-open fact discovery. The court decided the motion to supplement expert reports on the papers pursuant to Fed. R. Civ. P. 78.

# III.  DISCUSSION

## A.      Standard of Review

A Magistrate Judge's decision is to be overturned only when the ruling was clearly erroneous or contrary to law.  L.Civ.R.72.1(c)(1)(A).[7]  The burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal."  Marks v. Struble, 347 F. Supp. 2d 136, 149 (D.N.J. 2004).  A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law.  Gunter v. Ridgewood Energy Corp., 32 F. Supp. 2d 162, 164 (D.N.J. 1998).

Where an appeal seeks review of a matter within the exclusive purview of the Magistrate Judge, such as a discovery dispute, an even more deferential standard, the "abuse of discretion standard" must be applied.  Port Auth. v. Affiliated FM Ins. Co., 2001 U.S. Dist. LEXIS 7579, at *5 (D.N.J. March 29, 2001).  "Where a magistrate judge is authorized to exercise his or her

---

[7] L.Civ.R.72.1(c)(1)(A) states:

> Any party may appeal from a Magistrate Judge's determination of a non-dispositive matter within 10 days after the party has been served with a copy of the Magistrate Judge's order . . . .  A Judge shall consider the appeal and/or cross-appeal and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law.

discretion, the decision will be reversed only for an abuse of discretion." Id. (citing Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 119, 127 (D.N.J. 1998); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 177 F.R.D. 205, 214 (D.N.J. 1997)). "This test displays considerable deference to the determination of magistrates in such matters." Id. (quoting 7 Moore's Federal Practice P 72.03 (7.-3) at 72-42 (1989)).

**B.**     **The 30(b)(6) Witness and Lead Plant Documents**

      **1.**     **The Magistrate Judge's Determination Regarding Defendants' Compliance with the September 20, 2006 Order**

The September 20, 2006 Order compelled Defendants to produce a witness pursuant to Rule 30(b)(6) to testify about the lead plant and the search for documents related to it.  The Magistrate Judge held that Defendants complied with the September 20, 2006 Order, finding that Defendants' effort to prepare Filiaci for his deposition met the standard under Rule 30(b)(6). (Magistrate's Order at 9).

Specifically, the Magistrate Judge, relying on Defendants' November 1, 2006 letter to the court (the "November 1, 2006 Letter") and Filiaci's deposition testimony, found that: (1) Defendants searched electronic and paper databases maintained in Carteret, New Jersey and Phoenix, Arizona for lead plant documents; (2) Defendants designated two former employees to interview other former employees concerning the lead plant before reporting back to Filiaci; and (3) Filiaci reviewed the universe of documents regarding the lead plant before attending his deposition.  (Magistrate's Order at 10).  The Magistrate Judge added:

> Mr. Filiaci's failure to offer elaborate details about the operations that took place over fifty years ago is not remarkable.  Defendants' failure

12

to uncover more information is the consequence of the passage of
time as opposed to its own evasive conduct.

Id.

_____Federal Rule of Civil Procedure 30(b)(6) states, in relevant part, that a corporation:

> shall designate one or more officers, directors, or managing agents,
> or any other persons who consent to testify on its behalf, and may set
> forth, for each person designated, the matters on which the person
> will testify. . . . The persons so designated shall testify as to matters
> known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6).

Plaintiff argues that the Magistrate Judge's ruling is clearly erroneous in that she relied in

large part on representations by Defendants that were "exaggerated, at best."  (Pl.'s Br. 10).

Plaintiff contends that a careful review of the bullet points in the November 1, 2006 Letter and

Filiaci's deposition testimony show that Defendants failed to comply with Rule 30(b)(6) and that

Defendants "continuously obstructed the deposition with coaching objections, speeches and

constant interruption."  (Pl.'s Br. 10-11).

Plaintiff describes the bullet points in the November 1, 2006 Letter as "window dressing"

and attacks each point.  First, Plaintiff argues that Filiaci's review of lead plant drawings fails to

address defendant's diligence in conducting their search for responsive documents.  Plaintiff

contends that despite being the record custodian, Filiaci could not state: (1) when he had first

seen of learned of the Brief History Document; (2) why the Brief History Document did not

surface at the first search review for documents; and (3) where the Brief History Document was

maintained by the corporation or how it came to light.

13

Filiaci's deposition testimony reveals that although he could not recall the exact date when he first saw or learned of the Brief History Document, he states that "it would have to be some time when we submitted the supplement of the First Set of Interrogatories, you know, in response to the second set of Interrogatories.  I just – I don't remember the dates."  (Filiaci Dep. 31).  In response to a question as to why it didn't surface at the first search review for documents, Filiaci states that the Brief History Document may have been "tucked away somewhere in my former employee's office, you know, Mr. Hemsel, who [w]as the accounting controller."  (Filiaci Dep. 31-32).  Finally, when asked where the Brief History Document was kept, Filiaci states that "[i]f anything it would have been kept within the files of his office, but I don't know for certain." (Filiaci Dep. 32).  This line of questioning, which Plaintiff argues shows that Defendants failed to properly prepare their witness, went only to one specific document - the Brief History Document.  Based on the September 20, 2006 Order, this document is just one document on which the witness was to testify.  ("[D]efendants shall produce a witness . . . to testify concerning . . . the search by defendants for all documents and information relating to said lead plant . . . .") (September 20, 2006 Order at 1) (emphasis added).  Indeed, many other questions regarding lead plant documents were asked and answered by Filiaci at his deposition.

Second, Plaintiff argues that "[r]eviewing the deposition testimony of other fact witnesses, none with any knowledge of a lead plant, could not and did not assist Filiaci in responding to questions or in determining whether or where defendants maintained relevant documents."  (Pl.'s Br. 11).  This argument is irrelevant.  Clearly, if the depositions of the fact witnesses contained relevant information regarding the lead plant, this would have assisted Filiaci in responding to Plaintiff's deposition questions.  The fact that these witnesses did not

14

have any knowledge of the lead plant does not demonstrate that Defendants failed to comply with Rule 30(b)(6).

Third, Plaintiff claims that Filiaci, contrary to Defendants' assertion in the November 1, 2006 Letter, only spoke with one former USMR employee, Eugene Deutsch, who they contend denies any knowledge of the lead plant. Plaintiff also argues that Filiaci never testified that he interviewed Robert Hemsel in preparing for the deposition. Defendants argue that Filiaci "in fact spoke directly about the lead plant with two former USMR employees about the lead plant, Mr. Deutsch and Mr. Hemsel . . ." (Defs.' Br. 14).

It appears from Filiaci's testimony that he did in fact speak with both Deutsch and Hemsel. There is no question that Filiaci spoke with Deutsch prior to the deposition. The fact that Deutsch did not have any knowledge regarding the lead plant does not mean that Defendants failed to comply with Rule 30(b)(6). As for Hemsel, when asked whether he had spoken to any former or current USMR employee, Filiaci stated, "The only other person would have been my former accountant if he had any knowledge and which he didn't and that's it. I don't know of any former employees who would have had knowledge of the lead plant operation." (Filiaci Dep. 36-37). Thus, it appears from Filiaci's testimony that in fact he did speak with the former company accountant.

Fourth, Plaintiff argues that "Filiaci conducted no interviews (other than meeting with counsel) in preparation for his deposition . . ." (Pl.'s Br. 12) and that Defendants' investigation was not conducted by Filiaci, but by Deutsch, who was not a corporate designee. They also contend that "[w]hatever information Filiaci was provided was filtered through counsel."

15

Defendants argue that there is no requirement that all of the interviews be conducted by the company's Rule 30(b)(6) witness and that the results of the interviews were imparted to Filiaci directly.  (Defs.' Br. 14).

Because Rule 30(b)(6) does not require that the corporate designee personally conduct interviews, and requires only that he "testify as to matters known or reasonably available to the organization," Defendants have not failed to comply with the Rule.

Fifth, Plaintiff argues that bullets five and six of the November 1, 2006 Letter "are not indicative of preparation by Filiaci for his deposition."  (Pl.'s Br. 13).  Those bullets state:

  •    Mr. Deutsch did so [interviewed former Amax and USMR employees] at the company's request to help prepare Filiaci for his deposition.
  •    None of these former employees had any knowledge concerning the lead plant, and that the results of the interviews were shared with Mr. Filiaci.

(November 1, 2006 Letter at 2).  Although these statements do not describe affirmative acts of preparation by Filiaci, they relate to the interviews of former Amax and USMR employees about their knowledge of the lead plant.

Sixth, Plaintiff points to Defendants' counsel's statement in the November 1, 2006 Letter that defendants "conducted an extensive computer and manual search of their records stored in Carteret and in Phoenix, Arizona . . ."  (November 1, 2006 Letter at 2).  Plaintiff argues that after testifying to the existence of a "data base,"  Defendants' counsel objected to plaintiff's counsel referring to those documents being "on computer."  Additionally, Plaintiff contends that Filiaci was "not able to state whether a 'van load of documents that went out six or eight months ago'

from Carteret were reviewed by counsel or incorporated into the database in Phoenix."  (Pl.'s Br. 14).

Plaintiff argues that in evaluating the degree to which Defendants complied with Rule 30(b)(6), it is important to keep in mind the corporate relationships and history among the parties.  Plaintiff states that USMR is a wholly owned subsidiary of Cyprus Amax Minerals Corporation ("CAMP"), which is owned by Phelps Dodge.  Plaintiff claims that "[a]s CAMP's corporate offices are (or were) located in Colorado, many documents relevant to the Site's environmental issues were generated, received, reviewed, moved to and/or housed in Colorado after 1993."  (Pl.'s Br. 14).  Plaintiff argues that in preparation for his deposition, "Filiaci made no effort to investigate whether there were any documents relevant to the lead plant issue housed in Colorado, or speak to Darling [CAMP's Director, Environmental Affairs who executed the 1994 Settlement Agreement], or to otherwise learn the extent of CAMP's knowledge and understanding as to issues in the 30(b)(6) notice."  (Id. at 15).

Finally, Plaintiff argues that Defendants' counsel "improperly delegated its responsibilities to identify documents to a non-party, Phelps Dodge, which has neither appeared before this Court nor is subject to its jurisdiction."  (Id.).  Plaintiff contends that "we know only that a van loaded with USMRC documents was shipped to Arizona, and that certain individuals, none of whom are parties before the Court, reviewed both electronic and paper documents."  (Id. at 16).  Plaintiff claims that it has not received any information regarding how the database was searched and that it "has not been informed as to whether any documents were located through searches of the database in Arizona, and whether such documents were produced."  (Id.).  Plaintiff maintains that it is evident from Filiaci's testimony that "he had no clue whether CAMP

17

had any relevant lead plant documents let alone other documents requested by plaintiff in this case although he was its deposition designee." (Id.).

At his deposition, Filiaci testified that the document search for lead plant documents was conducted by counsel for Defendants, as well as the legal department for Phelps Dodge Corporation in Phoenix. (Filiaci Dep. 40-41, 74-75). Filiaci further testified that the documents that were sent to Phoenix were searched using a "TRIM database search" and that no documents regarding the lead plant were found. (Id.).

In reviewing the entire record, and in light of the considerable deference to the determination of magistrates in discovery matters, the court finds that the Magistrate Judge's determination was not clearly erroneous, and she did not abuse her discretion.

## 2.   The Magistrate Judge's Determination Regarding Plaintiff's Request to Pursue Further Discovery Regarding the Lead Plant

In the Magistrate's Order, the Magistrate Judge denied Plaintiff's request to conduct further fact discovery regarding the lead plant. Specifically, the court found that pursuant to Fed. R. Civ. P. 26(b)(2)(C)(ii), Plaintiff had "ample opportunity" to obtain information about the lead plant. (Magistrate's Order at 12). The court found that at oral argument Defendant presented documents from Plaintiff's own production referring to the lead plant, and that despite this knowledge, Plaintiff chose to forgo any extensive deposition questioning regarding the plant. (Id.). Additionally, the court noted that the September 20, 2006 Order, while acknowledging Plaintiff's lack of diligence in pursuing information regarding the lead plant, gave Plaintiff yet another opportunity to do so. (Id.). Finally, the court found that pursuant to Rule 26(b)(2)(C)(iii), the burden of pursuing further information about the lead plant was far

18

outweighed by any potential benefits.  (Id.).

Plaintiff argues that "the Court misread the circumstances largely based upon defendants'
misleading statements; and partly based upon the Court's erroneous finding that defendants had
complied with the Court's September 20 Order." (Pl.'s Br. 17).  Plaintiff claims that it asked
every witness about the lead plant, but did not get any answers.  (Id.).  As to the Brief History
Document, Plaintiff contends that soon after the document was produced, Defendants amended
one of their responses to the First Set of Interrogatories to state that a lead plant had operated on
the Site.  (Id. at 18).  Plaintiff argues that if it could have developed evidence regarding the lead
plant prior to the middle of 2006, it would have and that because the Brief History Document and
the interrogatory amendment were served after the close of discovery, Plaintiff did not have
"ample opportunity" to investigate the issue.  (Id.).[8]

Plaintiff also contends that the Magistrate Judge's Rule 26(b)(2)(C)(iii) finding was
erroneous because the Magistrate Judge assumed that defendants already complied with their due
diligence obligations to search for, review, and produce responsive documents and that Filiaci's
testimony demonstrates the fallacies of that assumption.  (Pl.'s Br. 19).  Plaintiffs suggest that
Defendants should be required to search their facilities for documents, verify the searches
performed by Phelps Dodge, and produce a proper 30(b)(6) witness.  (Id.).  Plaintiff argues that
this burden would not be particularly significant in light of the critical importance of information
regarding the lead plant.  (Id.).  Having already found that the Magistrate Judge did not abuse her

---

[8]Plaintiff also added, by way of a footnote, that Plaintiff might have had ample
opportunity to obtain information if Defendants had complied with their 30(b)(6) obligations.
Having found that Defendant did comply, the court need not elaborate on this argument.

19

discretion in this regard, Plaintiff's argument is unpersuasive.

Finally, Plaintiff contends that because the amount in controversy is millions of dollars, because Defendants have more resources, and because Defendants have not acted diligently, this militates in favor of further discovery. The court disagrees. The record is clear that Plaintiff has had "ample opportunity" to conduct discovery and that the burden of pursuing additional discovery concerning the lead plant outweighs any potential benefits. Thus, the Magistrate Judge's ruling will be affirmed.

**3.     The Magistrate Judge's Determination Regarding Plaintiff's Objection to Defendant's Speaking Objections**

The Magistrate Judge found that Plaintiff's objections to Defendant's speaking objections at the October 26, 2006 deposition were out of time. The court found that at the September 13, 2006 oral argument , the court ordered the parties to immediately advise the court, via telephone concerning any obstructionist conduct during the deposition. (Magistrate's Order at 20). The court held that because Plaintiff did not object to counsel's conduct until after the deposition, Plaintiff's objection was time-barred. (Id.).

Plaintiff contends that the Magistrate Judge's ruling was erroneous because Judge Arleo's September 13, 2006 instruction was not clear-cut. (Pl.'s Br. 21). Plaintiff contends that because the instruction arose from a discussion directed to Plaintiff's counsel admonishing him to adhere to the permitted topics of questioning, Plaintiff's counsel understood the instruction to call the court to be addressed to Defendants' counsel. (Id.). Plaintiff argues that this understanding, coupled with the fact that plaintiff's counsel immediately prepared a letter discussing the alleged deposition deficiencies, should have been enough to preserve the issue for adjudication.

Judge Arleo's September 13, 2006 instruction states:

> I don't want - - other than privilege, I don't want any objections,
> unless either side believes, or the lawyer deposing, or the lawyer
> defending believes that the lawyer is being so abusive, and so off the
> charts on relevancy, they have to call me in, and I'll decide.  And if
> I think a lawyer's acting abusive, I'll sanction them.

(Hr'g Tr. 24:6-11, September 13, 2006).  Because this instruction clearly was directed at both

parties, and Plaintiff failed to follow Judge Arleo's instruction, the Magistrate Judge did not

abuse her discretion in barring Plaintiff's objection.

**C.**     **The Magistrate Judge's Determination Regarding Plaintiff's Request to Supplement Expert Reports**

In Plaintiff's request to supplement its expert report, Plaintiff sought to supplement the

expert reports of Scott Stoldt, Kelly Stynes, Richard Cawley, and Robert Pearson.  The

Magistrate Judge denied the request to supplement the reports of Stynes, Cawley, and Pearson

and granted Plaintiff's request, in part, as to Stoldt.  The Magistrate Judge ruled that:

> Plaintiff can correct certain ministerial errors related to its
> "Remediation Cost Table" and discuss how the March 2006 NJDEP
> letter relates to Stoldt's previously stated opinion about responsibility
> for metals in groundwater . . . Stoldt's supplemental report **must not
> expand** upon earlier stated opinions or rebut Defndants' [sic] experts'
> opinions.

(Magistrate's Order at 17).  As to the remaining "experts," the court found that "the proposed

supplementation goes well beyond the standard set forth in Rule 26(e)(1) . . . [and that] Plaintiff

conflates the definition of 'supplemental' with the definition of 'rebuttal' by describing expert

reports that 'address' or 'respond' to Defendants' experts' opinions."  (Id.).

Plaintiff contends that the Magistrate Judge's findings were incorrect and that it should be entitled to supplement its expert reports. The thrust of Plaintiff's argument can be best understood from the following passage from its brief:

> Plaintiff originally served expert reports from five experts; prior to receiving defendants' expert reports . . . before the Brief History was produced; in advance of production of the USEPA FOIA documents; in the nascent stages of the dialogue with, and testing at the direction of, the NJDEP which now indicates that the New Jersey Attorney General believes Reichhold will be held at least partially responsible for natural resource damage arising from metals contamination of the adjacent Arthur Kill; and prior to the October 2006 reopened fact discovery period. Plaintiff now seeks to supplement certain of its expert reports to account for the additional information obtained, and resulting shift in focus, since the initial reports were completed; and, in some cases, to correct errors and address perceived errors identified by defendants' experts and/or counsel.

(Pl.'s Br. 22). Plaintiff argues that the Pennypack[9] factors tilt in favor of supplementing the reports and argues that: (1) there has been no prejudice nor surprise to Defendants with respect to their request; (2) defendants would have the opportunity to cure any perceived prejudice; (3) the likelihood of disrupting an orderly and efficient trial is very small; and (4) there is no question of bad faith on the part of Plaintiff. (Id. at 23-24).

In its present application, Plaintiff seeks to overturn the Magistrate Judge's decision as it relates to Pearson and Cawley.[10] Additionally, Plaintiff adds, in its reply brief, that Plaintiff should be permitted to submit a supplemental report for Stoldt, beyond that permitted by the

---

[9]Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894 (3d Cir. 1977)

[10]In its initial brief, Plaintiff also sought to supplement the report of Stynes. However, in light of this court's Daubert Opinion, which excluded her testimony as an expert, Plaintiff withdrew its motion as to supplementing her report. (See Pl.'s Reply at 8 n.4).

Magistrate Judge.  Because the court will not consider arguments raised for the first time in a

reply brief, this argument will be disregarded.  Kedia v. Jamal, No. 06-6054, 2007 WL 1147059,

at *2 (D.N.J. April 18, 2007) (citing Dana Transp., Inc. v. Ableco Fin., LLC, No. 04-2781, 2005

WL 2000152, at *6 (D.N.J. Aug. 17, 2005)).

> **1.      The Supplement of Robert Pearson**

In Plaintiff's February 1, 2007 letter to the Magistrate Judge, Plaintiff described its

proposed supplement to Pearson's report as follows:

> Robert Pearson's supplemental expert report addresses defendant
> expert Winges' contention that Pearson failed to sufficiently quantify
> levels of airborne metals contamination migrating from USMRC's
> property to the Site.  Pearson relies on air emission data generated by
> USMRC in the 1980's; EPA FOIA documents referred to earlier; and
> the Dittrich testimony.  Equally important, Pearson's opinion will be
> critical to Reichhold's assertion that USMRC is liable to Reichhold
> for past and future costs attributable to Natural Resource Damages
> ("NRD") in the Arthur Kill, a waterway adjacent to the Site.  The
> New Jersey Attorney General advised Reichhold's counsel in mid-
> 2006 that the State may assert an Arthur Kill NRD claim against
> Reichhold.  Reichhold had no knowledge of an NRD claim when its
> experts prepared their initial reports.  For the past year, plaintiff has
> made several supplemental document productions to defendants to
> keep them apprised of the ecological evaluations NJDEP has directed
> plaintiff to perform on the Site property adjacent to Arthur Kill,
> which data the State may consider in connection with any NRD
> claim.   Pearson's supplemental report will examine inter alia
> USMRC's contamination of the Site and the Arthur Kill.

The Magistrate Judge found that "the proposed supplementation goes well beyond the

standard set forth in Rule 26(e)(1)" and that Plaintiff "proposes one 'supplemental' expert report

that offers an opinion regarding an entirely new claim for damages arising out of contamination

in the Arthur Kill."  (Magistrate's Order at 17).

Plaintiff contends that the "supplemental air modeling to be submitted by Pearson is critical to enhance the trier of fact's understanding of Pearson's earlier report and the central issue regarding the extent of aerial deposition on both the Site and the Arthur Kill." (Pl.'s Br. 25). Plaintiff claims that the Magistrate Judge's ruling was erroneous because it was based on a misunderstanding of the significance of the areas to be supplemented. (Id.).

Plaintiff contends that the reason Pearson did not previously opine on the contamination of the Arthur Kill is that the New Jersey Attorney General only advised Reichhold in mid-2006 that it plans to assert a NRD claim against Reichhold. (Id. at 26). Plaintiff argues that such a claim by the State is part of the declaratory judgment claims in the Complaint and that the claim was speculative before the Attorney General's discussion with counsel. (Id.). Plaintiff contends that although it "was asked to assess ecological impacts and perform metals sampling in the sediments on the BTL Parcel in the vicinity of the Arthur Kill earlier in the discovery process, those requests did not gel into a cognizable claim until the Attorney General advised Reichhold in 2006 that it would likely be making a NRD claim." (Pl.'s Reply 5).

Additionally, Plaintiff contends it was error to deny its request to supplement Pearson's report with respect to defendant's expert, Kirk Winges. In the supplement, Plaintiff seeks to incorporate EPA FOIA documents obtained in 2006 and the Dittrich testimony to quantify levels of airborne contamination migrating from Defendants' property to the Site. (Pl.'s Reply 4). Plaintiff argues that Pearson's failure to quantify the deposition of emissions on the Site was a "perceived error and that a model quantifying aerial deposition would assist the trier of fact immeasurably." (Pl.'s Br. 26).

24

Under the Pennypack factors, Defendants argue that "Reichhold's request to issue an entirely new expert opinion concerning metals in the Arthur Kill, a highly complex subject, would be particularly prejudicial and would cause a significant delay." (Defs.' Br. 26). Furthermore, Defendants assert that Reichhold's proposed cure - additional depositions and Daubert briefing - would aggravate the prejudice. (Id. at 26-27). Finally, Defendants argue that the submission of the proposed expert testimony would delay trial of the case (Id. at 27).

Defendants argue that is it too late for Reichhold to submit an opinion concerning the Arthur Kill. (Id. at 29). They contend that Reichhold has known of its potential obligations with respect to metals in the Arthur Kill since at least March 2005, well before it submitted its expert reports in January 2006. (Id.). Defendants also argue that Pearson's new opinion on airborne metals "is impermissible rebuttal based on information already in Reichhold's possession (the USMR air emission data) and information that was readily available to Reichhold (the EPA FOIA documents and Dittrich testimony) when Dr. Pearson issued his first report." (Id. at 28-29).

The court finds that the Magistrate Judge should have allowed Plaintiff's request to supplement Pearson's report to include an opinion concerning the contamination of the Arthur Kill. Although this requested supplement is characterized as "an opinion regarding an entirely new claim for damages . . ." (Magistrate's Order at 17), this supplement addresses Plaintiff's claim for declaratory judgment relief requested in the Complaint. Furthermore, because it is uncontested that the New Jersey Attorney General only advised Reichhold in mid-2006 that it plans to assert a NRD claim against Reichhold, Reichhold will be permitted to supplement Pearson's report with respect to the Arthur Kill.

Similarly, Plaintiff should have been permitted to supplement Pearson's report with respect to the quantity of airborne metals contamination that migrated from Defendants' property to the Site. Although characterized as "rebuttal," (Magistrate's Order at 17), the proposed supplement addresses an important issue on which Pearson did not have the data to opine at the time of his original report, i.e., the quantity of particles that reached the Site. In the Daubert Opinion, the court allowed Pearson's report even though he could make only qualitative estimates of the amount of airborne particles deposited onto the Site based on his lack of sufficient data. (Daubert Opinion at 23). Now, having received additional information from EPA FOIA documents obtained in 2006 and the Dittrich testimony, Plaintiff should and will be permitted to supplement the incomplete report. Any prejudice to Defendants can be cured by the allowance of further depositions.

## 2.    The Supplement of Richard Cawley

Plaintiff contends that the court should allow the supplemental report of Richard Cawley so that he can "respond[ ] to the unexpected and patently implausible claim that USMRC never placed slag on the undeveloped northern portion of the Site." (Pl.'s Br. 28). Plaintiff contends that the proposed addition is a supplement but argues that even if the court finds the addition to be a rebuttal, there would be no prejudice to Defendants. (Id. at 28-29).

The court finds that the Magistrate Judge did not abuse her discretion in denying Plaintiff's request to supplement the report. The proposed "supplement" aims to respond to Defendants' claims and thus does not fall within the standard set forth in Rule 26(e)(1), which allows supplementation only if the information is incomplete or incorrect.

D.    <u>Plaintiff's Motion For Leave to File a Motion for Reconsideration of the Daubert</u>
<u>Opinion</u>

In addition to its appeal of the Magistrate Judge's decision, Plaintiff has filed a motion for

leave to file a motion for reconsideration of certain rulings in the <u>Daubert</u> Opinion related to its

expert, Scott Stoldt.

"A motion for reconsideration shall be served and filed within 10 business days after the

entry of the order or judgment on the original motion by the Judge or Magistrate Judge."

L.Civ.R. 7.1(i).  On March 14, 2007, the tenth business day following the entry of the <u>Daubert</u>

Order, Plaintiff's counsel telephoned the court and requested an extension to file a motion for

reconsideration of the <u>Daubert</u> Opinion and Order.  Plaintiff's counsel was advised that it was

free to file the motion on March 14, 2007.  Plaintiff's counsel was also advised that if it chose

not to file on March 14, 2007, it was free to file a motion for leave to file a motion for

reconsideration out of time.  Having chosen the latter, Plaintiff filed the current motion on March

16, 2007.

Any Local Rule "may be relaxed or dispensed with by the Court if adherence would result

in surprise or injustice."  L.Civ.R. 83.2(b).  However, '[t]o the extent that L.Civ.R. 7.1(i) may be

considered to be an analog of Fed. R. Civ. P. 59(e) . . . the 10-day period for filing a motion

under Fed. R. Civ. P. 59(e) cannot be enlarged by the court, the provisions of L.Civ.R. 83.2(b)

notwithstanding."  *LITE, N.J. FEDERAL PRACTICE RULES, Comment 6(b)(2) to L.Civ.R. 7.1(i)*

*(GANN)*.  This court has consistently considered L.Civ.R. 7.1(i) to be an analog of Fed. R. Civ. P.

59(e).  <u>See</u>  <u>Flowers v. Schultz</u>, Civ. No. 07-0045 (JBS), 2007 WL 1186312, at *1 n.1 (D.N.J.

April 19, 2007); <u>United States v. Trenk</u>, Civ. No. 06-1004 (MLC), 2007 WL 174327, at *2

(D.N.J. Jan. 22, 2007); <u>Bey v. Cathel</u>, Civ. No. 00-1155 (JAG), 2006 WL 1281418, at *1 (D.N.J. May 9, 2007).

Plaintiff contends that no prejudice would result in providing it additional time beyond the permitted 10 days to file its motion for reconsideration and notes that no dates have been set for trial or submission of a pre-trial date.  Plaintiff contends that the need for additional time is " the result of a unique confluence of circumstances presented by the instant motion and the . . . [appeal of the Magistrate's Order and] is not due to any dilatory conduct in the prosecution of this case."  (Pl.'s Br. 5).  Plaintiff argues that "[g]iven the length of the Daubert Opinion and the complexity of the underlying technical issues in this case, it has taken time to fully unravel the relationship between the Daubert Opinion and the . . . [appeal of the Magistrate's Order] and to appreciate its potentially negative impacts on Plaintiff's presentation of evidence at trial."  (<u>Id.</u> at 5-6).

Given (1) Plaintiff's failure to articulate any surprise or injustice that would result in the court's adherence to L.Civ.R. 7.1(i); and (2) the court's consideration of L.Civ.R. 7.1(i) as an analog to Fed. R. Civ. P. 59(e), the court will deny Plaintiff's motion for leave to file a motion for reconsideration.

The court further notes that the basis of the majority of Plaintiff's motion for reconsideration is dependent on a supplementation of Stoldt's report.  As the court has already disregarded any arguments with respect to the supplementation of Stoldt's report, any motion for reconsideration would likely be denied.

## IV.  CONCLUSION

For the reasons set forth above, the Magistrate's Order will be affirmed in part and reversed in part, and Plaintiff's motion for leave to file a motion for reconsideration will be denied.  The court will enter an order implementing this opinion.


/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:        May 8, 2007

29