**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------

REICHHOLD, INC.,                          :
                                          :
                   Plaintiff,       :          Civ. No. 03-453 (DRD)
                                          :
         v.                    :
                                          :
UNITED STATES METALS REFINING            :          **O P I N I O N**
COMPANY, et al.,                          :
                                          :
              Defendants.        :
                                          :

-------------------------------------------------------


EPSTEIN BECKER & GREEN, P.C.
William A. Ruskin, Esq.
Sheila Woolson, Esq.
Aime Dempsey, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003

*Attorneys for Plaintiff Reichhold, Inc.*



McCARTER & ENGLISH, LLP
William S. Greenberg, Esq.
Keith E. Lynott, Esq.
J. Forrest Jones, Esq.
Joseph R. Scholz, Esq.
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07101-0652

*Attorneys for Defendants United States Metal Refining Company, et al.*

**DEBEVOISE, Senior District Judge**

Plaintiff, Reichhold, Inc. ("Reichhold"), commenced this action on January 31, 2003

requesting legal and declaratory relief against United States Metals Refining Company

("USMR") pursuant to the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, as amended by the Superfund Amendments

and Reauthorization Act of 1986, Pub. L. 99-499, 100 Stat 1613 (1986); and the New Jersey Spill

Compensation and Control Act (the "Spill Act"), N.J. Stat. Ann. §§ 58:10-23.11 to 23.11(2).

Reichhold later filed an amended complaint, adding Cyprus-Amax Minerals Company and

related entities ("Cyprus-Amax") as defendants.  (USMR and Cyprus-Amax will be collectively

referred to as "Defendants.")

Reichhold moves for partial summary judgment that Defendants are liable under § 107 of

CERCLA and the Spill Act.  Defendants move for summary judgment that all of Reichhold's

claims are barred by a 1994 settlement agreement between the parties or are barred by the

applicable statutes of limitations and must therefore be dismissed.  Because there are issues of

material fact, as set forth below, both motions will be denied.

## I.  BACKGROUND

### A.    The Site

From the early years of the twentieth century to the mid-1980s, USMR operated a copper

smelter and refinery in Carteret, New Jersey.  USMR also operated a lead plant on its property in

Carteret between 1931 and 1952.  In connection with its operations on its property in Carteret,

USMR produced slag and stockpiled bulk material, including slag, on at least the southern portion of its property.  In June 1960, USMR sold the extreme western portion of its property in Carteret, comprised of approximately 40 acres, to Reichhold (the "1960 Sales Contract").  The sale included two parcels: (1) a southern parcel located between the Arthur Kill and a parcel of land owned by The Central Railroad Company of New Jersey, and (2) another parcel of land located north of The Central Railroad Company's property.  The 1960 Sales Contract included a provision which allowed USMR one year to remove "Stockpiled Materials" from the site:

> Seller shall have the right during a period of one year from the date of closing hereunder to enter the premises at any time and from time to time to remove therefrom any of that part of the Business Property constituting bulk materials stored on the premises and listed on a list entitled "Stockpiled Materials" attached hereto as Annex "B" . . . . Seller shall not be under any obligation to remove any of such materials and shall not be under any obligation to grade or resurface in any manner any areas from which any such materials are removed.  At the expiration of one year from the date hereof, all such materials not so removed shall become the property of the Purchaser.

Annex B of the 1960 Sales Contract listed the following as "Stockpiled Materials:"

| | |
|---|---|
| Zinc Oxide | 5400 T |
| Insulated Wire | 500 T |
| | |
| Anode Ashes | 760T |
| Misc. Cu Bearing | 1930 T |
| Smelter Insulation Ashes | 1900 T |
| Sea Sand | 1050 T |
| Disputada Concentrates | 1075 T |
| Anode Slag | 660 T |
| Coke | 1200 T |

Reservoir Mud-Mould Wash          100T

Granulated Slag                   approx. 300 T

At about the same time Reichhold purchased the property from USMR, it also acquired The

Central Railroad Company's property and merged the three parcels (collectively, "the Site").

After over two decades of operating its chemical production facilities, Reichhold sold all

of its operations and property in Carteret in a sequence of two transactions beginning in 1986.

That year, Reichhold sold its phenolic resin plant, and most of the southern portion of the Site, to

BTL Specialty Resins Corporation (the "BTL Parcel").  Shortly thereafter, Reichhold sold its

plasticizer plant and related property to the Staflex Specialty Esters unit of the Denka Chemical

Corporation (the "Staflex Parcel").

The parties do not dispute that slag currently remains exposed at ground surface near the

shoreline of the Arthur Kill, but Defendants dispute Reichhold's allegation that such slag was a

result of USMR's operations.

**B.      The Cleanup Plan**

Reichhold's sale of the Staflex Parcel and the BTL Parcel triggered obligations under

New Jersey State law, now known as the Industrial Site Recovery Act, N.J. Stat. Ann. § 13:1K-6

et seq. ("ISRA").  Reichhold became obligated to investigate possible environmental

contamination at the Site and to remediate such contamination.  Reichhold began its

investigation and evaluation of the Site with the submission of a General Information Statement

and a Site Evaluation Statement in 1986, as required by ISRA.  NJDEP investigated the Site

itself and engaged in a lengthy dialogue with Reichhold, which included many iterations of the

4

plan to remediate the contamination at the Site.  In June 1991, Reichhold submitted a proposed

Cleanup Plan to NJDEP (the "June 1991 Cleanup Plan").  In December 1991, NJDEP responded

to Reichhold regarding the June 1991 Cleanup Plan.  In its response, NJDEP approved some

parts of the June 1991 Cleanup Plan, identified the areas of the plan which were unsatisfactory,

and described how Reichhold could remedy the deficiencies.  In February 1992, Reichhold

submitted an Amendment to the June 1991 Cleanup Plan.  NJDEP responded with a letter of

May 15, 1992 and Reichhold submitted a response on June 10, 1992.  On August 21, 1992,

NJDEP sent Reichhold a letter in which it approved "the above referenced Cleanup Plan . . . as

conditioned below."  The subject line of the letter identified the "Cleanup Plan" as follows:

"Cleanup Plan Dated: June 28, 1991, Amended February 3, 1992, Draft Cleanup Plan response

June 10, 1992, March 15, 1988 Cleanup Plan Addendum."  There is not a single, integrated

document that contains the entire Cleanup Plan.  Rather, the Cleanup Plan seems to be a

collection of various documents prepared by or on behalf of Reichhold and documents prepared

by the NJDEP.

## C.    The Settlement Agreement

    After the NJDEP approved the Cleanup Plan, Reichhold approached USMR seeking

financial contribution for cleanup of the Site.  Reichhold and Cyprus-AMAX, USMR's then-

parent corporation, entered into a settlement agreement and release with an effective date of May

25, 1994 (the "Settlement Agreement").  Under the Settlement Agreement, Cyprus-AMAX

(defined to include its subsidiaries, and thus USMR) paid Reichhold $325,000 in exchange for

Reichhold's covenant not to sue Cyprus-AMAX "with regard to the Site or Hazardous

Substances at or beneath the Site."  (Settlement Agreement ¶ 2.)  In addition to the covenant not

5

to sue, Reichhold further agreed "to cover the exposed Slag on the Site in the area depicted on

Figure 6.05 of the June 1991 Cleanup Plan . . . in a manner approved" by the NJDEP.  (Id.)

The Settlement Agreement, however, did not foreclose every possible claim by Reichhold

against Defendants related to cleanup of the Site.  It contained a Re-Opener Provision, which

described the claims from which Reichhold did not release the Defendants.  The parties defined

"New Environmental Obligations" as "new legal obligations (including, but not limited to

directives or orders) to investigate, remediate or otherwise address Hazardous Substances at,

beneath or migrating from the Site imposed upon Reichhold or to which Reichhold first becomes

subject subsequent to the Effective Date."  (Settlement Agreement ¶ 1(C).)  The Re-Opener

Provision defines with particularity the New Environmental Obligations that were subject to re-

opening.  It states, in relevant part:

> 3.      Re-Opener or Non-Released Matters
>
> Reichhold does not release Cyprus-AMAX from any claims, of any kind or any nature, arising from the following circumstances:
>
> A.      Material New Environmental Obligations imposed by federal, state or local governmental authorities to the extent arising out of: (1) Material changes in law (including federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies) promulgated subsequent to the Effective Date, including, but not limited to: (i) Material new cleanup standards imposed by governmental authorities subsequent to the Effective Date; (ii) Material new regulations and requirements promulgated subsequent to the Effective Date pursuant to New Jersey's Industrial Site Recovery Act, P.L. 1993, c. 139 (formerly known as ECRA) or the Spill Act; (2) A Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus-AMAX's former or current operations, but not including requirements to remediate groundwater or soil contamination at the Site to the extent the contamination was caused by Slag in the area depicted on Figure 6.05 of the June 1991

6

> Cleanup Plan for the Site. . . . A New Environmental Obligation will not be considered "Material" unless its satisfaction will result in an Increased Cost to Reichhold of $200,000.  An "Increased Cost to Reichhold" means an actual out-of-pocket cost to Reichhold over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold.

Thus, in order for Reichhold to prevail on any of its claims against Defendants for the cost of cleanup at the Site (assuming it has established liability under CERCLA or the Spill Act), Reichhold must establish (1) that the claim is due to a "material change" in the law[1] promulgated subsequent to May 25, 1994, or due to a "Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by" Defendants; and (2) that the satisfaction of the new obligation will result in an Increased Cost to Reichhold, as defined above, of $200,000.

The parties also included a provision on "Tolling of Non-Released Claims."  Under that provision, the statute of limitations on any Non-Released claims that Reichhold may have against Defendants is tolled "until that time that Reichhold is obligated to initiate physical on-site construction of a remedy to address the Hazardous Substances which are the subject of the Non-Released claims contained in Paragraph 3 of this agreement."  This tolling provision in the

---

[1]"Law" is defined to include "federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies."  (Settlement Agreement ¶ 3(A)(1).)  However, "law" as defined in the Settlement Agreement is limited to requirements that are generally applicable as distinguished from requirements directed to a single entity.  Thus, its scope is narrower than that of a New Environmental Obligation, which, as defined in the Settlement Agreement could include a "law," but also extends more broadly to "new legal obligations (including, but not limited to directives or orders) to investigate, remediate or otherwise address Hazardous Substances . . . imposed upon Reichhold or to which Reichhold first becomes subject subsequent to the Effective Date."  (Settlement Agreement ¶ 1(C).)

Settlement Agreement mirrors the tolling provision of the statute of limitations for a claim for a remedial action under CERCLA § 107.  See 42 U.S.C. § 9613(g)(2)(B).

## II.  DISCUSSION

### A.      Standard for Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The court must consider the pleadings, depositions, answers to interrogatories, admissions, affidavits, etc. submitted by the moving party to determine if that party has established "an absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The submissions of the parties may include the testimony of experts, provided "the affiant is competent to testify on the matters stated" as required by Fed. R. Civ. P. 56(e).  See also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Testimony from experts may be useful to determine if there is an issue of fact, but only if such testimony is undisputed (or not reasonably disputed) will it, on its own, establish the absence of a genuine issue of material fact.  The court's function is not to make any determinations of credibility or to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Requirements to Prove a Claim Under CERCLA**

Congress enacted CERCLA in 1980 to address the "serious environmental and health risks posed by pollution."  United States v. Bestfoods, 524 U.S. 51, 55 (1998).  CERCLA provides for the apportionment of the cost of cleanup of hazardous waste among entities generally referred to as potentially responsible parties ("PRPs").  E.I. DuPont Nemours & Co. v. United States, 508 F.3d 126, 128 (3d Cir. 2007).  Section 107 defines four categories of PRPs, including "(1) the owner and operator of a vessel or a facility," and "(2) any person who at the

9

time of disposal of any hazardous substance owned or operated any facility at which such

hazardous substances were disposed of."  42 U.S.C. § 9607(a).

The two provisions of CERCLA at issue in this case, §§ 107 and 113, "allow private

parties to recover expenses associated with cleaning up contaminated sites."  United States v.

Atl. Research Corp., 127 S. Ct. 2331, 2333 (2007).  These two provisions provide two "clearly

distinct" remedies.  Cooper Indus., Inc. v. Aviall Serv., Inc., 543 U.S. 157, 163 (2004).  Section

107(a) provides for a right to cost recovery in certain circumstances, whereas § 113 provides for

a separate right to contribution in other circumstances.  Atl. Research, 127 S. Ct. at 2337.  "[A]

private party that has itself incurred cleanup costs" may recover those costs under § 107.  Id. at

2338.  A PRP "with common liability stemming from an action instituted under § 106 or

§ 107(a)" is entitled to contribution under § 113.  Id.  Reichhold has asserted claims against

Defendants under §§ 107 and 113[2] of CERCLA and Defendants have asserted counterclaims

against Reichhold under § 113.

### i.   CERCLA § 107

Section 107 of CERCLA "permits recovery of cleanup costs but does not create a right to

contribution."  Atl. Research, 127 S. Ct. at 2338.  "A private party may recover under § 107(a)

without any establishment of liability to a third party."  Id.  Section 107 allows a PRP to recover

only the costs it has "incurred" in cleaning a site.  "When a party pays to satisfy a settlement

---

[2]Reichhold originally filed a claim against Defendants under § 113 of CERCLA before
the Supreme Court decided in Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157
(2004), that in order to maintain an action under § 113 a party must have been sued under § 107
or § 106 and paid money to satisfy a settlement agreement or court judgment.  See Section
(II)(B)(ii) below.  Reichhold's CERCLA claim in this case is, thus, limited to § 107.

agreement or a court judgment, it does not incur its own costs of response," but is instead

reimbursing other parties for their costs.  Id.

> Section 107 makes PRPs liable for, among other things:
>
> > (A) all costs of removal or remedial action incurred by the United
> > States Government or a State or an Indian tribe not inconsistent with
> > the national contingency plan;
> >
> > (B) any other necessary costs of response incurred by any other
> > person consistent with the national contingency plan.

Id.  § 9607(a)(4)(A)-(B).  In order to prove liability under § 107 of CERCLA, a plaintiff must

prove:

> > 1) that the defendant is a PRP; 2) that hazardous substances were
> > disposed of at a "facility"; 3) that there has been a "release" or
> > "threatened" release of hazardous substances from the facility into the
> > environment; and 4) that the release or threatened release has required
> > or will require the plaintiff to incur "response costs."

N.J. Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103-04 (3d Cir. 1999).

Until fairly recently, it was unclear whether a PRP could recover from another PRP under

§ 107 of CERCLA or whether a PRP was limited to actions under § 113.  The Supreme Court

settled that question in Atlantic Research, where it held that PRPs may avail themselves of both

CERCLA §§ 107(a) and 113(f).  127 S. Ct. at 2336 ("[T]he plain language of subparagraph (B)

[of § 9607(a)(4)] authorizes cost-recovery actions by any private party, including PRPs.").

### 1.      Joint & Several Versus Several Liability

The Atlantic Research Court did not, however, determine whether liability under § 107(a)

is joint and several.  Specifically, the Court did not address whether liability is joint and several

in the situation where, as here, one PRP seeks to recover from another PRP under § 107.  Rather,

in a footnote the Court stated, "We assume without deciding that § 107(a) provides for joint and several liability." Atl. Research, 127 S. Ct. at 2339 n.7. The Court, however, also noted that

> [A] PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a). The choice of remedies simply does not exist. In any event a defendant PRP in such a § 107(a) suit could blunt any inequitable distribution costs by filing a § 113 counterclaim. Resolution of a § 113(f) counter-claim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.

Id. at 2338-39. The Court of Appeals for the Third Circuit has also not settled the issue whether liability is joint and several when one PRP seeks to recover from another PRP under § 107.

The text of CERCLA § 107 does not expressly provide for or prohibit the imposition of joint and several liability. Nor does it indicate whether liability should differ when the plaintiff is or is not a PRP. Both the House of Representatives and the Senate deleted provisions imposing joint and several liability from their respective versions of CERCLA before it was enacted. United States v. Alcan Aluminum Corp., 964 F.2d 252, 268 (3d Cir. 1992). An exhaustive review of statements by the sponsors of the legislation regarding the deletion of the provision for joint and several liability reveals that:

> the scope of liability and term joint and several liability were deleted to avoid a mandatory legislative standard applicable in all situations which might produce inequitable results in some cases. The deletion was not intended as a rejection of joint and several liability. Rather, the term was omitted in order to have the scope of liability determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis.

Id. (quoting United States v. Chem-Dyne Corp., 572 F. Supp. 802, 808 (S.D. Ohio 1983)

(internal citations omitted)).  The Court of Appeals has, in agreement with many other Circuits,

thus turned to the Restatement (Second) of Torts for guidance in determining whether the

imposition of joint and several liability is appropriate under § 107 of CERCLA.  Id.

Section 433A of the Restatement (Second) of Torts provides that joint tortfeasors, acting

independently, are subject to liability only for the portion of harm caused by the individual

tortfeasor when there is a reasonable basis for division of the single harm according to the

contribution of each.  It states:

> (1)  Damages for harm are to be apportioned among two or more
> causes where
>
> (a)  there are distinct harms, or
>
> (b)  there is a reasonable basis for determining the contribution of
> each cause to a single harm.
>
> (2)  Damages for any other harm cannot be apportioned among two
> or more causes.

Restatement (Second) of Torts § 433A.  The Restatement (Second) of Torts also provides an

affirmative defense to joint and several liability such that if joint tortfeasors, acting

independently, cause distinct harms or a single harm "for which there is a reasonable basis for

division according to the contribution of each, each is subject to liability only for the portion of

the total harm that he has himself caused."  Id.  Thus, in the analysis under CERCLA § 107 in

this case, liability shall be joint and several unless the Defendants prove that the alleged harm to

13

the Site is somehow divisible,[3] in which case Defendants shall be liable only for the "portion of

the harm fairly attributable to [them]."  Alcan Aluminum, 964 F.2d at 269; New Castle County v.

Haliburton NUS Corp., 111 F.3d 1116, 1121 n.4 (3d Cir. 1997) ("A section 107 defendant may

seek apportionment where there is a reasonable basis for determining the contribution of each

cause to a single harm . . . . It is the defendant's burden to prove that the harm is divisible and

that the damages are capable of some reasonable apportionment.").

### 2.      "Voluntary" Response Costs

The Court in Atlantic Research noted that "costs incurred voluntarily are recoverable only

by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal

judgment or settlement are recoverable only under § 113(f)."  127 S. Ct. at 2338 n.6.  Citing this

footnote, Defendants argue that "Reichhold did not incur costs voluntarily, but engaged in the

(much protracted) investigation and (partial) remediation of the Site in satisfaction of its

obligations under ECRA/ISRA" and thus should not be allowed to maintain an action under

§ 107.  (Defs.' Opp'n Br., Doc. 172, at 30-31.)  Defendants misconstrue the use of the term

"voluntary" by the Court.  In this context, the term is used to distinguish between costs

undertaken as the result of a legal judgment or settlement, and those undertaken for other

reasons.  Costs undertaken as the result of a legal judgment or settlement are not "voluntary" and

are thus recoverable only under § 113.  Costs incurred for any other reason – even when incurred

---

[3]The requirement that Defendants prove that the alleged harm is divisible and that the damages are capable of some reasonable apportionment may be entirely academic in this case. Because Reichhold has to identify individual claims for cleanup costs in order to prove that its claims were not released by the Settlement Agreement, Reichhold will, itself, prove some degree of divisibility of harm, though Defendants may wish to prove that Reichhold's individual claims are, themselves, capable of further division and reasonable apportionment.

as the result of a protracted negotiation with the NJDEP – are voluntary and thus recoverable under § 107.  As Reichhold correctly notes, Defendants' interpretation of the term voluntary, "if adopted, would have the anomalous result of barring the doors of the courthouse to CERCLA plaintiffs who cannot bring a CERCLA § 113 claim (having not been the prior subject of a § 106 or § 107 claim . . . ), but whose cleanup may not have been 'voluntary' in the strictest sense." (Pl.'s Reply Br., Doc. No. 181, at 9.)  This result was not the intent of the Court in Atlantic Research.

### ii.    CERCLA § 113

Section 113 of CERCLA "authorizes a contribution action to PRPs with common liability stemming from an action instituted under [CERCLA] § 106 or § 107(a)." Atl. Research, 127 S. Ct. at 2338.  Section 113 provides, in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title [CERCLA § 107], during or following any civil action under section 9606 of this title [CERCLA § 106] or under section 9607(a) of this title [CERCLA § 107].

Id. § 9613(f).  The Supreme Court held in Cooper Industries that a private party may seek contribution from other liable parties only after having been sued under § 106 or § 107(a).  543 U.S. at 161.  "Hence, a PRP that pays money to satisfy a settlement agreement or court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)." Atl. Research, 127 S. Ct. at 2338.

**C.      Requirements to Prove a Claim Under the Spill Act**

The Spill Act is the New Jersey analog to CERCLA.  SC Holdings, Inc. v. A.A.A. Realty

Co., 935 F. Supp. 1354, 1365 (D.N.J. 1996).  Like CERCLA, the Spill Act is a strict liability

statute that prohibits the discharge of hazardous substances and provides for the remediation of

spills.  Id.  The Spill Act provides:

> Whenever one or more dischargers or persons cleans up and removes
> a discharge of a hazardous substance, those dischargers and persons
> shall have a right of contribution against all other dischargers and
> persons in any way responsible for a discharged hazardous substance
> or other persons who are liable for the cost of the cleanup and
> removal of that discharge of a hazardous substance. In an action for
> contribution, the contribution plaintiffs need prove only that a
> discharge occurred for which the contribution defendant or
> defendants are liable pursuant to the provisions of subsection c. of
> section 8 of P.L.1976, c. 141 (C.58:10-23.11g), and the contribution
> defendant shall have only the defenses to liability available to parties
> pursuant to subsection d. of section 8 of P.L.1976, c. 141
> (C.58:10-23.11g).

N.J. Stat. Ann. 58:10-23.11f(a)(2)(a).

**D.      Contract Interpretation**

Contracts should be construed according to the plain and ordinary meaning of their terms.

J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "Clear contractual terms

that are capable of one reasonable interpretation must be given effect without reference to matters

outside the contract."  Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001)

(internal quotations and citations omitted).  Thus, the court must give force to the intent of the

parties by interpreting the Settlement Agreement between Reichhold and Defendants according

16

to the plain meaning of its terms.  Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate.  Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999).  To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning."  Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted).  If the meaning of a contract is ambiguous, it is not subject to summary judgment.  As discussed below, although the Settlement Agreement requires close reading, all its terms except one are subject to one reasonable interpretation.  The ambiguous term is "Cleanup Plan."  The meaning of that term will have to be determined at trial.

## E.    Statutes of Limitations

### i.    CERCLA

An initial action for recovery of costs under CERCLA § 107 must be commenced

> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2).  The terms "remedy" or "remedial action" are defined in the statute as:

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened

17

release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. . . . [T]he term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

The parties used the language of § 9613(g)(2)(B) in the tolling provision of the Settlement Agreement, which states that Non-Released claims Reichhold may have against Cyprus-AMAX are tolled until "Reichhold is obligated to initiate physical on-site construction of a remedy" to address the Hazardous Substances at issue in the Non-Released claim. (Settlement Agreement ¶ 5.)

### ii.    *The Spill Act*

The Spill Act does not contain a statute of limitations for private contribution actions. In these circumstances, courts are directed to select a limitations period from among those periods applicable to actions seeking similar relief at common law. See New W. Urban Renewal Co. v. Westinghouse Elec. Corp., 909 F. Supp. 219, 228 (D.N.J. 1995). N.J. Stat. Ann. 2A:14-1 provides a six year statute of limitations for trespass to real property and tortious injury to real property. N.J. Stat. Ann. 2A:14-1. "This six year statute of limitations is applicable to

18

environmental tort actions at common law, and more specifically to environmental actions based on strict liability." SC Holdings, Inc. v. A.A.A. Realty Co., 935 F. Supp. 1354, 1367 (D.N.J. 1996) (quoting Kemp Indus., Inc. v. Safety Light Corp., Civ. No. 92-0095, 1994 WL 532130, at *17 (D.N.J. Jan. 25, 1994)); Champion Labs., Inc. v. Metex Corp., Civ. No. 02-5284, 2005 WL 1606921 (D.N.J. July 8, 2005)("A private cause of action for contribution under the Spill Act is most analogous to a common law environmental tort claim, for which the period of limitations is six years."). Thus, the court will apply a six year statute of limitations to Reichhold's claims under the Spill Act.

**F.      Reichhold's Motion for Partial Summary Judgment**

Reichhold seeks partial summary judgment that Defendants are liable under § 107 of CERCLA and under the Spill Act.  Reichhold also requests that the court hold that such a finding of partial summary judgment would shift the burden of proof at trial to Defendants to prove that they should not be held jointly and severally liable under § 107 of CERCLA for all of Reichhold's claimed response costs at the Site.  Reichhold does not seek summary judgment on the amount of damages it claims.

*i.        Reichhold's Claim Under CERCLA § 107*

Reichhold seeks this grant of partial summary judgment without alleging that Defendants are responsible for any particular contamination at the Site for which Reichhold claims response costs.  Rather, relying upon the fact that CERCLA is a strict liability statute, Reichhold claims that summary judgment on Defendants' liability under CERCLA is appropriate because there are no issues of fact with respect to the four necessary factors to prove a claim under CERCLA

19

§ 107:  (1) that the Site is a "facility:" (2) that there was a "release" or "threatened" release of

hazardous substances at the Site; (3) that the release or threatened release has required or will

require Reichhold to incur "response costs;" and (4) that the Defendants are PRPs.  (Pl.'s Mot.

Summ. J., Doc. 152, at 12, citing N.J. Tpk. Auth., 197 F.3d at 103-04.)  Oddly, Reichhold asks

the court for this grant of summary judgment that Defendants are liable under CERCLA without

any mention of the existence of the Settlement Agreement in its opening brief.  In its reply brief,

Reichhold does admit that it has "the burden of demonstrating at trial that its claims fall within

the Re-Opener Provision of the 1994 Settlement Agreement," yet it argues that it would be

appropriate for the court to grant summary judgment that Defendants are liable under CERCLA.

Although the Settlement Agreement adds another layer to the analysis in this case, the court will,

for the limited purpose of the initial discussion of Reichhold's motion in the following

subsection, assume for the moment that the Settlement Agreement does not exist and that the

issue is straightforward liability under CERCLA.  Even assuming that the Settlement Agreement

does not affect the issue of liability under CERCLA, there are issues of material fact regarding, at

least, the release of hazardous substances at the Site.

### 1.    Release of Hazardous Substances

Reichhold claims that it has identified the presence of metals and chlorinated volatile

organic compounds ("CVOCs") in the soils and groundwater in the Arthur Kill and that this

identification proves that USMR released hazardous substances at the Site.  (Pl.'s Mot. Summ. J.,

Doc. 152, at 15.)  It further claims that because USMR produced slag as a by-product of its

smelting operations, which was at one time deposited on the Site, and that because Reichhold

claims to have identified "pervasive lead contamination in soil samples in and around USMRC's

20

former lead plant," Reichhold has proven that USMR has caused the release of a hazardous

substance at the Site.  (<u>Id.</u>)  Further, Reichhold claims that USMR's operations

> resulted in the disposal of hazardous substances by (1) the placement
> of slag and release of other hazardous materials on the ground
> throughout the Site from its smelting operations and the operation of
> the lead plant on the Site; (2) the fugitive aerial emissions of
> hazardous substances associated with the use of the haul road to
> transport slag from the Site; (3) the deposition of hazardous
> substances from aerial point source emissions associated with
> USMRC's smelting operations, and (4) by contaminating
> groundwater with metals and chlorinated compounds.

(<u>Id.</u> at 17.)  Each of these material facts is at issue and thus prevents summary judgment on

Reichhold's CERCLA claim.

First, there is an issue of material fact with respect to Reichhold's allegation that USMR

disposed of slag "on the ground throughout the site."  Defendants contend that "the metals

contaminants at issue here are associated with areas of the Site filled by Reichhold during its

ownership of the Site" and that Reichhold moved the slag around the Site and caused its release

into the environment.  (Defs.' Opp'n Br., Doc. 172, at 36.)  To contest Reichhold's allegation

regarding the disposal of slag, Defendants rely upon the declarations of John Rhodes and

Frederick Runyon.  Although Reichhold is correct that Mr. Rhodes is precluded from offering, as

expert testimony, an opinion that Reichhold cut fill (slag) from one portion of the Site and moved

it to another (Feb. 28, 2007 Slip Op. at 11), neither party has presented evidence which resolves

this question.  As the court noted in its Feb. 28, 2007 Opinion, there are "rather compelling

deductions to be drawn from the fill data [Mr. Rhodes] established through acceptable scientific

and technical means" regarding the cut fill and new fill, but it is a question to be left to the trier

of fact.  There is no new evidence to resolve this question, so it shall remain an issue for the trier of fact at the upcoming trial.

The declaration of Fred Runyon, a former USMR employee, also raises an issue of fact regarding the disposal of slag.  Reichhold claims that USMR used slag to construct a haul road across portions of the Site.  (Pl.'s Mot. Summ. J., Doc. 152, at 10.)  In support of this claim, Reichhold's expert, Robert Pearson, relies upon a 1996 memorandum created by Mr. Runyon which stated that "[s]lag was placed on this site as a base material in constructing the haul road." (Cert. of Robert Pearson, Doc. 153, ¶ 18.)  Mr. Runyon now states, however, that his statement that the road was made of slag was "simply an assumption" and "not based on any knowledge of how the road was actually constructed."  (Defs.' Opp'n Br., Doc. 172, at 37.)  He "did not see slag on the road itself," which was actually built almost two decades before he began working for USMR.  (Id.)  The court will not engage in determinations of credibility on a motion for summary judgment and deems this to be another issue of fact to be resolved at trial.

Second, Reichhold's allegation regarding the deposition of hazardous substances from "fugitive aerial emissions" and "aerial point source emissions" associated with USMR's operations is the subject of a typical "battle of the experts."  Reichhold's expert, Dr. Pearson, maintains that USMR's smelting and refining operations led to aerial emissions that resulted in the deposition of hazardous materials across the Site.  (Cert. of Robert Pearson, Doc. 153, ¶¶ 15-16.)  Defendants' expert, Kirk Winges, maintains that Dr. Pearson's conclusions are erroneous and states that the sampling efforts and data supplied by Reichhold exhibit a pattern that could not be produced by aerial deposition.  (Cert. of Kirk Winges, Doc. 175, ¶¶ 6-11.)  Mr. Rhodes also disputes Dr. Pearson's findings on aerial emissions, alleging he made a "fundamental error"

22

in the calculation of soil contamination from aerial emissions.  (Cert. of John Rhodes, Doc. 174,

Ex. B at 8.)  The court has previously held Mr. Pearson's testimony to be admissible under

Daubert (see Feb. 28, 2007 Slip Op. at 19-26) and Reichhold has not challenged Mr. Winges's

testimony under Daubert, but the court will not weigh the evidence or make determinations of

credibility on a motion for summary judgment, so, this, too, must be left for the finder of fact at

trial.

　　　　Third, there are issues of fact regarding the contamination of groundwater at the Site with

metals and chlorinated compounds.  Reichhold claims that it did not make any discharges of

metals or chlorinated volatile organic compounds, but Defendants present evidence that

Reichhold admitted to the NJDEP's Bureau of Hazardous Waste Engineering that it used

chlorinated solvents at its operations on the Site.  (Defs.' Opp'n Br., Doc. 172, at 41.)  Further, as

Defendants note, Reichhold has not submitted any expert testimony regarding contamination of

groundwater at the Site with metals, or any evidence that Reichhold has been required by the

NJDEP to take any action regarding metals in the groundwater.  Thus, there is a material issue of

fact regarding the contamination of groundwater and summary judgment is not appropriate on

Reichhold's claims under CERCLA.

　　　　　　　　2.　　　The Settlement Agreement

　　　　As mentioned above, Reichhold asks the court to grant its motion for partial summary

judgment without regard to the existence of the Settlement Agreement.  Reichhold's claims

under CERCLA, however, cannot be decided independently of the Settlement Agreement.  For

example, the element of the "release" of hazardous substances required under CERCLA is

affected by the existence of the Settlement Agreement.  Reichhold argues that in order to prove this element of its claim under CERCLA, it does not have to prove USMR's hazardous substances themselves caused the release or caused Reichhold to have to incur response costs, but simply that "a release of hazardous substances occurred and that USMRC is responsible for these hazardous substances."  (Pl.'s Mot. Summ. J., Doc. 152, at 14, citing United States v. Alcan Aluminum Corp., 964 F.2d 252, 264-66 (3d Cir. 1992).)  While it may not usually be necessary to prove this element of causation under CERCLA, one part of the re-opener provision of the Settlement Agreement provides for an exception to the general release when there is a Material New Environmental Obligation arising out of "[a] Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus-Amax's former or current operations . . . ." (Settlement Agreement ¶ 3(A)(2) (emphasis added).)  Thus, the Settlement Agreement has inserted the issue of causation into the analysis of Reichhold's claims and they cannot be resolved without an inquiry into whether Defendants' operations caused the contamination of the groundwater or soils which Reichhold claims need to be remediated.

Further, the existence of the Settlement Agreement alters the entire analysis in this matter, an issue that Reichhold did not address in its motion and that also precludes summary judgment on Reichhold's motion.  Reichhold cannot recover on any claim related to "the Site or Hazardous Substances at or beneath the Site" until it proves that its claim is a Non-Released claim under the Settlement Agreement.  Thus, for every claim Reichhold makes, it must first prove, among other things, that the obligation at issue is imposed by governmental authorities and arises out of:

24

(1) Material changes in the law; or

(2) Material amendment to the Cleanup Plan "which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus-AMAX's former or current operations."

In addition, Reichhold must also prove for each individual claim that satisfaction of the obligation will result in an Increased Cost[4] to Reichhold of $200,000 and that it meets the other criteria of "materiality."

### ii.   Reichhold's Claim Under the Spill Act

As with CERCLA, a key element to liability under the Spill Act is the "discharge of a hazardous substance."  Because there are issues of material fact as to the release or discharge of hazardous substances by Defendants, as explained above, and because the Settlement Agreement requires an initial proof by Reichhold that each of its claims is a Non-Released claim, Reichhold's motion for summary judgment of its claim under the Spill Act is also denied.

### G.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Reichhold's claims on the basis that they are barred by the terms of the Settlement Agreement.  Defendants contend that all of Reichhold's claims against it in this matter were released by Reichhold in the Settlement Agreement and do not fall within the exception for Material New Environmental Obligations.

---

[4]"Increased Cost to Reichhold" is defined in the Settlement Agreement as "an actual out-of-pocket cost to Reichhold over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold."  (Settlement Agreement ¶ 3(A).)

Defendants further contend that Reichhold's claims are barred by the applicable statutes of limitations.

### i.      The Settlement Agreement

Reichhold is correct in its assertion that the 1960 Sales Contract does not provide the Defendants with a defense to liability in this case.  Indeed, Defendants do not rely on it as a defense here, but seem to mention it only by way of background.  Therefore, the court will not address this issue.  The Settlement Agreement, however, does provide the Defendants with a possible defense in this matter, as it released them from all liability "with regard to the Site or Hazardous Substances at or beneath the Site" with an exception for Material New Environmental Obligations.

### 1.      Non-Released Material New Environmental Obligations

In the context of this case, there are two possible kinds of Material New Environmental Obligations which could overcome the release in the Settlement Agreement:  (1) those which result from a material change in law and (2) those which result from a material amendment to the Cleanup Plan "which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus-AMAX's former or current operations."

To determine exactly what claims are Non-Released claims requires consideration of several provisions of the Settlement Agreement.  The Definitions section defines "New Environmental Obligations" as "new legal obligations (including, but not limited to directives or orders) to investigate, remediate or otherwise address Hazardous Substances at, beneath or migrating from the Site imposed upon Reichhold or to which Reichhold first becomes subject

26

subsequent to the Effective Date." (Settlement Agreement ¶ 1(C).) Thus "New Environmental Obligations" is defined in the broadest possible terms. The term includes not only laws and regulations of general application, but it also includes orders and directives aimed specifically at Reichhold.

The relevant provisions of the Re-Opener paragraph of the Settlement Agreement provide that two sub-sets of New Environmental Obligations are not released. The first is "[m]aterial changes in law (including federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies) promulgated subsequent to the Effective Date . . . ." (Id. ¶ 3(A)(1).) It will be noted that "changes in law" includes only rules of general application and does not include directives addressed only to a single entity such as Reichhold.

The second sub-set of New Environmental Obligations that is not released is "[a] [m]aterial amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus - AMAX's former or current operations . . . ." (Id. ¶ 3(A)(2).) Excluded from this non-release provision are "requirements to remediate groundwater or soil contamination at the Site to the extent the contamination was caused by Slag in the area depicted on Figure 6.05 of the June 1991 Cleanup Plan for the Site." (Id.)

It does not appear that Reichhold is relying on a Material change in the law to support any of its claims against Defendants. Rather, on each claim it seems to rely on a Material amendment or revision to the Cleanup Plan. To establish a claim on that basis, Reichhold will have to establish that its remediation effort resulted from a Material amendment or revision to the

27

Cleanup Plan that (i) required Reichhold to further remediate (ii) groundwater or soil at the Site (iii) contaminated by Defendants' former or current operations but (iv) was not a requirement to remediate groundwater or soil contamination to the extent the contamination was caused by Slag in the area depicted in Figure 6.05 of the June 1991 Cleanup Plan for the Site.  In addition, of course, Reichhold will have to prove that the remediation met the $200,000 requirement of materiality.  (See id. ¶ 3(A).)

### a.  *Material Change in the Law*

The first category of Non-Released claims are those which result from new obligations that arise out of "[m]aterial changes in the law."  These material changes in the law include changes in "federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies" promulgated subsequent to May 25, 1994.  Relying on the plain meaning of the phrase "changes in the law," this contract term includes changes that affect all entities within a jurisdiction, not just Reichhold.  In other words, "changes in the law" are changes which are generally applicable (as opposed to a change to the Cleanup Plan, as discussed below, which is applicable only to Reichhold or related entities).  Just as Reichhold's obligations prior to the Settlement Agreement will not be identified merely from generally applicable laws and regulations (see discussion below), Reichhold's Material New Environmental Obligations will not be proven simply by a generally applicable change of law.  Rather, Reichhold must demonstrate that its claimed Material New Environmental Obligation was imposed specifically upon Reichhold pursuant to a change in the law.  Thus, in order to show that a claim is a Non-Released claim under this provision of the Settlement Agreement, Reichhold must first point to a change in the law, which would be generally applicable, such as a statute or regulation.  Second,

28

Reichhold must prove that this change in the law led to a new obligation for it to undertake

cleanup at the Site.  Only if Reichhold can prove both of these aspects (and the monetary

threshold) will it be deemed to have presented a prima facie case that its claimed obligation is a

Material New Environmental Obligation under ¶ 3(A)(1) of the Settlement Agreement.

### b.    Material Amendment to the Cleanup Plan

The definition of the term "Cleanup Plan" in the Settlement Agreement is ambiguous.

Although the Cleanup Plan is a key aspect of the re-opener provision, there is no single document

which comprises the approved Cleanup Plan and it is not defined in the Settlement Agreement

beyond the following statements in the recitals:

> WHEREAS, Reichhold has received an approved cleanup plan (the
> "Cleanup Plan") for the Site from the New Jersey Department of
> Environmental Protection and Energy ("NJDEPE").  The Cleanup
> Plan requires Reichhold to construct a cover to be placed over the
> Slag at the Site.

> WHEREAS, the Cleanup Plan does not require Reichhold to sample
> the groundwater at the Site for contamination originating from off-
> site sources, nor does it require Reichhold to remediate groundwater
> at the Site that exceeds cleanup levels to the extent that such
> groundwater is being adversely impacted by off-site sources.

As discussed above, NJDEP's letter of August 21, 1992 contains the final approval, with

conditions, of the Cleanup Plan, which it seems to define as (1) the June 1991 Draft Cleanup

Plan, (2) the February 3, 1992 Amendment, (3) the June 10, 1992 Response, and (4) the March

15, 1988 Cleanup Plan Addendum.  Defendants contend that the Cleanup Plan includes not only

these documents, but also every other correspondence between Reichhold and NJDEP after the

June 1991 Draft Cleanup Plan until the Effective Date of the 1994 Settlement Agreement.

Reichhold contends that the Cleanup Plan consists only of the June 1991 Draft Cleanup Plan and the August 1992 approval letter.  One of the issues at trial will be exactly what constitutes the Cleanup Plan.  Until the exact terms of the Cleanup Plan are identified, it will, of course, be impossible to determine whether something is a "material amendment" to the Cleanup Plan.

### 2.  Monetary Threshold

The Settlement Agreement provides that a New Environmental Obligation will not be "Material" unless "its satisfaction will result in an Increased Cost to Reichhold of $200,000." Increased Cost is defined as "an out-of-pocket cost to Reichhold over and above the out-of-pocket cost that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold."  Each individual claim made by Reichhold must independently satisfy this monetary threshold in order to qualify as a Material New Environmental Obligation. The costs of several different claims may not be aggregated in order to reach the monetary threshold for materiality.

### ii.  *Whether Claims Are "Material New Environmental Obligations"*

As discussed above, in Reichhold's motion for summary judgment, it did not identify a list of claims which it asserts are Material New Environmental Obligations.  Rather, Reichhold seeks summary judgment under CERCLA without regard to the Settlement Agreement.  When pressed at oral argument to identify its claims, Reichhold identified eight specific claims it asserts against Defendants for reimbursement of response costs.  These eight claims are slightly different from the seven claims Defendants identified in their brief as those they understood Reichhold to be asserting.  For the purposes of this motion, the court will address those claims

30

identified by Reichhold at oral argument.  There are genuine issues of material fact as to whether

or not these claims are Non-Released claims (including whether they meet the monetary

threshold), so summary judgment is not appropriate.

      **1.  NE/NW Field of the Staflex Parcel** – Reichhold claims to have discovered

surficial slag, 1-2 feet deep, in November of 1995 in the NE and NW fields of the Staflex Parcel.

Reichhold claims to have previously received a "no action" letter from the NJDEP regarding the

NW field of the Staflex parcel and to have had no previous obligation regarding cleanup in the

NE field of the Staflex parcel, thus the claim is a New Environmental Obligation.  Reichhold

claims that the response costs for the cleanup of the NE and NW fields is several hundred

thousand dollars, thus making the claim Material.

      Defendants allege that this claim was released in the Settlement Agreement because in

May 1994 Reichhold was aware of the slag in the Staflex parcel and was under an obligation

from the NJDEP to remediate.  In support, Defendants point to what appear to be directives from

the NJDEP to delineate slag at the Site generally and to a July 20, 1987 Site Assessment by

Dresdner, Robin & Associates which stated that the "undeveloped" portions of the Staflex parcel

were contaminated with heavy metals, likely from slag, above ECRA remedial guidelines.

(Defs.' Mot. Summ. J., Doc. 156-3, at 21.)  The report has a handwritten note of a "bcc" to Dave

Bright at Reichhold, but Reichhold argues that the report was not actually sent to Mr. Bright.

Reichhold's project manager at the engineering firm Brien and Gere, which worked on

Reichhold's environmental obligations at the Site, testified that he was unaware of anyone at

Brien and Gere receiving the report and that he never discussed it with Mr. Bright.  (Pl.'s Opp'n

Br., Doc. 166,  at 26.)  Additionally, Reichhold claims that it was only under an obligation from

the NJDEP to address <u>exposed</u> slag; Reichhold points to correspondence with the NJDEP that seems to indicate that its proposal of visual delineation of slag would be acceptable.  (<u>Id.</u> at 25.)  Because there is an issue of material fact as to Reichhold's obligations with respect to the Staflex Parcel as of May 1994, and thus whether this is a Non-Released claim, summary judgment is not appropriate.

        **2.  Capping of the Staflex Parcel by PRC** – PRC-Catellus ("PRC") assumed Reichhold's remedial obligations with respect to the Staflex parcel.  Reichhold claims it has agreed to pay PRC $900,000 in order for PRC to conduct a "full rededication" of the Staflex parcel pursuant to NJDEP standards, including testing, evaluation and placement of a soil cap (<u>Id.</u> at 41), in order to receive a "no further action" letter from NJDEP.  Reichhold claims that this payment is also in exchange for the entry of a deed restriction by PRC.  Reichhold has not yet made this payment, as its obligation to do so is triggered only upon PRC's receipt of a "no further action" letter.

        Defendants allege that this claim was released by the Settlement Agreement because "as early as 1989, the NJDEP had informed Reichhold that any areas where elevated concentrations of metals were to remain on the Site would require a 'covering' (i.e., a 'cap') and a deed notice."  (Defs.' Mot. Summ. J., Doc. 156-3, at 30.)  Again, here, there is an issue of material fact as to the extent of Reichhold's obligations to delineate and remediate slag on the Site as of May 1994, so summary judgment is not appropriate on this claim.

        **3.  Capping of the Remainder of the BTL Parcel** – The parties agree that under the Settlement Agreement Reichhold covenanted to cap a portion of the BTL parcel.  Reichhold

claims it is now obligated to cap the remainder of the BTL Parcel.  As with claims 1 and 2 above, Defendants argue that Reichhold was already obligated to delineate and remediate the slag Site-wide as of May 1994, and Reichhold claims that it was only obligated to determine the slag by visual observation.  Further, Defendants claim, and Reichhold offers no rebuttal, that this claim is a new allegation, which Reichhold had not yet advanced in this litigation.  Whether the capping of the remainder of the BTL parcel is a Non-Released claim is an issue of material fact, so summary judgment is not appropriate on this claim.

       **4. Remediation of Property Directly Adjacent to the Arthur Kill** – Reichhold claims both past and future costs from its investigation and remediation of the property directly adjacent to the Arthur Kill.  Defendants argue that Reichhold was obligated under the terms of the Cleanup Plan to conduct this investigation and remediation, noting that the NJDEP had criticized the initial 1991 Draft Cleanup Plan because Reichhold's risk assessment "did not consider ecological impacts from the Site on the Arthur Kill."  (Defs.' Mot. Summ. J., Doc. 156-3, at 41.)  Defendants also discuss, however, a Baseline Ecological Evaluation ("BEE") submitted by Reichhold to the NJDEP in September 2004 in which Reichhold "proposed that it should <u>not</u> be required to sample the sediments of the Arthur Kill and the western drainage ditch."  (<u>Id.</u> at 41-42.)  Although Defendants allege that the NJDEP's response to Reichhold's BEE directed Reichhold to conduct evaluations that it had been "required to perform . . . since at least 1990," nothing in the NJDEP's response indicates that this is so.  Because it is unclear when Reichhold's obligation to investigate and remediate the property directly adjacent to the Arthur Kill came about, the court cannot grant summary judgment on this claim.

**5. Chlorinated Volatile Organic Compounds ("CVOCs")** – Reichhold claims both past and future costs for remediation of groundwater contaminated with CVOCs. As discussed above in Section (II)(F)(i)(1), there are issues of fact regarding the contamination of groundwater at the Site with metals and chlorinated compounds. Reichhold claims that it did not make any discharges of metals or chlorinated volatile organic compounds at the Site, but Defendants present evidence that Reichhold admitted to the NJDEP's Bureau of Hazardous Waste Engineering that it used chlorinated solvents at its operations on the Site. (Defs.' Opp'n Br., Doc. 172, at 41.) Further, as Defendants note, Reichhold has not submitted any expert testimony regarding contamination of groundwater at the Site with metals, or any evidence that Reichhold has been required by the NJDEP to take any action regarding metals in the groundwater. Thus, there is a material issue of fact regarding the contamination of groundwater and summary judgment is not appropriate on this claim.

**6. Metals-Related Investigative Costs** – Reichhold claims investigative costs for characterizing the metals contamination at the Site, including the "haul road," which runs through the NE and NW fields of the Staflex Parcel, and the area where the lead plant was, which is the current BTL Parcel. Defendants allege that this is a new claim raised by Reichhold, and, as discussed in Section (II)(F)(i)(1) above, there are issues of material fact with respect to Reichhold's claim regarding the haul road. Reichhold claims that USMR used slag to construct a haul road across portions of the Site. (Pl.'s Mot. Summ. J., Doc. 152, at 10.) In support of this claim, Reichhold's expert, Dr. Pearson, relies upon a 1996 memorandum created by former USMR employee, Mr. Runyon, which stated that "[s]lag was placed on this site as a base material in constructing the haul road." (Cert. of Robert Pearson, Doc. 153, ¶ 18.) Mr. Runyon

34

now states, however, that his statement that the road was made of slag was "simply an assumption" and "not based on any knowledge of how the road was actually constructed." (Defs.' Opp'n Br., Doc. 172, at 37.)  He "did not see slag on the road itself," which was actually built almost two decades before he began working for USMR.  (Id.)  The court will not engage in determinations of credibility on a motion for summary judgment and thus deems this to be another issue of fact to be resolved at trial.

       **7.  2004 Boiler House Remediation Costs** – Reichhold claims that PRC discovered buried battery casings in the area of the Boiler House and claims the costs for removal of the casings.  Defendants allege that Reichhold operated an auto crushing plant on this site, and that Reichhold is thus the source of the battery casings.  Reichhold claims that it was an "auto repo" where damaged cars were brought and the parts thereof were sold.  Neither party offered any evidence, other than statements of counsel at oral argument, regarding these battery casings. Thus the conflicting allegations of the parties raise an issue of material fact that precludes summary judgment.  It is also unclear from the submissions and arguments of the parties whether this claim includes Reichhold's claim for the cost of disposal of soil contaminated with lead, but the issue of soil disposal will be addressed in the next section.

       **8.  "Delta Cost"** – Reichhold claims the "delta cost" of soil disposal, or the difference between the cost of disposing of soil contaminated with petroleum and phthalates, which Reichhold admits it would have had to pay on its own, and the cost of disposing of soil contaminated with lead.  Reichhold claims that the lead contamination is the result of Defendants' activities on the Site and that Defendants should have to pay the increased cost of the disposal of soil contaminated with lead.  Reichhold alleges that it would have paid $40 per

ton to dispose of soil contaminated with petroleum and phthalates, but that it now must pay $140 per ton to dispose of the soil contaminated with lead because such soil is now considered hazardous waste.

There are issues of fact regarding whether this soil disposal was required by the Cleanup Plan, and thus was a released claim under the Settlement Agreement.  The parties agree that the removal of petroleum contaminated soil in 1994 was work performed subject to the Cleanup Plan and was therefore a released claim under the Settlement Agreement.  The parties, of course, do not agree about the soil excavation work performed in 2004, for which Reichhold now seeks payment.  Reichhold claims that its obligations for soil excavation under the Cleanup Plan were "long since" completed to the satisfaction of NJDEP when the soil was excavated in 2004. Defendants argue that Reichhold is simply seeking costs for the same soil excavation which it was already obligated to complete under the Cleanup Plan.  While Defendants point to a "1994 Illustration of petroleum area" and a "2004 illustration of petroleum excavation area" in order to prove that Reichhold's current claim was part of the released obligation under the Settlement Agreement, it is unclear what exactly these illustration show, and, in any case, Reichhold claims that the soil excavation in 2004 involved "removal of contamination at a greater soil depth and in different concentration."  (Pl.'s Opp'n Br., Doc. 166, at 46.)  Again, the submissions of the parties do not resolve all issues of material fact and summary judgment is not appropriate on this claim.

At the upcoming trial, Reichhold must prove that these claims, in addition to any other claims for cleanup costs, are Non-Released claims.

### iii.     *Statute of Limitations*

Defendants also seek summary judgment that all of Reichhold's claims are barred by the applicable statute of limitations.  An "initial action" for recovery of costs for remedial action under CERCLA § 107 must be brought within six years of "initiation of physical on-site construction of the remedial action."  42 U.S.C. § 9613(g)(2).  The tolling provision in the Settlement Agreement mirrors this requirement of initiation of "physical on-site construction of a remedy."  As discussed above, the statute of limitations for claims under the Spill Act is also six years.  Defendants argue that Reichhold's excavation of soils from the Boiler House/Fuel Tank area in 1994 for disposal off-site triggered the tolling provision in the Settlement Agreement and, because this action was filed more than six years later, all of Reichhold's claims under CERCLA are barred by the statute of limitations.  Although Reichhold now states that it does not seek to recover the costs associated with the excavation in the Boiler House/Fuel Tank area (Pl.'s Opp'n Br., Doc. 166, at 50), the arguments advanced by both parties on the issue of the statute of limitations do not address the necessary factors.

Defendants argue that all of Reichhold's claims are barred based on the initiation of physical on-site construction of the remedy for only one Non-Released claim.  Just as the monetary threshold in the Re-Opener provision must be calculated individually for each different claim, the statute of limitations must also be calculated individually for each different claim.  There is nothing in the language of the Settlement Agreement to indicate that the parties intended that Reichhold's obligation to initiate physical on-site construction of one remedy would begin to run the statute of limitations for all future claims for remediation of other Non-Released claims, no matter when any other future Material New Environmental Obligations come about.  Such an

interpretation of the Settlement Agreement would have the anomalous result of barring all claims six years after Reichhold became obligated to remediate the first claim, even if the other claims do not arise until well after the six year period.  There is nothing in the Settlement Agreement that indicates that this interpretation was the intention of the parties.

Because the parties have not submitted evidence regarding when they claim that the statute of limitations for each individual claim advanced by Reichhold began to run, this matter is not appropriate for summary judgment.

### III.  CONCLUSION

For the reasons set forth above, Reichhold's motion for partial summary judgment is denied and Defendants' motion for summary judgment is denied.  The court will enter an order implementing this opinion.


                              s/ Dickinson R. Debevoise
                              DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:          November 20, 2008_____