**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

REICHHOLD, INC.,                         :
                                         :
        Plaintiff,                       :       Civ. No. 03-453(DRD)
                                         :
    v.                                   :       **O P I N I O N**
                                         :
UNITED STATES METALS REFINING            :
COMPANY, et al.,                         :
                                         :
        Defendants.                      :
_____  :

EPSTEIN BECKER & GREEN, P.C.
William A. Ruskin, Esq.
Sheila A. Woolson, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003
        Attorneys for Plaintiff Reichhold, Inc.

McCARTER & ENGLISH, LLP
William S. Greenberg, Esq.
Joseph R. Scholz, Esq.
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07101-0652
        Attorneys for Defendants United States
        Metal Refining Company, et al.

**DEBEVOISE, Senior District Judge**

# CONTENTS

                                                                        Page

I.  Background ........................................................    3

II.  The Parties' Contentions ........................................   10

III.  Preliminary Rulings ............................................   13

A.  Treatment Increased Costs  ....................................................   14
B.  Inclusion of Investigation Costs  ............................................   16
C.  Aerial Deposition Evidence  .................................................   17
D.  Admissibility of Evidence Establishing Costs  .......................   24

IV.  Negotiation of the of the Cleanup Plan with NJDEP  .......................   37

V.  New Environmental Obligations  .........................................   44

A.  General  .......................................................................   44
B.  Site-Wide Analytical Delineation ..........................................   45
C.  CVOCs ..........................................................................   52
D.  Capping the Staflex Parcel .................................................   55
E.  BTL Cap ........................................................................   56
F.  BTL Baseline Ecological Evaluation .....................................   56
G.  Delta Costs ....................................................................   56

VI.  Source of Contamination  .................................................   58

A.  General .........................................................................   58
B.  Site-Wide Analytical Delineation .........................................   62
C.  Staflex Parcel Cap ............................................................   66
D.  BTL Cap .........................................................................   69
E.  BTL Baseline Ecological Evaluation .....................................   76

VII.  Discussion ......................................................................   77

VIII.  Conclusion .....................................................................   86

Plaintiff, Reichhold, Inc. ("Reichhold"), commenced this action on January 31, 2003,

requesting legal and declaratory relief against United States Metals Refining Company

("USMRC") pursuant to the Comprehensive Environmental Response, Compensation and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, as amended by the Superfund Amendments

and Reauthorization Act of 1986, Pub. L. 99-499, 100 Stat 1613 (1986); and the New Jersey Spill

Compensation and Control Act (the "Spill Act"), N.J. Stat. Ann. §§ 58: 10-23.11 to 23.11(2).

Reichhold later filed an amended complaint, adding Cyprus-AMAX Minerals Company and

related entities as defendants[1].

Reichhold seeks damages from USMRC for its past and future costs to address and remediate metals and chlorinated volatile organic compounds ("CVOCs") contamination at the approximately 40-acre property formerly owned by Reichhold in Carteret, New Jersey (the "Site"). Reichhold also seeks a declaratory judgment for future investigation and remediation costs both on the Site and adjacent areas in and around the Arthur Kill that Reichhold has been directed by the New Jersey Department of Environmental Protection ("NJDEP") to investigate and address.

During the period January 22 to March 4, 2009, the case was tried without a jury. This opinion constitutes the court's findings of fact and conclusions of law.

## I. Background

USMRC was incorporated as the Delmar Cooper Refining Company in November, 1903. The name was changed to USMRC in November, 1906. Between 1901 and 1986, USMRC conducted metals refining operations on property out of which the Site was carved when USMRC sold it to Reichhold in June, 1960. (See accompanying map of Site - Appendix A.)

USMRC performed primarily three operations on its property adjacent to the Site: (1) smelting and refining copper-bearing materials, including high and low grade scrap, (2) production of standard and unconventional coppers, and (3) smelting and refining of scrap materials bearing precious metals. More than 500,000 tons of scrap per year were typically charged to the smelter. A variety of materials containing metal components were processed at

---

[1] Cyprus-AMAX has assumed full financial responsibility for any financial obligation incurred by judgment or agreed upon in settlement of this matter. For convenience, in this opinion the defendants will be deemed to be a single entity and will be referred to as USMRC.

the USMRC facility to recover copper and precious metals, including telephone and electronic scrap, automotive parts, electric motors and insulated wires.

USMRC's smelting operations produced slag as a residual.  The slag was transported from the cupola by rail car or by truck to slag storage areas including, in particular, a large slag pile on the BTL Parcel.  (See Appendix A.)

In 1930 USMRC constructed a lead plant on what became the Reichhold Site.  It began operations in 1931 and was used to refine lead and tin.  The USMRC lead plant was dismantled in or before 1952.  The lead plant was housed in the building which will be referred to as Building 401.

By letter dated November 13, 1950, USMRC agreed to sell approximately 400,000 cubic yards of granulated slag to the Villa Contracting Company.  That company intended to use this slag in connection with its contract with the New Jersey Turnpike Authority.  Slag was placed on the Staflax Parcel (See Appendix A) to form a base for a haul road over which slag was trucked to the Turnpike.

In 1956 Anchor Abrasives Co. commenced producing slag grit.  Slag, which USMRC sold to Anchor Abrasives, was run through screens to eliminate fine and large particles to create a product of uniform size.  The product was bagged and sold for sandblasting.  These screens were operated on top of the slag pile on the BTL Parcel.

In 1960, USMRC sold the 40-acre portion of its property in Carteret constituting the Site to Reichhold pursuant to a Purchase Agreement dated June 27, 1960 (the "Purchase Agreement").  The Site included a southern parcel (the "BTL Parcel") located between the Arthur Kill and a parcel of land owned by the Central Railroad Co. of New Jersey (the "Jersey Central

4

Railroad"), and another parcel located north of the railroad property (the "Staflex Parcel").  The Staflex Parcel consisted of a Northwest Field and a Southwest Field, to which reference is made in some of the relevant documents in this case.

The Purchase Agreement included a provision which allowed USMRC one year to remove "Stockpiled Materials" from the Site:

> Seller shall have the right during a period of one year from the date of closing hereunder to enter the premises at any time and from time to time to remove therefrom any of that part of the Business Property constituting bulk materials stored on the premises and listed on a list entitled "Stockpiled Materials" attached hereto as Annex "B" . . . Seller shall not be under any obligation to remove any of such materials and shall not be under any obligation to grade or resurface in any manner any areas from which any such materials are removed. At the expiration of one year from the date hereof, all such materials not so removed shall become the property of the Purchaser.

Annex B of the Purchase Agreement listed the following as "Stockpiled Materials:"

| | |
|---|---|
| Zinc Oxide | 5400 T |
| Insulated Wire | 500 T |
| Anode Ashes | 760 T |
| Misc. Cu Bearing | 1930 T |
| Smelter Insulation Ashes | 1900 T |
| Sea Sand | 1050 T |
| Disputada Concentrates | 1075 T |
| Anode Slag | 660 T |
| Coke | 1200 T |
| Reservoir Mud-Mould Wash | 100 T |
| Granulated Slag | Approx.  300T |

At about the same time it acquired USMRC's property, Reichhold also acquired the Jersey Central Railroad property lying between the BTL Parcel and the Staflex Parcel.

Reichhold constructed and operated a Polyol Plant in the south-center portion of the BTL Parcel, and it constructed a Phenolic Resin Plant, a Phenolic Molding Compound Plant and a

5

Plasticizer Plant along the eastern side of the BTL Parcel.  Phenolic resins were created by the condensation reaction of phenol with formaldelyde in the presence of various catalysts and minor additives.  Phenolic molding compounds were produced by blending and extruding phenolic and/or polyester resins with filters, initiators, inhibitors and minor additives.

In the southwestern portion of the Staflex Parcel Reichhold constructed and operated a Batch Esters Plant.  Speciality esters were produced by reacting acids and anhydrides with low to medium weight alcohols and glycols in the presence of catalysts and minor additives.

On June 27, 1986, Reichhold sold the BTL Parcel, containing its Specialty Phenolics Division, which consisted of a Phenolic Resin Plant, a Phenolic Molding Compound Plant, and a Polyol Plant (as well as most of the southern portion of the Site) to Bakelite Thermoset Limited, Inc. ("BTL").

Reichhold sold the remainder of its operations (including the Staflex Parcel) to Staflex Specialty Batch Esters, Inc., a subsidiary of Denka Chemical Corp., on March 23, 1987.  This sale included the Esters Plant and title to the remainder of the Site.  The property sold to Denka Chemical Corp. consisted of the portion of the property north of the Jersey Central Railroad parcel, the railroad property, and a portion south of the former railroad parcel containing auxiliary structures, including a Boiler House just south of the former railroad parcel.

In 1994 the Staflex Parcel was sold first to Bayer Corporation and then to C.P.H. Sub. II, Inc., a subsidiary of C.P. Hall Company ("Hall").   In May 2003, Port-Reading Carteret, LLC ("PRC") purchased the approximately 23.6 - acre Staflex Parcel.  PRC was wholly owned by Catellus Development Corporation ("Catellus").

These real estate transactions triggered obligations under New Jersey State law, formerly

6

known as the Environmental Cleanup Responsibility Act ("ECRA"), now known as the Industrial

Site Recovery Act ("ISRA").  N.J. Stat. Ann. § 13:1 K-6 et seq.  Reichhold became obligated to

investigate possible environmental contamination at the Site and to remediate such

contamination.  Reichhold's 1986 sale to BTL triggered ECRA, and ECRA Case No. 86099 was

opened.  NJDEP and Reichhold agreed to an Administrative Consent Order dated June 11, 1986.

By Amendment to Administrative Consent Order dated March 30, 1987, ECRA Case No. 86099

was amended to include the Staflex Parcel to address environmental remediation following the

Staflex Parcel sale.

Having retained the firm of O'Brien & Gere, Reichhold began its investigation and

evaluation of the Site with the submission of a General Information Statement and Site

Evaluation Statement in 1986, as required by ISRA.  NJDEP investigated the site itself and

engaged in a lengthy dialogue with Reichhold, which included many iterations of the plan to

remediate the contamination at the Site.

There resulted from these discussions a June, 1991, cleanup plan that throughout this

litigation has been referred to as the "Cleanup Plan."  The Cleanup Plan is encompassed in a

number of documents.  Reichhold contends the Plan is set forth in six documents.  USMRC

contends that a seventh document is included in the Plan.  The seven documents, about which

there is agreement except for the seventh, are as follows:

> 1) O'Brien & Gere, Proposed Cleanup Plan (June 1991);
>
> 2) NJDEP, Proposed Cleanup Plan Disapproval and Deficiency Letter (Dec. 30, 1991)
>
> 3) O'Brien & Gere, Proposed Cleanup Plan Addendum (Feb. 3, 1992);

4) NJDEP, Cleanup Plan Disapproval and Deficiency/Draft Cleanup Plan
Approval (May 15, 1992);

5) O'Brien & Gere, Response to Draft Cleanup Plan Approval Letter (June 10,
1992);

6) NJDEP, Conditional Cleanup Plan Approval (Aug. 21, 1992); and

7) O'Brien & Gere, Additional Response to Conditional Cleanup Plan Approval
Letter (Oct. 9, 1992).

Among numerous other provisions, the Cleanup Plan proposed relocating visible slag

from five existing areas of concern to the slag pile on the BTL Parcel and capping it.  The cap

was approximately 125,000 square feet - almost the entire southeastern portion of the BTL

Parcel.  The Cleanup Plan proposed to monitor groundwater for benzene, toluene, xylene and

phenol.  There was no proposal to monitor for CVOCs, ammonia or metals in the groundwater in

the first draft of the cleanup plan, and such monitoring was not added in the six subsequent

communications forming a part of the Cleanup Plan.

After the NJDEP approved the Cleanup Plan, Reichhold approached USMRC seeking

financial contribution for cleanup of the Site.  Reichhold and Cyprus-AMAX, USMRC's then-

parent corporation, entered into a settlement agreement and release with an effective date of May

25, 1994 (the "Settlement Agreement").  Under the Settlement Agreement, Cyprus-AMAX

(defined to include its subsidiaries, and thus USMRC) paid Reichhold $325,000 in exchange for,

among other things, Reichhold's covenant not to sue Cyprus-AMAX "with regard to the Site or

Hazardous Substances at or beneath the Site."  (Settlement Agreement ¶ 2.)

The Settlement Agreement, however, did not foreclose every possible claim by Reichhold

against USMRC related to cleanup of the Site.  It contained a Re-Opener Provision, which

described the claims from which Reichhold did not release USMRC.  The parties defined "New Environmental Obligations" as "new legal obligations (including, but not limited to directives or orders) to investigate, remediate or otherwise address Hazardous Substances at, beneath or migrating from the Site imposed upon Reichhold or to which Reichhold first becomes subject subsequent to the Effective Date."  (Settlement Agreement ¶ 1(c).)   The Effective Date was the date Reichhold received the settlement funds, namely, May 25, 1994.  The Re-Opener Provision defines with particularity the New Environmental Obligations that were subject to reopening.  It states, in relevant part:

3. <u>Re-Opener or Non-Released Matters</u>

Reichhold does not release Cyprus-AMAX from any claims, of any kind or any nature, arising from the following circumstances:

A.  Material New Environmental Obligations imposed by federal, state or local governmental authorities to the extent arising out of: (1) Material changes in law (including federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies) promulgated subsequent to the Effective Date, including, but not limited to: (i) Material new cleanup standards imposed by governmental authorities subsequent to the Effective Date: (ii) Material new regulations and requirements promulgated subsequent to the Effective Date pursuant to New Jersey's Industrial Site Recovery Act, P.L. 1993, c. 139 (formerly known as ECRA) or the Spill Act; (2) A Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by Cyprus-AMAX's former or current operations, but not including requirements to remediate groundwater or soil contamination at the Site to the extent the contamination was caused by Slag in the area depicted on Figure 6.05 of the June 1991 Cleanup Plan for the Site . . . A New Environmental Obligation will not be considered "Material" unless its satisfaction will result in an Increased Cost to Reichhold of $200,000.  An "Increased Cost to Reichhold" means an actual out-of-pocket cost to Reichhold over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on

9

Reichhold.

Thus, in order for Reichhold to prevail on any of its claims against USMRC for the cost of cleanup at the Site (assuming it has established liability under CERCLA or the Spill Act), Reichhold must establish (1) that the claim is due to a "material change" in the law[2] promulgated subsequent to May 25, 1994, or due to a "Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by" USMRC; and (2) that the satisfaction of the new obligation will result in an Increased Cost to Reichhold, as defined above, of $200,000.

The parties also included a provision on "Tolling of Non-Released Claims." Under that provision, the statute of limitations on any Non-Released claims that Reichhold may have against USMRC is tolled "until that time that Reichhold is obligated to initiate physical on-site construction of a remedy to address the Hazardous Substances which are the subject of the Non-Released claims contained in Paragraph 3 of this agreement." This tolling provision in the Settlement Agreement mirrors the tolling provision of the statute of limitations for a claim for a remedial action under CERCLA § 107. See 42 U.S.C. § 9613(g)(2)(B).

## II. The Parties' Contentions

Reichhold has spent large sums of money investigating and remediating the Site.

---

[2] "Law" is defined to include "federal, state or local laws, statutes, codes, regulations, mandatory governmental guidelines or enforcement policies." (Settlement Agreement ¶ 3(A)(1).) However, "law" as defined in the Settlement Agreement is limited to requirements that are generally applicable as distinguished from requirements directed to a single entity. Thus, its scope is narrower than that of a New Environmental Obligation, which, as defined in the Settlement Agreement, could include a "law," but also extends more broadly to "new legal obligations (including, but not limited to directives or orders) to investigate, remediate or otherwise address Hazardous Substances . . . imposed upon Reichhold or to which Reichhold first becomes subject subsequent to the Effective Date." (Settlement Agreement ¶ 1(c).)

Although it received $325,000 from USMRC for its covenant not to sue USMRC "with regard to the Site or Hazardous Substances at or beneath the Site," it contends that substantial portions of its expenditures were within the Settlement Agreement's Re-Opener provision, constituting New Environmental Obligations in that they resulted from a "Material amendment or revision of the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site contaminated by [USMRC's] former or current operations."

Under the Settlement Agreement a New Environmental Obligation is "material" if satisfaction of the new obligation will result in an increased cost to Reichhold of $200,000.  It is Reichhold's contention that the $200,000 requirement is met once it has expended that amount on New Environmental Obligations, and that every such expenditure thereafter is material.  The court held in its November 20, 2008, opinion addressing the parties' summary judgment motions that "[e]ach individual claim made by Reichhold must independently satisfy this monetary threshold in order to qualify as a Material New Environmental Obligation.  The costs of several different claims may not be aggregated to reach the monetary threshold for materiality."  (Slip. Op. at 30.)  The court will reexamine this ruling in light of the evidence submitted at the trial.

Reichhold defines what it asserts are the relevant parameters of the Cleanup Plan.  The Cleanup Plan, including the seven documents referred to above, imposes numerous obligations on Reichhold, most of which are not the subject of claims that Reichhold advances in this case.  These relevant Cleanup Plan requirements, according to Reichhold, are that: (1) Reichhold cap the approximately 125,000 square foot slag pile on the BTL Parcel depicted in Figure 6.05 of the Cleanup Plan; (2) Reichhold delineate visual slag in the May, 1994, Areas of Environmental Concern and relocate it to the slag pile for capping; and (3) Reichhold remediate the Site to Non-

Residential standards.

Reichhold now seeks costs that it asserts are based on six New Environmental Obligations under the Settlement Agreement.  These New Environmental Obligations are said to arise from material amendments or revisions of the Cleanup Plan that required Reichhold to:  (1) perform site-wide analytical delineation of slag and related metal contamination; (2) cap the Staflex Parcel; (3) perform ecological evaluation on the BTL Parcel; (4) expand the cap on the BTL Parcel; (5) remediate CVOCs (chlorinated volatile organic compounds); and (6) incur increased disposal costs due to lead or other hazardous contamination (referred to as "Delta Costs").  As to each claim Reichhold alleges that the remediation required was not part of the Cleanup Plan; each contamination was caused by USMRC's former operations; and each remediation exceeded $200,000 in cost.

USMRC advances numerous defenses to Reichhold's claims.  It starts with the undeniable contention that subject to the Re-Opener provision of the Settlement Agreement, Reichhold fully released USMRC of all claims against USMRC with regard to the Site or hazardous substances at or beneath the Site.  Thus, the burden is on Reichhold to prove that each claim is a non-released claim under the Settlement Agreement.

USMRC's defenses to Reichhold's claims based on amendment or revision of the Cleanup Plan are: (1) a material amendment or revision of the Cleanup Plan that requires Reichhold to "further remediate" groundwater or soils at the Site does not include investigative costs, thus excluding costs that Reichhold seeks to include to render the amendment or revision material; (2) with or without the investigative costs exclusion, Reichhold has failed to prove that any amendment or revision of the Cleanup Plan meets the materiality requirement of increased

12

costs of at least $200,000 over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold; (3) Reichhold has failed to prove two elements required to establish USMRC's liability under § 107 of CERCLA, namely, (i) that USMRC released or disposed of hazardous substances at the Site and (ii) that Reichhold incurred "necessary costs of response" as a result of USMRC's actions; (4) Reichhold has failed to prove that the response costs it incurred were consistent with the national contingency plan; (5) even if Reichhold proves all of the elements of a § 107 claim, if USMRC can prove that there is a reasonable basis for division of the harm according to the contribution of USMRC and Reichhold, each is subject to liability only for the portion of the total harm it has caused; (6) Reichhold has failed to establish a claim against USMRC under the Spill Act; (7) Reichhold has failed to prove an essential element of its claim under the Re-Opener provision of the Settlement Agreement, namely, that USMRC's operations caused the contamination of the groundwater or soils for which Reichhold seeks to be compensated; and (8) the six years statute of limitations under CERCLA and the Spill Act bars one or more of Reichhold's individual claims.

In addition to its defenses, USMRC has asserted a counterclaim for contribution from Reichhold under CERCLA § 113 and allocation under equitable principles.

These claims and defenses raised factual issues that were addressed at trial. Before and during the trial evidential issues arose the resolution of which was reserved for disposition after the conclusion of the trial.

### III.  Preliminary Rulings

There are four issues that should be resolved at the outset: (1) whether the increased cost

of $200,000 required to qualify a Reichhold claim as "Material" must be met as to each New

Environmental Obligation or whether the costs attributed to New Environmental Obligations may

be aggregated to arrive at the $200,000 threshold; (2) whether remediation costs include costs of

investigation or whether remediation costs are limited to the costs of physically removing,

capping or otherwise disposing of a contaminant; (3) whether the second report of Reichhold's

expert, Dr. Robert L. Pearson, and the testimony reflecting it purporting to calculate the quantity

of smelter dust falling upon the Site is admissible; and (4) whether Reichhold's evidence

calculating the costs it incurred remediating each of the areas on which it bases its claims is

admissible.

     **A.**  **Treatment of Increased Costs:**  The Settlement Agreement provides that a New

Environmental Obligation will not be considered Material unless its satisfaction will result in an

Increased Cost to Reichhold of $200,000.  An Increased Cost to Reichhold means an actual out-

of-pocket cost to Reichhold over and above the out-of-pocket costs that Reichhold would have

incurred if the New Environmental Obligation had not been imposed on Reichhold.

     In the court's opinion addressing the parties' summary judgment motions it held that:

"Each individual claim made by Reichhold must independently satisfy this monetary threshold in

order to qualify as a Material New Environmental Obligation.  The costs of several different

claims may not be aggregated in order to reach the monetary threshold for materiality."  (Slip Op.

at 30.)  Reichhold challenges this conclusion.  Apart from the law of the case doctrine, the

unambiguous language of the Settlement Agreement requires this interpretation.

     Paragraph 1C defines New Environmental Obligations as "new legal obligations . . . to

investigate, remediate or otherwise address Hazardous Substances at, beneath or migrating from

the Site imposed upon Reichhold or to which Reichhold first becomes subject subsequent to the Effective Date."  This suggests the imposition of more than one new obligation imposed at different times after the Effective Date.

In ¶ 2B Reichhold released all claims against USMRC with regard to the Site or Hazardous Substances at or beneath the Site except for the material New Environmental Obligations described in ¶ 3A (and private third party claims not relevant in this case).  The only ¶ 3A New Environmental Obligations upon which Reichhold relies are "Material Amendment[s] or revision[s] to the Cleanup Plan which require Reichhold to further remediate groundwater or soils at the Site contaminated by USMRC's former or current operations."  (Settlement Agreement ¶ 3A(2).)

The definition of Material makes sense only if it refers to each New Environmental Obligation individually and not to the New Environmental Obligations in the aggregate: "<u>A</u> New Environmental <u>Obligation</u> will not be considered 'Material' unless <u>its</u> satisfaction will result in <u>an</u> Increased Cost to Reichhold of $200,000.  <u>An</u> 'Increased Cost to Reichhold' means <u>an</u> actual out-of-pocket <u>cost</u> to Reichhold over and above <u>the</u> out-of-pocket costs that Reichhold would have incurred if <u>the</u> New Environmental Obligation had not been imposed on Reichhold."  (<u>Id.</u> ¶ 3A(3) (emphasis added).)   Totally different language would have been used if the costs of the several different claims were to be aggregated in order to reach the monetary threshold for materiality.  The case was tried on this theory, and Reichhold has attempted to prove that each amendment or revision of the Cleanup Plan met the Materiality requirement.

The provisions of ¶ 5 concerning tolling of non-released claims confirms that claims are to be considered individually and not in the aggregate.  "The statute of limitations for <u>any</u> Non-

Released claims . . . shall be tolled until that time that Reichhold is obligated to initiate physical on-site construction of a remedy...."  (Id. ¶ 5 (emphasis added).)

   **B.  Inclusion of Investigation Costs:**  The parties disagree about the meaning of the word "remediate."  USMRC contends that remediation costs do not include costs of site investigation and include only the costs of removing, capping or otherwise neutralizing the contaminated materials.  Reichhold seeks, and has provided evidence of, the very extensive investigative costs that it incurred in preparation for the physical remediation of the six requirements upon which it bases its claims, asserting that these costs are included among those for which it is entitled to be paid.

   USMRC argues that the Settlement Agreement treats the terms "remediate" and "investigate" as two distinct concepts.  It notes that both terms are used throughout the Settlement Agreement (a) when listing the various tasks Reichhold was being required to undertake pursuant to ECRA and (b) to define the concept of New Environmental Obligations.  It notes, on the other hand, that only the term "remediate" is used in specifying the types of amendment or revision of the Cleanup Plan that would trigger an exemption from the release clause: "[a] Material amendment or revision to the Cleanup Plan which requires Reichhold to further remediate groundwater or soils at the Site . . ."  (Settlement Agreement ¶ 3(A)(2) (emphasis added).)

   Apart from the fact that "remediation," as generally used, incorporates the investigative tasks that precede the physical decontamination process, USMRC misconstrues ¶ 3 of the Settlement Agreement.  The word "remediate" as used in the clause upon which it relies is not the measure of the compensation to which Reichhold is entitled.  It is simply used as part of one

16

of the triggering events that give rise to entitlement to compensation.

To determine the amount of the compensation to which Reichhold is entitled one must start at the very beginning of the somewhat complex paragraph.  There it is provided that "Reichhold does not release USMRC from any claims, of any kind or any nature arising from the following circumstances."  (Settlement Agreement ¶ 3.)  Tracing the language through the paragraph, one of these circumstances is the material amendment or revision of the Cleanup Plan. If there is such an amendment or revision, regardless whether "remediate" as used in this triggering clause does or does not include investigation, investigation costs are a basis for claims because they are "arising from" the material amendment or revision to the Cleanup Plan.

C. **Aerial Deposition Evidence:**  According to Reichhold, USMRC contaminated the Reichhold 40 acre tract in two principal ways.  First, through airborne deposition, it deposited on the Site enormous quantities of chemical pollutants; second, USMRC dumped throughout the Site huge amounts of slag and lesser amounts of other chemical-bearing materials.  This section of the Opinion will first address airborne pollutants.

From its outset in 1903 until its operation ceased in 1983, USMRC's copper smelter spewed vast pollutant-bearing clouds of material into the atmosphere.  The nature of the spewing changed somewhat in 1948 when a 400 foot stack was erected and attempts were begun, and continued thereafter, to introduce controls of the residue of the smelting process through dispersing the outgoing materials from a much higher level and ensuring that its fallout would take place in less concentrated form at a greater distance from the smelter.

The Site was generally west of the retained USMRC property.  The Staflex parcel is somewhat to the northwest of the smelter and the BTL parcel is somewhat to the southwest of the

17

smelter.  The particulate matter in the smelter's charge material included lead, copper, zinc, chromium, and cadmium, traces of which would be found in the plant's emissions.  In Carteret, the winds blow generally from the west, the southwest or the northwest, thus away from the Site and towards the smelter.  However, on occasion the winds come from the east, northeast or southeast.  A critical issue in this case is the extent to which there was dumped upon the Site particles coming from the smelter bearing pollutants, lead in particular.  Testimony of the parties' experts differ to an extraordinary degree.

Reichhold's expert was Robert L. Pearson, Ph.D., P.E., who is Vice President of CH2M Hill.  He has more than 36 years of experience in environmental and technical engineering, regulatory review and assessment, preparation of industrial compliance policies, and environmental consulting.  He prepared two reports in this case.  In the first, dated February 28, 2006, he was unable to give an opinion about the quantity of deposition material flowing from the smelter onto the Site.  He stated, on the basis of data available to him, particularly a modeling report of USMRC's environmental engineer, Richard Dunk, that over the years significant amounts of metals were deposited on the Reichhold property and that the depositions accounted for a significant portion of the soil contamination that is detected on the Site.

Dr. Pearson issued a second report dated May 30, 2007.  First developed by the EPA in 1979, the Industrial Source Complex Model ("ISC") is a computer program that is designed to calculate the concentrations of air pollutants that would result from a given source of emissions.  A great deal of information about the source of the pollutant, the meteorology of the location, the terrain and other variables is fed into a computer and the model estimates the increase in the air pollutant at another location.  Using a team from CH2M Hill, Dr. Pearson applied the ISC model

18

to the pollutants emanating from the USMRC smelter to determine the depositions from that source on the Reichhold Site.  Dr. Pearson himself was insufficiently familiar with the ISC model to make the appropriate entries into the computer, and an associate at CH2M Hill, working with him, performed that function.

Dr. Pearson followed similar procedures that Dunk had previously used when applying the ISC model.  He modeled for only a 38 year period during which the 400 foot stack was in use, and he assumed that the emissions were controlled, that is, that protective control devices were in place and fully effective.  He entered emissions derived from the smelter only and not from other sources, such as the lead plant.  He treated separately the depositions caused by wind scouring of the piles of slag located at various places on the Site or on USMRC property adjacent to the Site.

The conclusion at which Dr. Pearson arrived was that, during the 38 year operating history, from the smelter alone there was deposition on the Site of 57 tons of lead.  This did not include lead deposition resulting from smelter operations prior to the 38 year period, nor did it include lead depositions resulting from slag pile scouring or such activities as road building, slag hauling, slag crushing or slag dumping.

USMRC's expert, Kirk Winges, is a principal consultant at the environmental consulting firm Environ International Corporation.  His primary area of expertise for 31years has been atmospheric  modeling studies involving use of computer models.  He has run air quantity models thousands of times.  USMRC retained him for a limited purpose - to critique Dr. Pearson's opinion based upon Dr. Pearson's use of the ISC model.  He was not retained to provide his own opinion about the quantity of lead depositions on the Site resulting from the operations of the

USMRC smelter.

Mr. Winges's critique of Dr. Pearson's application of the ISC model was devastating. The first error he noted was a mathematical error in which Dr. Pearson was off by a factor of 3, finding 1.5 tons per year instead of the mathematically called for 0.56 tons per year. Correcting this error would result in his ultimate conclusion becoming 1/3 of 57 tons of lead deposition.

The next error cited by Mr. Winges is Dr. Pearson's misapplication of the friction velocity factor that is critical in determining deposition. Friction velocity is the wind speed at the surface of the ground. It is calculated using an EPA computer program - RAMMET. Dr. Pearson, or his associate, did not use RAMMET and arrived at velocities ranging from .65 to 1.2. One half were higher than the wind speed, which is physically impossible, and even the low point was not physically possible.

Mr. Winges, using RAMMET, obtained friction velocities of a factor 100 lower than that used by Dr. Pearson. Mr. Winges also found that Dr. Pearson's particle density figures threw his results off by a factor of three. Further, two of the wind directions shown in Dr. Pearson's diagrams did not carry the ambient air flow over the Reichhold site.

Mr. Winges re-ran Dr. Pearson's ISC calculation, correcting all of his errors. He arrived at a 38 year deposition on the Site of 95 pounds instead of 57 tons. The amount of the deposition, he testified, could not cause 400 parts per million of lead in the soil and thus lead to an environmental violation. Further, not finding an even distribution of lead over the surface of the Site, Mr. Winges concluded that contamination on the Site is unconnected with airborne distribution.

Mr. Winges's analysis of Dr. Pearson's calculations is highly persuasive, leading to

rejection of Dr. Pearson's second report to the extent that it is based on his attempted utilization of the ISC model. That is not to say, however, that Mr. Winges's use of Dr. Pearson's ISC model as corrected is evidence that deposition from the smelter during the 38 year period was a mere 95 pounds. In the first place, it became obvious that there is not sufficient data to run an ISC model. Further, while Mr. Winges, in running his calculations, corrected all of Dr. Pearson's errors that pointed to a higher deposition rate, he failed to include the significant factors that Dr. Pearson did not include in his calculation that pointed to a higher deposition rate. Dr. Pearson relied on the models that Dunk submitted to NJDEP. Those models omitted various sources of emissions.

Equally important, Mr. Dunk, Dr. Pearson, and Mr. Winges assumed in their calculations that the smelter emissions were controlled. The evidence established that the USMRC smelter operations were virtually uncontrolled. Devices that were installed were defective or not working, and many of the devices were projected but not yet installed. The EPA has established a ratio between controlled and uncontrolled emissions in smelters and cupolas. With respect to insulated copper wire, a factor of 120 is attributed to uncontrolled emissions and a factor of 5 to controlled – 24 times greater if uncontrolled. With respect to scrap copper and brass, a factor of 120 is attributed to uncontrolled emissions and a factor of 1.2 to controlled – 35 times greater if uncontrolled. Use of these factors would have greatly affected Mr. Winges's calculation (as well as Dr. Pearson's).

The testimony of Dr. Pearson and Mr. Winges relying on use of the ISC model is of no help concerning the airborne deposition on the Reichhold Site. There is other evidence that bears on that question. There were other sources of airborne depositions than the smelter, such as the slag piles, the haul road, transportation of slag, Anchor Abrasive's crushing slag for use in

21

sandblasting, and the lead plant operations. Both Dr. Pearson's and Mr. Winges's testimony is relevant to the extent of such depositions.

Richard Kunter, an extracting metallurgist, described the copper smelting process in detail, starting with conversion of the material to be refined into a molten state at the smelter's cupola, retrieving the desired product and ultimately processing and disposing of the resulting slag.

There are charge doors at the top of the cupola (about 80 feet off the ground), where the raw material that is being smelted is put into the cupola with a crane. The "doors" are not actually doors; they are heavy chains. When a 30 ton charge is dropped through the chains, there is apt to be a fairly high velocity gas blow back, resulting in eight tons of lost fumes per day of operation.

At the outset, in 1903 when the smelter started, there was not much abatement. In the 1930's, there was installed a Cottrell electrostatic device which was effective for large particles, but not so effective for flue gas. In the 1970's, USMRC put in a baghouse which has a woven weave that takes out particles that are coarser than the weave. Covers were added surrounding the top of the cupola. The output of gas going through the baghouse goes to the stack.

Between 1980 and 1986, other pollution control devices were installed – spray chambers, after burners and in 1983 or 1984, a doghouse. A doghouse is an enclosure that covered the blast furnace with an induction fan or fans that would take fugitive emissions coming from the furnace and, rather than releasing them into the ambient air, would release the emissions through the after burner and the spray chamber and then to the baghouse.

Between 1980 and 1982 the tall stack was built. This was designed to achieve greater dispersion before the emissions reached breathing or ground level.

Of particular usefulness is Exh. C-4, the April 1961 Report of Herbert H. Kellogg which,

22

during a five-day period, measured all substances entering and leaving the USMRC cupola (the "Kellogg Report").  Technicians measured all of the material that came out of it, including the slag and the various dusts captured in the abatement area and the eight tons per day of fugitive dust that came from the top of the cupola as described above.  It identified the contamination coming out of the smelter.  This included the metals cadmium, zinc, lead, copper, tin, and nickel.  In addition, there was fugitive dust loss through the stack and through the louvers at ground level through which fans would push the dust.  The loss of baghouse dust to the stack, plus other minor losses were estimated as four percent of the baghouse dust or 6 l/2 tons per day.

The Kellogg report essentially described conditions as they existed in 1961.  USMRC's Mr. Dunk testified that because of the installation of control equipment, conditions improved dramatically after 1980.  Thus, the Kellogg Report can be considered an accurate description of emissions from the smelter's operations at least for the period from 1961 to 1980.

Other evidence demonstrates that even in the 1980's, fugitive dust sources resulting from the smelter's operations were still largely uncontrolled.  There were continuing state and county notices of violation of air quality standards.  The State of New York brought suit against USMRC in this court, obtaining injunctive relief.  Control equipment was either missing, defective or non-operative.  The violations resulted in the plant being ordered to shut down for five months that ended February 6, 1986.  When the plant reopened the baghouse was not working.

Thereafter, the same kinds of fugitive emissions, including the charge door emissions described in the Kellogg Report continued to flow from the smelter.  Violations of the permits and the court order occurred regularly.  Dr. Philip L. Landregan, a professor at Mount Sinai Hospital Department of Community Medicine, Division of Environmental and Occupational Medicine in

New York City, prepared a report dated March 6, 1986, for this court in the State of New York lawsuit.  He cited the 1984 New Jersey State Implementation Plan for Lead which stated that "USMR emits 50.1 tons of lead per year from its stacks and releases another 36 tons per year in the form of fugitive emissions."  After a review of available data and after testing his many soil samples, Dr. Landregan concluded that "[t]he available data indicates clearly that large quantities of lead are released into the atmosphere from USMRC.  The air sampling data from New Jersey indicate that the emission control measures which had been established by USMR through mid-1985 are not effective in reducing lead emissions from the plant to levels below the EPA's National Ambient Air Quality Standard for Lead."

It cannot be determined from the evidence the amount of contaminating metal that USMRC's smelter caused to be deposited on the Site by aerial deposition from commencement of operations in 1903 until the smelter closed down in 1986.  For the entire period, the smelter spewed forth enormous amounts of contaminating materials, entirely from the cupola until a stack was built and thereafter both from the cupola and the stack.  Even after controls were put in place the controls were inadequate, defective and often non-functional.  The wind blew this outpouring in the direction of the Site only about 14% of the time.  Disregarding Dr. Pearson's attempt to quantify the amount of contaminating material that fell on the Site from this source, the testimony of other witnesses and reports in the record establish that contaminated dust deposition on the Site was considerable.  In light of the slag and other contaminants found on the Site that were placed there by USMRC, it is unnecessary to arrive at more definitive finding with respect to aerial depositions.

D. **Admissibility of Evidence Establishing Costs:**  Under ¶ 3 of the Settlement

Agreement a New Environmental Obligation is subject to the Re-Opener provision only if it is "material."  "Material" is defined as follows:

> A New Environmental Obligation will not be considered "Material" unless its satisfaction will result in an Increased Cost to Reichhold of $200,000.  An "Increased Cost to Reichhold" means an actual out-of-pocket cost to Reichhold over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold.

Reichhold has identified six tasks that the NJDEP imposed upon it that it claims are Material amendments or revisions to the Cleanup Plan.  To qualify each for re-opening Reichhold must, at the outset, establish that its implementation resulted in out-of-pocket increased costs to Reichhold of $200,000 or more, over and above the out-of-pocket costs that Reichhold would have incurred if the New Environmental Obligation had not been imposed on Reichhold.

By 1994 Reichhold believed that it had completed the original Cleanup Plan.  In 1994, however, after an inspection of the Site by a new NJDEP case manager, NJDEP began imposing new requirements upon Reichhold.  Reichhold believed these constituted Material New Environmental Obligations, and during the ensuing years it sought without success to involve USMRC in the discussions with NJDEP.  Reichhold recognized that there was a likelihood that it would have to pursue claims against USMRC, and beginning in 1996 took steps to document its claims.

The court has held that the $200,000 requirement is applicable to each New Environmental Obligation, and starting in 1996 Reichhold took some steps to allocate payment invoices to particular projects, but the six remedial actions upon which the present claims are based had not been identified separately, and invoices were not allocated in these six categories.

Reichhold's attempt at this time to prove the cost attributable to each claim faces formidable difficulties.  In about 1995 Reichhold began to incur costs in responding to NJDEP's demands, but the paper copies of invoices for that year could not be located.  There are about 60 missing invoices for the following years when invoices generally are available.  Of these, 51 are from a single laboratory, Envirotech, three are payable to the New Jersey State Treasurer and five are payable to O'Brien & Gere.  In 1996, when an effort was begun to allocate payments, the allocation was only done in a most general way.  For example, metals remediation was one category, but metals remediation was the subject of several of the six projects for which Reichhold is making a claim.  A number of the invoices are for work performed on more than one of the six projects, e.g., for management fees or for both metals and CVOC related work.  USMRC argued that invoices for investigative work would have to be excluded, but because the court has held that investigative work is part of the remediation process, such exclusion is unnecessary.

USMRC objected to the testimony of Reichhold's Charlotte White and to Exh. P-822 that she prepared.  P-822 includes an Exhibit A consisting of summary charts, arranged by year, of all invoices received by Reichhold related to the Carteret Site from 1996 through 2008.  The vendors included Reichhold's environmental consultants, analytical laboratories, contractors and others.  Accompanying each summary are copies of the invoices for the applicable year.  With respect to the year 1995, Exhibit B to P-822 is a summary prepared from Reichhold's records other than the missing 1995 invoices which detail the 1995 expenditures related to the Carteret site.

In her testimony Ms. White described how Reichhold processed invoices in the years beginning in 1996.  Upon receipt, the paper invoices that related to environmental projects were

26

distributed to the project manager for approval.  Pertinent data was entered into the computer system used for accounts payable and then the invoice was paid.

Ms. White prepared the spread sheets from the computer system and then pulled the invoices (other than the missing 60) from 1996 to the present for each year, appending them to the spread sheets.  For the year 1995, Ms. White referred to the Accounts Payable Distribution Report, which was an accounting of all the invoices that were entered into the computer system that was used during that year, listing the invoice number, the invoice amount, the dates and the other data keyed into the present computer system.  Using similar data Ms. White was able to obtain verification of the information relating to the 60 missing invoices.  The spread sheets from 1996 to 2008 list 663 payments.

Ms. White testified that Reichhold paid all 663 invoices listed in the summaries.  At the conclusion of her testimony the court overruled USMRC's objection to the testimony and Exh. P-822.  At USMRC's request, Ms. White's January 5, 2009 affidavit was included as a part of the exhibit.  The requirements of Fed. R. Evid. 1006 had been met.  The relevance of the exhibit was dependent upon Reichhold's ability to establish that the individual payments reflected in the exhibit were paid on account of one or another of the projects for which Reichhold was asserting a claim against USMRC.  Reichhold attempted to do this primarily through the testimony of two witnesses, Kelly Stynes and Robert Stoldt.

Reichhold hired Ms. Stynes in 1996 as a project manager for its environmental work at the Carteret Site.  She continued there until 1998.  When she started at Reichhold the remedial action required by the Cleanup Plan had been completed or was winding down, and Reichhold was in the process of responding to letters from the NJDEP requesting additional investigation and response

action.  Some of them related to metals in the northeast and northwest fields of the Staflex Parcel.
This resulted in negotiations with NJDEP and, in view of the Re-Opener provision in the
Settlement Agreement, communications with USMRC.  Ms. Stynes understood that "any
additional work not identified in the 1991 cleanup plan, specifically figure 6.05, related to metals
that exceeded $200,000 would constitute a reopener."  (Stynes, 2/5/09 at 28.)

Slag had been discovered in the northwest and northeast fields, and O'Brien & Gere was
in the process of proposing to NJDEP various methods of remediating it.  Similar discussions
were taking place concerning the entire BTL Parcel.

Ms. Stynes testified about the manner in which invoices for the project were handled.  As
project manager she was required to review invoices and approve or disapprove them for
payment.  When she took over the project there was no separation of the invoices by task, but
soon it became clear that Reichhold would want to start tracking the costs by task in order to
implement the Re-Opener.  She asked O'Brien & Gere to begin tracking the costs separately.
That began in 1996.  Metals were a major concern, and O'Brien & Gere set up authorizations
specifically for metals and also for quarterly groundwater monitoring and PAH sampling on the
Staflex Parcel.

The final NJDEP requirements had not yet been determined, and consequently the task
classifications did not correspond to what ultimately became the six remediation projects on
which Reichhold bases its claims.  For example, a major category that O'Brien & Gere laid out
was metals.  Metals, however, are now part of several of the claims.

Ms. Stynes identified several invoices to which task numbers had been assigned.  Task
authorization 3 reflected that the invoice was for a part of the CVOC impact investigation.  Task

authorization 8 reflected that the invoice related to soil and exposed slag, i.e., metals.  In 1996, all invoices with the code task 8 would be slag or metal related and all invoices with the code task 3 would relate to the CVOC investigation.

Unfortunately task force code numbers changed year by year.  In 1997, the number for slag and metals became 9, and 8 became associated with a different task.  There must have been some reason for these changes, but they complicate allocation of invoices to the projects on which Reichhold bases its claims.  Reference was made to invoices that encompassed a number of different tasks, and Ms. Stynes testified that O'Brien & Gere separated out the costs associated with the metals aspect of such invoices.  She testified also that simply looking at most invoices would enable a person to determine what it was for.  At the time Reichhold was particularly concerned with charges related to metals generally and to CVOCs.  If the invoice lacked sufficient specificity to disclose the nature of task, its date and field notes would enable a person working on environmental concerns to determine what the invoice was for.

Ms. Stynes testified that the all-encompassing metals category related to both the Staflex Parcel and the BTL Parcel, and during her time at Reichhold nothing was done to differentiate metals used for one or the other.  That could be done only by going back and determining from the records what was being done at the time for which the invoice was submitted.  From that it would be possible to determine for what the invoice was submitted.

The testimony of Ms. White and Ms. Stynes and Exh. P-822 standing alone might establish in a general way the amount of money Reichhold spent remediating environmental contamination during the 1995-2008 period.  Without individual allocation it does not establish the materiality of any of Reichhold's six claims.  During much of this period there were on-going

negotiations between NJDEP and Reichhold, and the precise parameters of NJDEP's requirements were not defined until late in this process.  For that reason it was impossible to allocate invoices to one or another of the six claims as they came in.  The requirements forming the basis of the claims had not been established at the time the invoices were paid.

Of necessity, when these requirements became fixed, Reichhold had to go back and allocate the invoices to specific NJDEP requirements both to determine if the project involved was material and to determine the amount of its claim on account of that project.  In some instances the amounts involved were so large, materiality was and is not really an issue and only the amount of damages claimed had and has to be determined.  In other instances the amounts involved were so close to $200,000 that both materiality and the amount of damages were and are at issue.

Reichhold added Robert Scott Stoldt to fill the huge gap left by the White and Stynes testimony.  Mr. Stoldt is a specialist in hydrogeology who started his career as a staff geologist at O'Brien & Gere in late 1994, moving to CH2M Hill in April, 2005, where he became an associate project manager and is presently working.  At both of these firms Mr. Stoldt was assigned to the Reichhold facility in Carteret.  At the outset of his employment he reviewed the 1991 Cleanup Plan.  His understanding of Reichhold's obligations under the Plan is the same as those described by other Reichhold witnesses.

Mr. Stoldt testified that in 1995 the BTL cap required under the Cleanup Plan had been completed.  He became familiar with the November 1994 NJDEP investigation of the Site and the resulting requirement that Reichhold inspect the entire site and analytically collect samples for PP metals (proprietary pollutant metals).  Wherever contaminants remained on the site above

30

residential criteria, engineering institutional controls were required.  Other NJDEP requirements were imposed thereafter.

Mr. Stoldt was asked to compute the costs Reichhold incurred in complying with NJDEP's demands that became the subject of Reichhold's six claims.  In essence it was his assignment to review the invoices referred to in Exh. P-822's spreadsheets and allocate them to the claims to which they related.

For each year, Mr. Stoldt set up a project number identifying the various tasks that the Reichhold Carteret project undertook in that year, such as project management, groundwater activities, and metal activities.  He assigned the invoice amounts to the Reichhold claims to which they related.  When the invoices were for mixed activities, such as a project management task or an invoice was for both metals and organic issues, Mr. Stoldt allocated the invoice based on the time period to which the invoice related.  He was able to allocate, for example, a percentage that was related to metals and a percentage that was related to organics.  Mr. Stoldt testified that because he was personally aware of the activities occurring on the project he could classify the invoices in an appropriate way.  This is consistent with Ms. Stynes's testimony.  For the limited period at an earlier time when she had to allocate mixed invoices to particular tasks, she was able to do this by examining field notes relating to the dates covered by the invoices.

Mr. Stoldt conducted what he called an "analytical check" to confirm the numbers that he had arrived at by allocating mixed invoices.  This determination was based on his review of the invoices and preparing a ratio of unmixed invoices and the project management invoices.  The analytical check in each instance resulted in figures very close to those derived from allocation of mixed invoices.

Mr. Stoldt testified with respect to each Reichhold claim, computing in the manner described above the costs Reichhold incurred in performing the task.  He started with Reichhold's claim based on the requirement that it perform Site-wide analytical delineation of slag and related metal contamination.

By February 5, 2001, delineation of the soils contamination both on the northern Staflex Parcel and the southern BTL Parcel was complete.   To determine the costs of the work to Reichhold, Mr. Stoldt first reviewed the invoices from the period of time during which the Site-wide analytical delineation was occurring.  He omitted the 1995 invoices and started the review process in March 1996, continuing through the end of January, 2001.  The total of these invoices was $279,512.  When he performed the analytical check the figure was $252,794.

The next claim that Mr. Stoldt addressed was the Staflex Parcel Cap.  After Reichhold had been instructed to remediate the Staflex Parcel, it proposed several alternative plans that had to be rejected or modified as new conditions came to light.  As part of the Site-wide delineation programs it was discovered that metals affected the entire Parcel and therefore the cap had to be expanded to include almost all of it.  In addition, the obligation to perform an ecological evaluation became part of the technical requirements in 1997.

Mr. Stoldt prepared estimates of the cost of constructing a cap.  They ranged from $1.3 to $1.5 million.  This did not include future costs that would be required to maintain the cap and certify it on a biannual basis.  As events turned out, Reichhold negotiated with the new property owner, C.P. Hall, to create a Remedial Action Work Plan ("RAWP") to spell out the cap proposal. NJDEP approved the RAWP, but the subsequent owner, Port Reading Carteret, LLC ("PRC"), found that the RAWP was inconsistent with its plans to develop the site.  PRC submitted a RAWP

32

Addendum in November 2003, and in exchange for $900,000, to be paid by Reichhold, agreed to assume Reichhold's obligations on the Staflex Parcel.  PRC executed an Environmental Responsibility Agreement ("ERA") with Reichhold and a Memorandum of Understanding with NJDEP.  Under the ERA Reichhold is obligated to pay PRC $900,000 upon presentation of a NJDEP No Further Action Letter.  Mr. Stoldt testified that the $900,000 was reasonable in light of his estimates of what it would cost Reichhold to construct the Staflex Parcel cap.

USMRC contests inclusion of the $900,000 obligation to PRC as a Reichhold cost.  The fact that Reichhold arranged with PRC to perform its capping obligation (paying PRC for undertaking this responsibility) does not alter Reichhold's obligation to NJDEP to complete the capping.  Upon receipt of a No Further Action letter, Reichhold's obligation to pay the $900,000 becomes irrevocable, an obligation caused by USMRC's metals contamination, as will be discussed in a subsequent section of this opinion.

Prior to the agreement with PRC, Reichhold had incurred additional costs in connection with remediation of the Staflex Parcel, in addition to the analytical costs.  Mr. Stoldt reviewed the invoices for the period February 2001 to date and extracted those that related strictly to the Staflex capping activities and the ecological evaluation for the Parcel.  Again there were invoices that were mixed for which he had to perform an allocation.  This resulted in a figure of $361,158 in addition to the future $900,000 payment.  Mr. Stoldt also performed the analytical delineation which resulted in a $338,263.00 figure.

Mr. Stoldt pursued the same procedure to compute the cost of remediating CVOCs.  The initial cost figure was $221,852.  Upon cross-examination he conceded that certain of the invoices that had been included were for expenditures for which USMRC could not be held responsible.

33

These totaled $17,210.  After deducting this amount, Reichhold sought $204,642 for CVOC remediation.

It developed that only $27,000 represented hard remediation costs.  These costs consisted of use of a hydrogen release compound.  The balance of the costs was incurred for maintaining monitoring wells and obtaining laboratory reports analyzing the specimens from the wells.

The monitoring wells were required not only to check on the presence of CVOCs.  They were required to monitor the presence of other chemicals such as benzene and phenol.  Reichhold, not USMRC, was responsible for any remediation required by reasons of the presence of these chemicals.  In order to allocate an appropriate share to USMRC, Mr. Stoldt applied a 37.5% figure to the monitoring and laboratory costs, adding the total to the hard monitoring costs of approximately $27,000 to arrive at $204,642.

The court concludes that in light of the number of monitored chemicals for which USMRC was not responsible, the 37.5% attributed to the presence of CVOCs was excessive.  Assuming that USMRC was responsible for the presence of CVOCs, the cost of their remediation would not exceed $200,000, and consequently Reichhold is not entitled to reimbursement for these costs under the Settlement Agreement.

Next, Mr. Stoldt addressed the costs associated with capping the BTL Parcel.  In 2006 NJDEP required Reichhold to cap the entire BTL Parcel.  Under the 1991 Cleanup Plan the BTL Parcel slag pile and relocated visible slag from other areas had to be capped.  The new requirement extended the cap to the southern part of the BTL Parcel and overlapped part of the original capping.

Mr. Stoldt identified bid and contract documents for the new BTL Parcel cap.  Quotes

34

were sought from 13 contractors, and most responded with bids.  Based on these bids the anticipated cost of the cap is $2.3 million.  In addition Mr. Stoldt computed in the manner previously described the costs that Reichhold has incurred for preparatory work on the cap.  Again some of the invoices required allocation.  And again Mr. Stoldt performed an analytical check.  The costs already incurred amounted to $696,425.  Using the analytical check the costs already incurred amounted to $725,228.

In March 2004, NJDEP ordered Reichhold to conduct a baseline ecological evaluation of the BTL Parcel.  This involved the same process as the Staflex Parcel baseline ecological evaluation and similarly was driven by metals contamination.  Reichhold completed a first evaluation and O'Brien & Gere concluded that the metals were retained as contaminants of ecological concern, and that the historical remedial activities conducted to date, as well as the proposed remedial action, cut off any exposure pathway to the receptors and, therefore, no additional investigation was warranted.  NJDEP did not agree with this conclusion, and in March, 2005, requested Reichhold perform another baseline ecological evaluation.

The new evaluation was to address potential discharges of contaminated groundwater to surface water and wetlands.  NJDEP was concerned about the Arthur Kill and the western drainage ditch.  The fresh water wetland areas were located along the banks of the Arthur Kill and within the western drainage ditch.  Reichhold, then acting through CH2M Hill, completed the additional baseline ecological evaluation.  Metals were the contaminants that gave NJDEP concern for the three environmentally sensitive areas - the Arthur Kill, the western drainage ditch, and the wetlands located adjacent to the site.

Despite Reichhold's resistance, in March 2006, NJDEP required Reichhold collect

samples from the Arthur Kill sediments, as well as the western drainage ditch and the wetland mud flat.  Reichhold continued to comply with NJDEP's requests in this regard, but, not satisfied, NJDEP requested further evaluations, the most recent one, at the time of trial, having been received in January, 2009.

Mr. Stoldt computed the costs to date of the baseline ecological evaluations.  He reviewed the invoices and identified those associated with the evaluations on the BTL Parcel.  There were mixed invoices that he allocated by reviewing the invoice, the invoice period, and the work conducted at the time, and allocated the proper amount to the ecological evaluation.  His total costs for this project to date was $220,837.  Performing the analytical check, Mr. Stoldt arrived at $203,479.

The final item for which Mr. Stoldt computed costs was the so-called "Delta costs."  This consisted of costs associated with having to dispose of contaminated hazardous soils by excavation that otherwise would have been disposed of at a lesser cost as non-hazardous soils.

NJDEP had required removal of TPH contaminated soil.  In June of 2004, NJDEP expanded the requirement to include battery casings and other materials encountered as well as expanding the post excavation analytical sampling, which was initially just TPH, to include a variety of compounds, including metals.  In Mr. Stoldt's opinion USMRC was responsible for the battery casings.  Reichhold had no use for battery casings, and they were found at a lower level during the boiler house excavation.

There was another area near the Arthur Kill where resin material was located.  It was excavated, sampled and deemed to be hazardous for the presence of metals.  Its hazardous nature greatly increased the costs of disposing of it.

36

Reviewing the invoices for the disposal of the hazardous material, Mr. Stoldt calculated the costs that would have been incurred to dispose of the material as non-hazardous and deducted that cost from the cost to dispose of it as hazardous material, arriving at an extra cost of $257,521. Application of the analytical method would have derived the same figure.

Although Reichhold has made a single claim for the extra costs incurred by reason of the necessity to dispose of hazardous rather than non-hazardous material, it is apparent that two separate New Environmental Obligations are involved and that they cannot be lumped together to determine their materiality.

The excavation of the resin spill at the Arthur Kill area was accomplished in 1998.  The excavation at the boiler house of the battery casings and other materials occurred in 2004. Although each addressed metals and involved extra disposal costs by reason of the hazardous nature of the contaminant, they occurred at different times and different places.  They were separate obligations.  The Delta costs of the 1998 excavation was approximately $65,000. Therefore, the Delta costs of the boiler house excavation would have been $192,000.  Because neither of these two separate New Environmental Obligation reaches the $200,000 materiality level, Reichhold is not entitled to reimbursement for its Delta costs.

The court concludes that Reichhold's method of calculating costs is reliable.  The combined testimony of Ms. White, Ms. Stynes and Mr. Stoldt together with the supporting exhibits is accepted as a basis for establishing the amount of Reichhold's costs for its various claims.

## IV.  Negotiation of the Cleanup Plan with NJDEP

Richard P. Cawley was Vice President of O'Brien & Gere, the environmental consulting

firm which Reichhold utilized during its initial dealings with NJDEP.  Reichhold relies heavily upon his testimony to establish that the remediation projects upon which it bases its claims were amendments or revisions to the Cleanup Plan.  Cawley dealt with NJDEP in connection with the initial studies of the Site, the negotiation of the Cleanup Plan, implementation of the Cleanup Plan and continuing interaction with NJDEP.

Reichhold's sale of this Site in 1986 and 1987 triggered the ECRA process.  Initially Reichhold was required to submit to NJDEP a summary of its operations and an environmental resume.  In addition, Reichhold was required to submit a sampling plan to provide an assessment of the facility.  NJDEP assigned a case manager to the Reichhold site, who, with his staff, engaged in inspections and frequent interchanges with Cawley.

O'Brien & Gere proceeded to prepare the General Information Statement ("GIS") and Site Evaluation Statement ("SES") that contained detailed information concerning such subjects as Reichhold's operations history, evaluation of Site conditions, a spill history, and a proposed sampling plan.  To prepare these documents O'Brien & Gere engaged in extensive interviews with people at Reichhold, studied its operations, ascertained the location and impact of hazardous substances and walked the entire Site.

During these 1986 walk throughs of the Site, interviews, and review of documents, O'Brien & Gere found no evidence that Reichhold had filled any portion of the property with slag, that it had discharged metals into the property or, except for organic chemicals that Reichhold had used in its operations, had introduced organic chemicals into any portion of the property.

During his early walk throughs Mr. Cawley observed slag.  There was the six acre slag pile on the BTL Parcel.   There was slag along the fence line at the western border between Reichhold

and USMRC.  It consisted of a 10 to 20 foot high pile of slag on the USMRC side, some of which spilled through the fence onto the Reichhold side.  No slag was observed on either the northwest or northeast fields of the Staflex Parcel.

In its July, 1986, sampling plan submitted to NJDEP O'Brien & Gere did not propose any sampling for slag on any portion of the Site, reasoning that it had been placed there by the previous owner.  Representatives of NJDEP reviewed the sampling plan, inspected the Site again in April, 1987, and prepared written comments on the sampling plan.  The letter containing the comments added certain proprietary pollutant metals analyses to Reichhold's proposed plan but did not ask for sampling for slag.

O'Brien & Gere responded that any analyses for metals would be unnecessary as the slag itself could be visually observed.  Reichhold proposed to identify visually the slag material and collect representative samples to determine potential concerns.  In response, NJDEP approved a three step process: (1) samples of the slag would be taken at each of the five areas where it had been observed; (2) the delineated slag at each of these areas would be distributed; and (3) a soil sample beneath the slag in each area would be taken to determine the impact of the slag upon the soils.  The five areas of concern ("AOCs") where there was visible slag were: the Compressor Area; Building 404; Fuel Loading/Fuel Oil Storage Tank Area; Trash Compactor Area; and the Alkaline Seepage Area.

Additional NJDEP inspections of the Site took place shortly after approval of the sampling plan.  Still no slag was observed on the northwest and northeast fields, and there was no discussion of slag on those fields.  O'Brien & Gere reported to NJDEP in detail concerning slag located on the BTL Parcel.

Thereafter O'Brien & Gere prepared a conceptual ECRA cleanup plan for the Site.  It proceeded on the theory that where there were elevated metals at the site they would be there due to wind blown slag.  For areas where Reichhold caused contamination, O'Brien & Gere proposed to excavate but did not propose to do anything with respect to slag.

In response, NJDEP suggested relocating the slag that had been visually identified to the central location on the BTL Parcel and capping it.  There was further interchange between O'Brien & Gere and NJDEP concerning additional sampling that continued into 1990.

A June, 1990, proposed cleanup plan refined the method for dealing with slag.  There was still no mention of slag in the northwest and northeast fields.  The overall plan for slag on the BTL Parcel was to take it from the five areas where it was visible and move it over to the slag pile on the southwestern part of the BTL Parcel and cap the pile.  As for groundwater, there was an underground tank that had leaked, and it was proposed to empty and remove the contents of the tank.  There was also a proposal to remediate groundwater oil, benzene toluenes, ethyl benzene, silene, phenol, and acid extract tablets.  As for ammonia and metals, Reichhold disclaimed responsibility for them because they had migrated to the Site from the USMRC property.  In its response, NJDEP wanted full delineation of the slag material in the area to be covered.

Reichhold had proposed no further action for a series of areas of concern, and NJDEP approved those.  The northeast field was not discussed because it was never an area of concern.

Thereafter Reichhold and NJDEP developed a phase three sampling plan before Reichhold's submission of its June 1991 Cleanup Plan.

A major part of the June 1991 Cleanup Plan related to contamination in and around production facilities that Reichhold had operated during its ownership such as the Polyol Plant,

the Phenolic Resin Plant, and the Batch Esters Plant.  The proposal for the slag areas read as follows:

> The exposed slag will be encapsulated with a fill/vegetative cover to eliminate the inhalation and ingestion pathways of the metals contained in the slag material.  The exposed slag encompasses an area of approximately 125,000 square feet and can be found on Figure 6.05.  Initially, the slag material will be graded to provide for positive drainage.  Stabilization fabric will then be placed in sections of the area to facilitate stockpiling and placement of the fill material.  A 12-inch layer of clean fill and a 6-inch layer of topsoil will be applied over the slag and stabilization fabric.  These layers will be placed in 6-inch lifts and compacted to 90% of maximum dry density.  Following compaction, seeding and mulching will be applied to prevent cover erosion and to minimize runoff.

There was a proposal for monitoring groundwater at the slag area for benzene silene and tolene phenol.  There was no proposal to remediate CVOCs, ammonia or metals in groundwater.

In a December 30, 1991 response, the NJDEP stated with respect to the deposit of 12 inches of clean fill topped with 6 inches of topsoil, "[t]his approach may be acceptable provided additional clarification and modifications are presented as discussed below."  The extent of the area to be remediated was questioned; the 18 inch cap was not acceptable, and the proposal had to demonstrate adequate runoff control.  Nonincorporation of chlorobenzene, ammonia and metals into the monitoring program was acceptable to NJDEP.

There followed further interchanges between Reichhold and NJDEP resulting in modifications of the June 1991 Cleanup Plan during the course of which Reichhold, with NJDEP's approval, selected non-residential and subsurface soil cleanup standards for the soil in the slag area to be encapsulated as compared to residential standards.

An August 21, 1992 NJDEP letter to Reichhold approved conditionally the June 28, 1991

Cleanup Plan, as amended by the various intervening communications between Reichhold and

NJDEP.  Among the conditions of approval were confirmation that the present owner of the BTL

Parcel accepted a deed restriction on the property and depiction of the extent of the slag material

on the southeast portion of the BTL property.  NJDEP accepted Reichhold's proposal that soil

remediation be to non-residential standards.

Cawley summed up Reichhold's obligations under the approved Cleanup Plan as follows:

> Q. Now, Mr. Cawley, at this point the DEP has approved the cleanup plan for the property, and can you just reiterate to us what your understanding of the obligation was with respect to remediation of slag and metals?
>
> A.  The responsibilities for slag was to encapsulate the southwest section of the detailed property, and to relocate the exposed slag that had been observed in about five areas of the property to that central location.
>
> Q.  And what were the obligations with respect to the remediation of groundwater at the property?
>
> A.  The obligations were then just to monitor groundwater and to remove the oil that was present at the underground tank at the phenol plant.
>
> Q.   And when you say monitor groundwater, what were you monitoring, information?
>
> A.   The compounds that were proposed, the Benzene tolomene, Benzen selene, and that was acid extractables, base neutrals.
>
> Q. And was there any obligation under the year 1991 cleanup plan as approved to perform remediation in the northwest field?
>
> A.  No.
>
> Q.  And was there any obligation in the June, 1991 cleanup plan as approved to remediate the northeast field?

A.  No.

Q.  And was there any obligation in the June, 1991 cleanup plan as approved to cap the Staflex parcel?

A.  No.

Q.  And was there any obligation under the June, 1991 cleanup plan to remediate chlorinated parcels to remediate compounds in the groundwater?

A.  No.

Q.  And was there any obligation in performing any baseline evaluations?

A.  No.

In November, 1994, after remediation under the Cleanup Plan was completed, an NJDEP Site inspection took place under the auspices of a new case manager, Michael Buriani.  He discovered slag in the northeast and northwest fields that had never been observed in any of the previous NJDEP or O'Brien & Gere inspections.

In a February, 1995, communication NJDEP directed Reichhold to reanalyze its studies using residential standards and submit a proposal for further delineation of these areas and the northeast and northwest fields.  Reichhold was also directed to submit a proposal to delineate CVOCs in monitoring wells MW 32, 33 and 34.  That is, Reichhold was required to address chlorobenzene, ammonia and metals.

NJDEP required Reichhold to go back and reinvestigate slag material site wide, that is to prepare a proposal for detailed soil sampling.  It required Reichhold to address all metal contamination which exists above residential cleanup criteria by remediation or institutional proposals.

43

Cawley was questioned about each of the requirements imposed upon Reichhold after the
1994 NJDEP inspection.  He testified that none of them were required by the June 1991 Cleanup
Plan, namely:

> 1.  The requirement that Reichhold address all metal contamination
> by use of residential rather than non-residential cleanup standards.
>
> 2.  The requirement that Reichhold delineate the areas it had already
> delineated in accordance with residential standards as well as
> delineating the northeast and northwest fields.
>
> 3.  The requirement that Reichhold delineate CVOCs in monitoring
> wells 32, 33 and 34, specifically, remediate chlorobenzene, ammonia
> and metals.
>
> 4.  The requirement that Reichhold encapsulate a portion of the
> combined northwest and northeast fields.
>
> 5.  The requirement that Reichhold delineate slag using soil sampling
> rather than visual detection.
>
> 6.  Requiring Reichhold to horizontally and vertically delineate the
> slag areas in the northwest and northeast fields.
>
> 7.  Requiring Reichhold to provide a deed restriction and cap the
> entire BTL Parcel.
>
> 8.  Requiring Reichhold to perform baseline evaluations.

### V.  New Environmental Obligations

A.  <u>General:</u>  Having accepted most of Reichhold's cost calculations, the court has found
that four of Reichhold's six claims meet the materiality requirement of ¶ 3 of the Settlement
Agreement.  Only the Delta Costs, being two separate Claims, neither of which reach the
$200,000 level, and the CVOC claim fail to meet that requirement.

As to each of the remaining four claims Reichhold must prove (1) that the NJDEP

44

requirement constitutes an amendment or revision to the Cleanup Plan that requires Reichhold to further remediate groundwater or soils at the Site and (2) that the groundwater or soils had been contaminated by USMRC's former or current operations.

Reichhold contends that each of its six claims is based upon NJDEP requirements that constituted a change in the Cleanup Plan.  USMRC contends that none of the tasks Reichhold was required to perform, with the exception of the BTL Parcel and Staflex Parcel baseline ecological evaluations, were changes in the Cleanup Plan.  This necessitates a close analysis of the seven documents constituting the Plan as they bear upon each of the six tasks.

B.  Site-Wide Analytical Delineation: According to Reichhold, the Cleanup Plan required the physical or visual identification of slag in five areas of concern ("AOCs"), removal of the slag in those areas to the slag pile on the BTL Parcel, investigating the ground under and around the removed slag for further contamination and capping the slag pile.  In its February 8, 1995, letter, NJDEP required Reichhold to analytically delineate slag across the entire Site, including the northeast and northwest fields of the Staflex Parcel.  This, Reichhold contends, was not a part of the Cleanup Plan.

USMRC urges that Site wide delineation was very much a part of the Cleanup Plan from the outset.  In support of its position, USMRC refers to numerous documents that were not among the seven documents constituting the Plan, but were created during early discussions between Reichhold and NJDEP leading up to approval of the Cleanup Plan.  For example, in a March 15, 1988, letter to NJDEP, O'Brien & Gere stated "O'Brien & Gere will propose to identify the extent of the slag material across the site and also collect representative samples to determine the potential concerns present."  (Ex. C-32.)  In a May, 1989, letter to Reichhold's counsel, NJDEP

45

wrote:

> RCI proposes a limited surficial excavation with groundwater control recovery for the site-wide slag material on-site . . . Based upon this and the distribution of the slag (primarily shallow and surficial, but including a limited area with slag depths of up to 25 feet) and the proposed future use of the property, the RCI proposal shall be modified. One possible modification would be relocating all shallow slag material to a more confined area, specifically the area of deep slag distribution.

(Exh. C43.)  In a January 19, 1990, letter to Reichhold, NJDEP stated with respect to soils:

> RCI proposes temporary encapsulation of the slag material . . . Finally, it should be noted that prior to the acceptance of any remedial action, complete delineation is required and based on the option selected, a deed restrictions is likely.  Since the site has gone through several owners subsequent to RCI's ownership, RCI should also realize that it is their responsibility to ensure a deed restriction is acceptable to the current owners prior to finalizing their remedial selection.

(Ex. C-48.)

Thus, prior to June 21, 1991, the date of the initial document constituting the Cleanup Plan, NJDEP was thinking in terms of Site-wide treatment of slag, which, at that time, it equated with metals generally.  The question remains whether this concept was incorporated in the seven documents constituting the Cleanup Plan itself.

The June, 1991 Cleanup Plan prepared by O'Brien & Gere (Ex. P-335) is the starting point.  It stated that during the preparatory process, 37 hazardous substance/waste areas were identified at the Site.  Of these areas, identified in a table, 16 were considered to be AOCs.  These AOCs were grouped into six units: the Polyol Plant Area, the Phenolic Resin Plant Area, the Warehouse #401/Boiler House Area, the Batch Esters Plant Area, the Slag Area and the Boro of Carteret Drainage Ditch Area.  The proposal for slag was set forth under the title "Slag Area" and

read as follows:

> 6.06.1 Proposed Soil Cleanup Plan
>
> The exposed slag will be encapsulated with a full vegetative cover to eliminate the inhalation and ingestion pathways of the metals contained in the slag material. The exposed slag encompasses an area of approximately 125,000 square feet and can be found on Figure 6.05. Initially, the slag material will be graded to provide for positive drainage. Stabilization fabric will then be placed in sections of the area to facilitate stockpiling and placement of the fill material. A 12-inch layer of clean fill and a 6-inch layer of topsoil will be applied over the slag and stabilization fabric. These layers will be placed in 6-inch lifts and compacted to maximum dry density. Following compaction, seeding and mulching will be applied to prevent cover erosion and to minimize runoff.

(Ex. P-335.)

In its December 30, 1991 response (Ex. C64), NJDEP declined to approve the proposal, finding "[i]nsufficient information has been presented in many areas, hindering the acceptance of the remedial approach targeted for specific areas of concern." Most of the December 30, 1991 response addressed issues that are not pertinent to the instant case. Referring to the Slag Area, the response stated:

> Foundry slag from a previous/adjacent operator has been deposited as fill in this site. The slag is distributed from the surface to just above the water table in some areas . . . RCI proposes to deposit 12" of clean fill topped with 6" of topsoil, followed by a geotextile material for stabilization

(Id.)

NJDEP stated that this approach might be acceptable provided modifications were presented. The first item under modifications appeared to address the area of the BTL Parcel slag pile. "The proposal to cap the slag and provide a deed restriction appears to be a reasonable

47

proposal. . ."  The next modification states that "RCI shall clearly show on the site plan the location of the buried slag and the exposed slag material. . . It was understood that much of the slag area can be visually delineated at the surface, however a discussion regarding the data used to establish the vertical extent and buried areas shall be provided."  This might well be interpreted to refer to Site-wide delineation, but the concluding sentence suggests that it is limited to the BTL Parcel where the slag pile was located: "The extent and depth of the contamination must be clearly understood prior to inclusion in the deed restriction."  The deed restriction related to the BTL Parcel.

O'Brien & Gere responded to the NJDEP by letter dated February 3, 1992.  (Ex. C-63.)  In its December, 1991, response NJDEP had advised that elevated levels of metals were present in the Boiler Room within Building #404 and that the area should be "included in the Slag area remediation."  This demonstrated that when it referred to the "Slag Area," NJDEP was referring to the part of the BTL Parcel with the slag pile.  O'Brien & Gere's response was: "the metals in this area are associated with a localized slag deposition.  These depositions will be visually identified during remediation and will be transported to the on-site slag area to be remediated as part of that area."

O'Brien & Gere's response to NJDEP's comments concerning the slag area demonstrates that it understood them to refer only to the portion of the BTL Parcel containing the slag pile:

> Upon acceptance of the Cleanup Plan, RCI will present the deed restriction issue to the current property owner and provide documentation to that effect upon the completion of negotiations.

NJDEP's March 15, 1992 response (Ex. C-67) started out, "[NJDEP] cannot approve the Cleanup Plan submitted in this case at this time."  NJDEP submitted a draft plan that would be

48

acceptable, giving Reichhold the option of accepting that plan or submitting a new plan.  The

NJDEP Plan set forth residential surface, subsurface, and non-residential surface standards for soil

cleanup, advising that, "[i]f operations are continuing on-site and are remaining ECRA subject, a

deed restriction will not be required when cleanup is conducted to the non-residential surface and

subsurface cleanup levels listed above - - RCI shall commit to either the non-residential surface

and subsurface cleanup levels or the residential surface cleanup levels in the entire soil column

during the draft comment period."  This appears to refer to the entire Site, not just the slag area.

No Further Action proposals were found acceptable for a number of areas.  Certain areas

were approved for No Further Action in the soil for all other contaminants "except for the metal

contamination associated with the fill issue."  These areas were approved with certain conditions.

The conditions for some of the areas included delineation for one or another contaminant.  With

respect to the Fuel Loading/Loading Area for the Terminal Oil System, the NJDEP proposed plan

stated that "[t]he proposal by RCI to remove the slag from the area and use visual delineation to

define the extent of the remediation is conditionally acceptable."  This suggests that NJDEP was

not contemplating site wide delineation.

The portion of the NJDEP's proposed plan relating to the slag areas was substantially a

repeat of the comments contained in its December 30, 1991, letter to Reichhold.  NJDEP

continued to direct its comment to the area shown in Fig. 6.05, i.e., the area of the slag pile on the

BTL Parcel.

O'Brien & Gere responded on June 10, 1992. (Exh. C-69.)  Reichhold had "determined

that the selection of Non-residential surface and subsurface soil cleanup standards is applicable to

the facility as compared to the residential levels and the criteria associated with there (sic)

development."  Reichhold's response to NJDEP's comments about the slag area referred to "the possibility for [deed] restrictions in other portions of the property."

With respect to NJDEP's comments about proposed cleanup technologies, O'Brien & Gere wrote:

> As you area aware, RCI has implemented at-peril excavation of contaminated soils at the Staflex facility and at the former Phenolic Resin Plant Area.  These at-peril activities address the majority of the soils contamination at the facility.  In order to address the NJDEP's concern with the approach for future remediation, RCI has included as Attachment I the approach for soils remediation for the remaining soil contamination.  Attachment I is presented to address the request for a detailed work plan for the implementation of the selected remedial technology.

Attachment I spells forth in considerable detail the manner in which Reichhold proposed to conduct soil cleanup, not only for metals (slag) but also for all the other contaminants that had been identified.  The Soil Remediation Technical Summary begins: "Reichhold Chemicals Inc. (RCI) has committed to utilizing the draft NJDEP Soil Cleanup Standards for Non-residential Facilities.  The non-residential surface and subsurface levels published in the February 3, 1992, New Jersey Register will be utilized (N.J.A.C. 7:26 D) during remediation at the Carteret facility." With respect to areas where additional soil remediation was required based on the new standards, "RCI's approach to addressing these areas is to excavate the locations identified, stockpile the soils on site, conduct post excavation sampling and backfill the location (assuming post excavation results are within cleanup standards).  Excavated soil will be reused on site."

Attachment I identified three areas of concern: Area 2 - Phenolic Resin Plant Area located at the eastern part of the BTL Parcel; Area 3 - Warehouse 401/Boiler House Area located at the center of the BTL Parcel east of the Slag pile area and west of the Phenolic Resin Plant; and the

Batch Ester Plant Area located along with the fuel oil loading and unloading area at the western side of the Staflex Parcel.

Reichhold proposed to concentrate excavation in the immediate proximity of these locations. Only a part of the excavation involved metals, as disclosed in the charts constituting a part of Attachment I. With respect to metals, Attachment I stated:

> Areas subject to metals contamination will be excavated initially based upon the visual extent of slag contamination. The maximum depth of the initial excavation will be approximately two feet. The metals contamination identified to date is anticipated to be the result of slag material deposits. Since the slag is readily discernable from soil, visual delineation for the initial excavation sampling will be utilized to confirm acceptable cleanup results.

The volume of metals contaminated soils was estimated to be 100 to 200 cubic yards.

Attachment I described the post excavation sampling approach and stated,

> As discussed in the June 28, 1991 Cleanup Plan (amended February 3, 1992) metals contaminated soil will be relocated to the slag area [the western portion of the BTL Parcel] and incorporated into the slag cover program. Based upon communications to date with NJDEP it is RCI's understanding that this approach has been accepted. The commitment to the non-residential cleanup levels will result in additional soil volumes which will require proper relocation. RCI proposes to address these soils through reuse on site.

On August 21, 1992, NJDEP issued a conditional approval of Reichhold's Cleanup Plan. (Ex. C-7.) It referenced the June 28, 1991 Cleanup Plan as modified by the subsequent communications between Reichhold and NJDEP described above.

Conditions for limited testing at facilities in both the BTL Parcel and in the Staflex Parcel were imposed. For example, with respect to the Fuel Loading/Unloading Area in the Staflex Parcel, post-excavation sampling was required, but "[t]he proposal by RCI to remove the slag

51

from the area and use visual delineation to define the extent of the remediation is conditionally acceptable."

The NJDEP's comments relating to the slag area were directed to the portion of the BTL Parcel shown in Fig. 6.05.  NJDEP required documentation regarding the current owner's acceptance of the deed restriction; it required further information to define the extent of the area to be remediated, including a showing of where buried slag existed; and it required a two foot cap.

The final document constituting the Cleanup Plan is O'Brien & Gere's October 9, 1992, letter to NJDEP.  (Ex. C-72.)  It added nothing of significance to the previous communications insofar as they related to delineation for metals.

USMRC cites pre-June 21, 1991, communications that refer to Site-wide delineation to establish that the Cleanup Plan always contemplated Site-wide delineation.  It cites for this purpose provisions in the Cleanup Plan documents that require metals delineation in areas other than the Slag Area on the BTL Parcel.  In its February 8, 1995, letter NJDEP required Reichhold to analytically delineate slag across the entire Site, including the northeast and northwest fields of the Staflex Parcel.  This goes far beyond the more limited requirements of the Cleanup Plan.  In light of information assembled over the years it might have been better policy to have required Site-wide delineation at the outset, but a fair reading of the Cleanup Plan documents does not lead to a finding that this was in fact required by the Cleanup Plan.  Therefore the Site-wide analytical delineation requirement is a New Environmental Obligation.

C.  CVOCs:  In its February 22, 1995, letter to Reichhold NJDEP directed that Reichhold "shall submit a proposal to delineate the elevated volatile organic compounds detected in monitoring wells MW-32, MW-33, and MW-34."  (Ex. C-106.)  In its response, O'Brien & Gere

stated:

> Annual groundwater sampling events at the facility have indicated the
> presence of chlorinated compounds within monitoring wells MW-32,
> MW-33 and MW-34.  RCI proposes to modify the quarterly ground
> water monitoring program within these wells to include these
> chlorinated compounds.  RCI has conducted a literature review of
> ECRA and ISRA related documents for the former RCI Carteret
> facility.  The purpose of this review was to evaluate RCI's possible
> former use of chlorinated compounds and the presence of chlorinated
> compounds at concentrations exceeding ECRA (and RDC or IGW)
> soil cleanup levels.  A thorough review of the Phase I, Phase II and
> Phase III Sampling Plan and Data Presentation documents, the
> Cleanup Plan and Remedial Action Report (Soils) indicate that no
> soil samples exceed the RDC or IGW Cleanup Criteria for
> chlorinated compounds.  Figure 8 has been developed which depicts
> the historical ground water sampling results for these parameters
> across the site.  As is indicated on Figure 8, former hydraulically
> upgradient well MW-9 (see Figure 7) contained these same
> parameters prior to its abandonment in 1992.  The chlorinated
> compound presence in MW-9 was therefore attributed to a
> hydraulically upgradient off-site source at the time the monitoring
> well closure was approved by the NJDEP.

> As part of the ongoing quarterly monitoring program, RCI proposes
> to change the analytical parameters from BTEX to volatile organic
> compounds (Method 624) within monitoring wells MW-32, MW-33
> and MW-34 to monitor the observed chlorinated compounds.  RCI
> plans to use this additional sampling to monitor analytical trends.
> RCI proposes to reevaluate this issue upon the generation of
> substantial analytical data with regard to the chlorinated compounds
> (anticipated to encompass an additional four sampling events).  An
> appropriate action will be recommended pending further evaluation
> of the data.

(Ex. C-110.)

As stated in that letter, Reichhold contended, and still contends, that CVOCs in the

groundwater had not been identified earlier as a parameter of concern.  Although CVOCs

concentrations had been detected in monitoring wells on the Site as early as 1988, no on-Site

source had been identified and elevated concentrations of CVOCs were detected in USMRC's groundwater, including tetrachloroethylene ("PERC"), which Reichhold never used in its operations.

In its Findings of Fact and Conclusions of Law, USMRC states simply that "[t]he obligations to address CVOCs are not new. With respect to CVOCs, Reichhold was already sampling for CVOCs prior to 1994." USMRC cites no reference in the Cleanup Plan to support this contention. The court reviewed the documents constituting the Cleanup Plan and could find no requirement that Reichhold delineate elevated volatile organic compounds.

The June 21, 1991 Cleanup Plan set forth a detailed groundwater monitoring plan. The proposals addressed in particular the specific areas of activity on the Site and the chemicals associated with Reichhold's operation: the Polyol Plant Area, the Phenolic Resin Plant Area, the Warehouse #401 and Boiler House Area, the Batch Esters Plant Area, the Slag Area, and Carteret Drainage Ditch Area.

In its December 30, 1991, letter, NJDEP commented on area specific ground water monitoring proposals. It noted:

> Contaminants present in/on the ground water include petroleum product, phenol BTEX, metals ammonia, and chlorobenzene. RCI has identified upgradient [USMRC] ground water conditions which may be the source for the ammonia and chlorobenzene contamination. Activities at the Reichhold site conducted by the upgradient property owner may be responsible for the metal contamination detected in the wells. Therefore, RCI has proposed no further action concerning the metal, chlorobenzene, and ammonia contamination.

O'Brien & Gere's February 3, 1992 letter to NJDEP confirmed the understanding that "[n]ot incorporating chlorobenzene, ammonia, and metals into the monitoring program is

acceptable, as the contaminants are the result of upgradient sources." There were comments upon the monitoring program but no discussion of monitoring for CVOCs.

The NJDEP March 15, 1992, letter to Reichhold reviewed the proposals concerning the Areas under discussion and, in particular, ground water monitoring. With respect to that subject the communication stated, "[t]he proposal not to incorporate chlorobenzene [a CVOC], ammonia and metals into the monitoring program is acceptable since the contaminants are the result of upgradient sources." In its June 10, 1992, letter to NJDEP O'Brien & Gere responded to the Ground Water Cleanup Proposal: "Comments noted and agreed."

NJDEP's August 21, 1992, letter contained the same proposal with respect to Ground Water Cleanup as was contained in its March 15, 1992, letter. The final communication constituting the Cleanup Plan, O'Brien & Gere's October 9, 1992, letter to NJDEP, contained nothing of significance concerning monitoring for CVOCs. In light of the foregoing provisions of the Cleanup Plan, NJDEP's requirement that Reichhold delineate COVCs is a New Environmental Obligation.

D. <u>Capping the Staflex Parcel:</u> The Cleanup Plan and its constituent documents have been reviewed in connection with the inquiry whether it required Site-wide analytical delineation and whether it required delineation for CVOCs. During that review it was determined that the Cleanup Plan contained detailed requirements with respect to the structures that Reichhold constructed and operated on the Staflex Parcel. These remediation requirements pertained to, among other things, the Fuel Oil Unloading/Loading Area for the Fuel Storage Tanks and the Batch Esters Plant Area. There was nothing in the Cleanup Plan approaching a requirement to cap the Staflex Parcel.

In an attempt to rebut this conclusion, USMRC writes: ". . .  any obligation to address slag or metals on the Staflex Parcel was not a new obligation imposed after 1994.  The Cleanup Plan required the relocation of slag to BTL slag area to be capped and delineation of metals . . . Additionally, this obligation to record a deed notices was not a new obligation.  The NJDEP was requiring deed notices in the 1990s."  (USMRC Findings of Fact at 86.)  The previously required relocation of slag and the giving of deed notices was in connection with specific areas of concern, primarily relating to the BTL Parcel.  Major capping of the Staflex Parcel was a different requirement altogether and constituted a New Environmental Obligation.

E.  <u>BTL Cap:</u> Under the Cleanup Plan, the only portion of the BTL Parcel that was to be capped was the section depicted in Fig. 6.05 of the Cleanup Plan.  The area depicted in Fig. 6.05 was also the extent of any deed restriction on the Site required by the Cleanup Plan.  In 2006, NJDEP instructed Reichhold to cap the entire BTL Parcel due to metals contamination.  USMRC urges that Reichhold was already obligated to fully delineate and remediate metals contamination - both surface and subsurface - pursuant to the Cleanup Plan.  USMRC cites as evidence of this obligation the fact that as part of the new cap, Reichhold is re-capping a portion of the former cap over the old BTL Slag Area that had been removed by the current property owner.  The court finds this argument to be a non sequitur and further that it is abundantly clear that the new BTL Cap is a New Environmental Obligation.

F.  <u>BTL Baseline Ecological Evaluation:</u>  In March, 2004, NJDEP required Reichhold to perform a Baseline Ecological Evaluation ("BEE") on the BTL Parcel.  USMRC does not dispute that the Cleanup Plan did not require Reichhold to perform this evaluation.

G.  <u>Delta Costs:</u>  Reichhold seeks reimbursement for the increased costs associated with

56

disposing of hazardous soil which, but for the presence of metals contamination, would have been disposed of as non-hazardous waste.

In 2004, when the then owner of the Staflex Parcel was removing petroleum contaminated soil during the demolition of the Boiler House, there was discovered lead down to 8 feet below ground and slag and debris beginning 3 feet below ground.  NJDEP directed the then owner to enlarge the excavation to address these materials in addition to the originally envisioned petroleum hydrocarbon contamination.  Because it was contaminated with metals, the soil had to be disposed of as hazardous waste.

The Delta costs also included increased costs incurred in disposing of hazardous soil in 1998.  This occurred along the Arthur Kill where resin evacuation look place from the top of the bank down to the Arthur Kill.  Because of the presence of metals in the soil, it had to be disposed of as hazardous waste, incurring extra costs.

The combined extra costs of disposing of the soils from these two sites, according to Mr. Stoldt, were $257,521.  The Delta costs resulting from the 1998 excavation were approximately $65,000, and the Delta costs resulting from the Boiler House excavation were, therefore, approximately $192,000.  In light of the separation in time of these two excavations and in light of the fact that they were dealing with different materials at different parts of the Site, Reichhold's claim must be considered two separate claims.  The fact that "the over-arching rationale was the same - the presence of metals required the soils to be disposed of as hazardous" - is insufficient to constitute these claims a single claim.  Since the cost Reichhold incurred for each claim, according to its own figures, is less than $200,000, neither obligation is material, and it is unnecessary to determine whether it is a New Environmental Obligation.

## VI.  <u>Source of Contamination</u>

A.  <u>General:</u>  It has been determined that NJDEP's imposition upon Reichhold of the

following tasks constitutes New Environmental Obligations: (1) Site-wide Analytical Delineation,

(2) the Staflex Parcel Cap, (3) the BTL Parcel Delineation, (4) the BTL Parcel Cap and (5) CVOC

monitoring (which has been found not to be a material New Environmental Obligation).  To

establish that USMRC is liable for the costs of these tasks, Reichhold must prove that the

contamination giving rise to these tasks was caused by USMRC's former or current operations.

Reichhold and USMRC present two fundamentally different concepts of the cause of the

contamination of the Site.  Each agrees that metallic contamination drives most of NJDEP

remediation directives, but there the agreement ends.

Reichhold contends that the metallic contamination in its entirety derives from USMRC's

smelter operations that, since 1903, through massive aerial deposition and enormous physical

placement of slag, totally contaminated all portions of the Site.  USMRC, on the other hand,

contends that the metallic remediation upon which Reichhold bases its claims was caused by

Reichhold's bringing contaminated fill onto the Site and by massive redistribution of

contaminated fill from one part of the Site where it was in acceptable condition to another part of

the Site, thus requiring the new remediation that NJDEP demanded.  Resolution of this

overarching issue is pertinent to the causation aspect of several of Reichhold's claims.

To start with, there is no evidence that Reichhold has brought contaminating metals onto

the Site.  It did not use heavy metals or slag in its operations.  It used the metal containing

substances zinc acetate, zinc stearate and lead acetate catalysts, but these substances were bound

in the product and were not released into the environment.

A present tenant on the BTL Parcel, Clean Earth, also known as Ciocycle operates out of a building and an adjacent area where it stores TPH contaminated soil, which is environmentally treated by Clean Earth to have the contamination removed.  Clean Earth is a Class B permit disposal/bioremediation facility that is not permitted by regulation to bring metals contaminated soil onto the Site.  The current owner of the BTL Parcel brought asphalt millings onto the Parcel to suppress dust, but these millings were not contaminated with metals or otherwise.

The primary constituents in USMRC's slag were silica and iron, with varying amounts of aluminum, calcium, zinc, copper, lead, nickel, tin, sulfer, arsenic, antimony, selenium, tellurium, gold and silver, with trace amounts of platinum and palladium.

USMRC's evidence that Reichhold moved vast quantities of slag from one point of the Site to another is based almost entirely upon Mr. Rhodes's testimony and the cut and fill drawings admitted into evidence through his testimony.  As explained elsewhere, I have found the conclusions based on the photogrammetry performed in this case unconvincing and place no reliance on the cut and fill drawings, handsome and colorful as they may be.  Mr. Rhodes's testimony, apart from that based on the photogrammetry material, is not based on personal knowledge.

Reichhold, of course, dislodged soil in connection with the construction of its buildings. The testimony of witnesses having knowledge of Reichhold's operations negates any relocation of slag contaminated fill.  Walter Dittrich was Reichhold's Plant Engineer between 1960 and July, 1985.  He was responsible for the construction of a number of the Reichhold buildings on the Site. He made no reference to movement of slag and could not recall if soil of any sort was moved.  He testified that no fill was required with respect to the Plasticizer Plant and adjacent tank farm.

They were built on ground surface, and Reichhold went down three feet to the frost line, finding no fill during the excavation.  During his 25 years of employment no fill was placed on the Staflex Parcel except rock and gravel for road construction.  The only excavation on the BTL Parcel was a three foot trench for the foundation of the Phenolic Molding Compound Building.  Mr. Dittrich did recall that Reichhold sold an unknown quantity of slag to a third party who removed it.  There was testimony that Reichhold purchased from Anchor Abrasives Co. processed slag with which it sandblasted the exterior of two of its buildings, resulting in a minimal amount of slag dust.

Reichhold's Site History states that Reichhold placed an estimated 300 tons of fill along the Arthur Kill between 1962 and 1975.  This was the equivalent of 25 truckloads.  The History contained a detailed list of the materials placed along the Arthur Kill, and no metals were included.

USMRC points to the slag found beneath the loading dock of Building 401 when it was demolished as evidence of Reichhold's responsibility for slag and the metals it contained.  However, the loading dock, a part of USMRC's Lead Plant, appeared in a 1949 aerial photograph, showing that it had been encased in concrete for more than 70 years prior to its demolition by the present owner.

USMRC asserts Reichhold used slag as fill on the Site in the area near the Boiler House.  To support this contention USMRC points to a Reichhold Site drawing depicting underground pipelines.  On the drawing was a handwritten note next to a cylindrical septic tank stating, "abandoned septic tank filled with slag 1985."  This is hardly evidence that Reichhold used slag as fill in the Boiler House area.

USMRC refers to a Reichhold waste pile as evidence of Reichhold's contamination of the

60

Site.  The first six inches of the pile were contaminated.  This soil was excavated; the waste pile was removed, and NJDEP issued a closure certification in 1986.

There is evidence that a subsequent owner or tenant of the BTL Parcel introduced two or three feet of contaminated fill on the BTL Parcel which was spread on top of an enormous amount of slag fill placed there by USMRC long before Reichhold's purchase of the Site.  However, there is a failure of evidence to support USMRC's claim that Reichhold brought contaminated fill onto the Site or that it engaged in movement of contaminated fill from one part of the Site to another.

By way of contrast, the evidence is overwhelming that by 1960, when USMRC sold the Site to Reichhold, it had deposited vast amounts of slag throughout the Site, thus causing widespread metallic contamination extending far below the ground surface.  Examples of this deposition are referred to throughout this opinion.  Examples are: (1) Slag was used to double the size of the BTL Parcel and to fill the area south of the smelter; (2) the 65,000 cubic yards of fill material that USMRC placed on the BTL Parcel was part of the fill activity that it undertook around the Tufts Point area, an area that was once marshland but was filled with 20-30 feet of slag in some places to create the current ground elevation of 6-10 feet; (3) slag was used to create the haul road that ran from the slag pile on the BTL Parcel across what became the Staflex Parcel; (4) USMRC stored slag at elevations in excess of 35 feet in the Slag Dumping Area on the BTL Parcel and dumped slag from its furnaces in large piles on the area immediately adjacent to the Slag Dumping Area; (5) perhaps included within the foregoing, a Hydroqual April 10, 1997 memorandum recited that USMRC placed 726,000 cubic yards of slag fill on the southern portion of the USMRC property to an average depth of 9.4 feet.  It must be concluded that USMRC's operations were responsible for all the slag that was and is found at the Site.

61

B. <u>Site-Wide Analytical Delineation:</u>  Starting in 1995 NJDEP required Reichhold to delineate slag across the entire site, including the northeast field and the northwest field.  From 1901 until 1986 USMRC conducted copper smelting operations at its Carteret facility.  More than 500,000 tons of scrap per year were charged to the smelter.  In addition to the noxious vapors that poured from the cupola charge doors, other openings in the cupola and, ultimately from the stack, the operations produced vast amounts of slag.  USMRC transported slag from the cupola by rail car or truck to the storage area west of the Lead Plant as well as to a storage area east of the Lead Plant, spanning the Reichhold and USMRC properties.

A slag haul road was constructed across the Staflex Parcel extending from its southeast corner to its northwest corner.  USMRC contends that Reichhold has not established the nature of the base material of the road, but there is convincing evidence that it was slag.  The road was used to transport slag from the USMRC plant to the New Jersey Turnpike, which was under construction at the time.  Approximately 800,000 cubic yards of slag were transported by truck across the Staflex Parcel.  Dr. Pearson calculated that 40,000 truck loads of slag must have moved across the haul road to fulfill USMRC's contract obligation to the New Jersey Turnpike.  This was separate and apart from the equipment involved in hauling slag from the cupola to the slag pile.

When it still owned the Site, USMRC used slag to double the size of the BTL Parcel and to fill the area south of the smelter.  The 65,000 cubic yards of fill material that USMRC placed in the BTL Parcel was part of the fill activity that it undertook around the Tufts Point area, transforming marshland with 20-30 feet of slag and creating ground elevations of 6-10 feet.

Also during USMRC's ownership of the Site, Anchor Abrasives Co. leased a portion of the Site by lease dated June 14, 1956, for production of slag grit.  Slag was run through screens to

62

create a product of uniform size.  USMRC sold stored slag to Anchor Abrasives, which would bag

its slag grit to sell as sandblasting material.  Richard Kunter, a qualified metallurgical engineer,

testified that Anchor Abrasives's activities contributed to metals contamination in soils on the

Reichhold property with zinc, lead, copper, cadmium and other heavy meals.  He noted that

particularly fine material is much more readily leached into the soil by meteoric conditions.

Although the court rejected Dr. Pearson's computation of the numbers of tons of metal

contaminated dust that flowed from the smelter onto the Site, as discussed above, it accepted his

testimony and other evidence that substantial amounts of such dust were deposited on the Site.  It

and the wind blown slag dust coming from the slag piles, the loading of slag into dump trucks, the

transportation of slag and Anchor Abrasives's activities did not approach in volume the amount of

slag that USMRC dumped throughout the Site, but it was significant.

USMRC operated the Lead Plant for an extended period of time as a secondary lead

recovery facility which removed lead from automobile batteries.  USMRC removed the non-lead

casings on the outside of the battery to smelter the anode, which typically contained several

pounds of lead.

Battery casings were discovered on the surface of the Site and in an excavation to the

north and west of the Lead Plant in and around the former Boiler House area.  Fumes from the

operation of the Lead Plant had to have been carried over the Site whichever way the wind was

blowing, because the Lead Plant was in the center of the BTL Parcel.

As noted above, Reichhold cannot recover on its Delta cost claims, because the increased

costs for removing the lead contaminated soil did not reach $200,000, but the existence of the lead

contamination was a part of the basis for NJDEP's demand for Site-wide analytical delineation.

63

USMRC counters the indisputable evidence of its extensive pre-1960 aerial and physical deposition of slag in all parts of the Site with the contention that Reichhold, during the course of its post 1960 development of the Site and its successors in title to the Staflex and BTL Parcels, were responsible for the contamination that triggered the NJDEP's new demands.

The critical question is whether Reichhold's development caused contamination of the Site, and more particularly, whether it used contaminated slag that was the basis of NJDEP's insistence upon Site-wide analytical delineation.  Reichhold's evidence that it did not cause the metals contamination by depositing slag is referred to above.  USMRC relied extensively upon the testimony of John Rhodes, a highly qualified and experienced expert in environmental engineering.  Mr. Rhodes made extensive use of aerial photographs taken over a series of years. He used these and other materials to prepare topographic maps of the site for the years 1940, 1951, 1961, 1974, 1986 and 1995.  These maps showed the surface elevation of the ground through contours of equal elevation and permitted quantification of changes in land over time, including the raising and lowering of surface elevations.  Through this means Mr. Rhodes provided a basis for his opinions concerning Reichhold's excavating and using slag as fill.

Mr. Rhodes prepared these maps making use, among other materials, of data provided by Frank Hunter, a photogrammetrist.  Using aerial photographs, Mr. Hunter derived elevation data from which Mr. Rhodes developed his topographic plans, including the topographic contours.  He testified that the data had absolute accuracy of plus or minus one foot.   Mr. Hunter was able to check the accuracy of his elevation data with a 1990 topographic plan of the Site that his company had previously done for Storck Engineers and another plan prepared in 2003.

From this and other data Mr. Rhodes prepared cut and fill drawings showing where

materials had been removed from the Site and where it had been filled in.  Mr. Rhodes relied upon his own review of the aerial photographs and topographic information from other documents.  He reviewed sampling data from Reichhold's reports for hundreds of sample taken on the property. He reviewed documents containing boring log samples, showing the kinds of materials encountered at different depths beneath the surface of the ground.

Mr. Rhodes's ultimate conclusion was that almost all of the contamination in the areas of the Site at issue in this litigation is associated with fill placed by Reichhold or soil that was disturbed by Reichhold during its construction activities.

Reichhold produced Tim Pool, a highly qualified and experienced expert in the field of photogrammetry.  Unlike Mr. Hunter, he has been certified by the American Society of Photogrammetry and Remote Sensing.  In Mr. Pool's opinion it was not possible for Mr. Hunter to achieve accuracies of plus or minus one foot in his DTM surfaces, because these accuracies are far outside industry standards, the scale of the photography, and the equipment; many of the photographs were taken with cameras from the 1960s and the 1970s which lacked the computer compensation for distortion that modern cameras possess.

The height of the aerial photos that Mr. Hunter used were 800 and 1600 foot scale.  On photos using 1600 foot scale the photogrammetrist cannot see the detail necessary to read elevations continually within a foot or to interpolate the surface with that level of accuracy.  Mr. Pool provided other reasons why Mr. Hunter could not achieve the level of accuracy that he claimed.  Obviously, the errors contained in Mr. Hunter's DTM surfaces affected the cut and fill drawings that Mr. Rhodes prepared.

Mr. Pool's testimony casts serious doubt upon the reliability of Mr. Hunter's work and the

accuracy of the cut and fill drawings that Mr. Rhodes developed.  The entire Site had been

affected by USMRC generated aerial or physical deposition.  There can be little question but that

the origin of the contamination that is the subject of Reichhold's claims was USMRC's smelter

operations and to a lesser extent the Lead Plant.  All the slag related metals and lead

contamination at the Site originated with USMRC's operations.  Thus, the revision of the Cleanup

Plan requiring Reichhold to conduct Site-wide analytical delineation was a requirement to further

remediate soils at the Site contaminated by USMRC's former operations.   There is no evidence

that Reichhold introduced metals contamination on the site.  The chemical and any other

contamination which resulted from its operations has been addressed in the Cleanup Plan and

Reichhold has remediated all of this contamination.

The metals which were the cause of NJDEP's requirement of Site-wide delineation were

solely the product of USMRC's operations and deposition.  Even if it were found that Reichhold

moved or disturbed some of the metallic substances deposited by USMRC during the course of

Reichhold's normal commercial activities such as constructing buildings and related facilities,

that would not render USMRC any less responsible under the Re-opener provision of the

Settlement Agreement.

C.  Staflex Parcel Cap: Under the Cleanup Plan there had been no obligation to remediate

slag in the Northwest or Northeast fields or cap the Staflex Parcel.  As has been described above,

Reichhold had engaged in considerable developments of the Staflex Parcel, particularly the Batch

Esters Plant and the Oil Tank area.  Much of the Cleanup Plan and subsequent NJDEP demands

required Reichhold to remediate contamination caused by these operations, which Reichhold

performed satisfactorily.  This, however, did not solve the slag related contamination.

USMRC's physical deposition of slag and aerial deposition of metallic contamination has been described in the previous sections.  USMRC's employee, Fred Runyon, reported and testified specifically concerning USMRC's deposition of slag on the Staflex Parcel.  A memorandum he prepared confirmed that USMRC had placed slag as base material in construction of the Staflex Parcel haul road used to transport slag.  Mr. Runyon concluded that most of the property was covered in a thin layer of slag, but that the slag was up to two feet deep under the old haul road.  He estimated the haul road to be 40 feet wide, 450 feet long and 2 feet deep.  His estimated cost for remediating the road was $1,085,200.

USMRC advances a number of reasons why it is not responsible for the proposed cap. Initially it contends that Reichhold's own operations caused the contamination requiring the cap, noting: (1) it built its own access road on the Staflex Parcel, during the course of which it brought large rocks from an unknown quarry and dumped them on Site to stabilize the road; (2) significant fill activity took place north of the railroad tracks on the southern portion of the Staflex Parcel; (3) a road was constructed across the railroad parcel to Middlesex Avenue and the railroad tracks were removed; (4) the Batch Esters Plant was constructed on the western side of the Staflex Parcel, during the course of which the new roadway was extended into the plant area, fill was added, and a rail line was constructed into the plant; (5) a water line was constructed running north to south in the eastern portion of the Staflex Parcel; (6) a parking lot was established in the southeastern corner of the Staflex Parcel; (7) the haul road was physically altered; and (8) there was earth moving activity throughout much of the rest of the Staflex Parcel.

Further, USMRC contends that (1) the cap served to remediate non-metals contaminants, including organics associated with the Batch Esters Plant; (2) the cap was intended to extend into

the Railroad Parcel, thus including metals on a parcel not owned by USMRC; (3) the Staflex

Parcel cap would include capping a soil pile containing metals created by CP Hall after it acquired

the property; (4) the costs include expenses for an ecological investigation of the drainage ditch on

the Staflex Parcel which Reichhold contaminated by burying more than 100 drums, some of

which were leaking; (5) Reichhold created a waste pile on the Staflex Parcel in an area of metals

contamination scheduled to be capped; and (6) PRC brought fill material onto the Staflex Parcel

with concentrations of contaminants exceeding New Jersey's residential direct contact cleanup

criteria.

   USMRC's evidence does not overcome the evidence upon which the court relies that

establishes that, throughout its operations of the smelter and its other facilities, USMRC was

responsible for the depositions of vast amounts of metals contaminated materials on the Staflex

Parcel, mostly in the form of slag, and that this contamination was the cause of NJDEP's

requirement that the Staflex Parcel be capped.  The court rejects Mr. Rhodes's opinion that

Reichhold was responsible for the slag found on the Parcel, finding his photogrammetry

techniques were seriously flawed and that little, if any, reliance can be placed on the cut and fill

drawings.  Neither they nor Mr. Rhodes's testimony is a basis to conclude that Reichhold moved

slag onto the Staflex Parcel.  A witness with knowledge, Walter Dittrich, testified that he was not

aware that Reichhold ever used or transported slag throughout the Site.

   It is irrelevant that USMRC did not own the Railroad Parcel.  It conducted operations on

that property for nearly 60 years, and the railroad serviced USMRC's operations exclusively with

spurs running to the Lead Plant loading dock, the slag disposal area, the Aluminum Plant, the

Copper smelter and the BTL Slag area.  Any metals contamination on the Railroad Parcel is

attributable to USMRC.  USMRC is responsible for disposal of contaminants on the Railroad Parcel under both CERCLA and the Spill Act.

As USMRC notes, there was organic contamination on the Staflex Parcel that the cap would cover.  However, were it not for the metals contamination no cap would have been required, and the organic contamination would have been physically removed at a relatively minor cost.  The C.P. Hall soil pile had never been contaminated with metals, and the organic contamination was removed from the pile before it was spread beneath the cap.  As for Reichhold's waste pile, contamination was limited to the first six inches of the pile.  Reichhold removed the waste pile and obtained a closure certification for it from NJDEP in 1986.

USMRC's assertion that PRC brought contaminated fill onto the Site is incorrect.  PRC's use of fill was thoroughly covered in the testimony.  It used soil that had been contaminated with petroleum hydrocarbons, but treated by Biocycle/Clean Earth so that contamination was reduced to below standards.  PRC then used the treated soil in connection with the cap on the Staflex Parcel.  The soil did not contain metals contamination.

The evidence establishes that the presence of metals contamination on the Staflex Parcel attributable to USMRC's operations was the cause of NJDEP's requirement that Reichhold cap the Staflex Parcel.

D. BTL Cap:  Under the Cleanup Plan the only portion of the BTL Parcel that was to be capped was the section depicted in Figure 6.05 of the Cleanup Plan.  That area was also the extent of any deed restriction on the Site required by the Cleanup Plan.  In 2006, NJDEP instructed Reichhold to cap the entire BTL Parcel due to metals contamination.  After extensive discussions between Reichhold, the then owner and NJDEP, in December 2007, details for a cap design were

69

approved.

The new property owner or tenant had brought substantial amounts of fill onto the BTL Parcel. Reichhold contends that initially it had believed, and so informed NJDEP, that this fill was contaminated. At trial it contended that subsequent investigation revealed that all the metals contamination originated with USMRC.

Reichhold provides a number of reasons for concluding that the metals identified in the BTL Parcel soils were attributable to USMRC's operations: First, the types of metals identified were the same as identified in other areas of the Site and on USMRC property. Second, the concentrations of metals in surface soil samples and sub-surface soil samples were comparable to the concentrations of metals in the slag associated with USMRC's operations. Third, no other chemical constituents were identified in soil sampling to suggest that the metals came from an off-site location. CH2M Hill, acting on behalf of Reichhold, took samples looking for volatiles, semi-volatiles, PCBs, pesticides and base neutrals (which would have been indicative of an off-site source), but only found metals similar to those on USMRC's property. From this, Reichhold argues that the only conclusion must be that the metals were attributable to USMRC's operations.

Further, Reichhold notes that demolition of the loading dock on Building 401 (the former Lead Plant) on the BTL Parcel revealed that USMRC had constructed it on slag, for which USMRC would be responsible. This was discussed earlier in this opinion.

USMRC insists that the contamination that precipitated NJDEP's demand that the BTL Parcel be capped was contained in the two or three feet of new soil that Reichhold's successor owner or tenant spread over the entire surface of that Parcel. Reichhold itself for many years insisted in its reports to the NJDEP that the surface soil was the source of the contamination and

70

that the new owner or its tenant was responsible for its remediation.  Only on the eve of trial did

Reichhold reverse its position and contend that the surficial soil was uncontaminated and only the

metals contamination far below the surface, for which USMRC was responsible, was the cause of

NJDEP's capping requirement.

The court will turn to the evidence of contamination of the new fill, a fact that Reichhold

vigorously disputes.  It disputes this fact in the face of its own representations made over many

years and with no support in the unimpressive testimony with which it seeks to explain its change

of position.

There can be no question but that a subsequent owner or tenant covered the uncapped

portion of the BTL Parcel with two or three feet of fill.  Nor can there be any question that from

the outset Reichhold contended that the new fill was contaminated and that the new owner or

tenant was responsible for its remediation.  On January 16, 2007, Reichhold's engineering firm

wrote to NJDEP:

> . . . following sale of this parcel to 40 Sayreville Realty, several feet
> of 'uncharacterized fill material' has been placed on the property by
> the property owner and/or its tenant and it was also necessary to
> differentiate this newly deposited fill material from any preexisting
> soils conditions that might be a part of Reichhold's responsibilities.

A March 30, 2007, letter to NJDEP from the same Reichhold engineering firm referred to

studies that purportedly "showed significant levels of metals in the newly added fill."  In an

August 16, 2007 letter to Reichhold, NJDEP, having reviewed a Reichhold revised BEE work

plan, wrote:

> In January 2007, Reichhold collected additional samples of the newly
> deposited fill material placed on the site following the sale of the
> property to 40 Sayerville Realty and the underlying pre-existing sale.

71

> The analytical results confirmed the presence of contamination in the newly deposited fill material.  Based on these results, Reichhold shall submit a Remedial Action Workplan to address the remaining soil contamination at the site.

From this letter it is evident that NJDEP was directing remediation designed to address both the original deeper subsurface contamination created by USMRC and the contamination arising from the new fill.

A September 14, 2007, letter from Reichhold's environmental attorneys, Drinker, Biddle & Reath, to NJDEP, responded to NJDEP's August 16, 2007 letter.  It included a quotation of the portion of the August 16, 2007, letter set forth above.  It did not dispute the statement that "analytical results confirmed the presence of contamination in the newly deposited fill material." The attorneys' letter stated:

> The second area of soils contamination concerns Reichhold's responsibility, if any, for remediating what is described in NJDEP's August 16, 2007 NOD letter as the 'newly deposited fill material placed on the site following the sale of the property' to the current property owner, 40 Sayerville Realty . . . it appears that the NJDEP does at least recognize and it agrees that the soil, <u>although contaminated</u>, was not deposited on the property prior to the date when Reichhold triggered its remedial obligation under ISRA . . .  As such, it is Reichhold's position that it lacks any legal responsibility to address this contamination under ISRA or otherwise.  Instead remediation of the <u>contaminated "newly deposited fill"</u> is the responsibility of the current property owner (or its tenant), who either brought the fill to the property or spread the fill about the property after it was placed there by some other person or entity following Reichhold's sale of the property.  (emphasis added).

Thus, at no point until shortly before the trial of the case did Reichhold disavow what Mr. Stoldt stated in his March 30, 2007 letter to NJDEP – that reports purportedly "showed significant levels of metals in the newly added fill."  As late as November, 2008, in a Final Report

Supplemental Baseline Ecological Evaluation Reichhold confirmed to NJDEP that "[a]dditional

fill material (2 to 3 feet or greater) has been brought on the BTL parcel by the current property

owner and generally encompasses the area not previously capped and prevents direct contact with

the surficial soil."

In his testimony Mr. Stoldt, referring to the NJDEP August 16, 2007, letter testified that

"[t]he contamination they're referring to [in the newly deposited fill] are metals, yes, I see that."

(2/10/09 Transcript at 54).  Further on Mr. Stoldt testified as follows concerning the March 30,

2007 CH2M Hill Report:

> Q.  Let me direct your attention to page 8 of that report.  Do you see
> in that paragraph above: Next period action items.  This report by a
> CH2M Hill states that the results indicate that the metal exceedencies
> were encouched in the native soil horizons as well as the
> uncharacterized field horizon?
>
> A.  Yes.
>
> Q.  Now, Reichhold in fact proposed to cap this uncharacterized fill;
> correct?
>
> A.  Proposed to cap the entire site, yes.
>
> Q.  On the BTL parcel, correct?
>
> A.  Yes, correct.
>
> Q.  And, in fact, as part of this March 30, 2007 report, Reichhold took
> a number of samples of this newly landfill, did it not?
>
> A.  It collected samples from both this surficial soil as well as deep
> native soil material and discovered metals as the only contaminant of
> concern, a variety of other organics were analyzed for and not
> detected.

(2/10/09 Transcript at 54-5.)

Despite the fact that Reichhold had long contended that the 2 to 3 feet of new fill as well as the soil beneath it were contaminated with metals, Reichhold changed its position at trial and contended that only the soil below the fill, for which USMRC was responsible, was contaminated. Mr. Stoldt provided a most unsatisfactory explanation of this change of position:

> Q.  Now, we were talking about who brought this newly added fill into the site, and we've seen that in the letters that you sent to the DEP, they state that the newly - - new owner brought it on, and that the DEP agrees with you.  You've testified, however, that you don't think that's accurate now, despite what you told the DEP?
>
> A. I'm not sure if the DEP agreed that it was brought in by the current property owner. . .
>
> Q.  And you told the DEP that it had been brought in by the new owner, right?
>
> A.  That was my thought at the time, it has been revised since.

(2/10/09 Transcript at 58-9.)

Mr. Stoldt testified that he had reviewed the September 14, 2007 letter of Drinker Biddle & Reath to the NJDEP that referred to the newly deposited fill that the new owners had placed on the BTL Parcel and that referred to the fill as contaminated.  Mr. Stoldt stated that "[t]hat was [Reichhold's] understanding at the time."  Then, according to Mr. Stoldt, shortly after September 14, 2007, "[we] were given new information from the current property owner's attorney to change our mind."  (2/10/09 Transcript 63).

Mr. Stoldt was then confronted with the November 2008 Supplemental Baseline Ecological Evaluation submitted to NJDEP that in a footnote stated:

> Additional fill material (2 to 3 feet or greater) has been brought onto the BTL parcel by the current property owner and generally encompasses the area not previously capped and prevents direct

74

contact with the surficial soil.

Asked to explain why Reichhold continued to tell NJDEP that the current property owner brought in the 2 to 3 feet of new fill a year after the new owner had provided "new information," Mr. Stoldt gave a potentially absurd answer: "We're talking about two different additional fills. This material that we're talking about now was some asphalt milling that they used to spread out in a general area of the site that was windy." (2/10/09 Transcript at 64.) If the fill referred to in the November 2008 Report was asphalt milling, it would have meant that the owner had covered the entire uncapped portion of the BTL Parcel with 2 to 3 feet of asphalt milling. That clearly was not what happened.

The testimony and the documents lead to the findings (1) that Reichhold during many years correctly advised NJDEP that the new owner or tenant placed 2 to 3 feet of fill over the entire BTL Parcel except the previously capped portion: (2) that the newly laid fill, as well as the soil at a lower depth, was contaminated with metals requiring remediation; (3) that USMRC's operations were the cause of the subfill contamination, which would have required capping even if the new fill had not been placed on the Parcel; and (4) the contaminated fill would have required capping even if the subsoil contamination had not been present. Reichhold is being required "to further remediate . . . soils at the Site contaminated by [USMRC's] former . . . operations," notwithstanding the fact that the actions of a non-USMRC source also require the capping.

USMRC's other objections to payment of these costs are not well founded. Although some non-metals contamination, e.g., polycyclic aromatic hydrocarbons, will be cured by the cap, these contaminations were minor in nature and could have been remediated at negligible cost if a

75

cap were not required.

E. <u>BTL Baseline Ecological Evaluation:</u> The initial BEE on the BTL Parcel that Reichhold submitted on or about July 2004, concluded that metals were the contaminants of concern. In March 2005, NJDEP requested that a revised BEE be performed because of concern over ecologically sensitive areas in or near the Arthur Kill and the western drainage ditch. Reichhold's 2005 revised BEE concluded that there was a pathway that would allow metals contamination to reach the Arthur Kill, the western drainage ditch and the wetlands. NJDEP required Reichhold to collect samples from the Arthur Kill, after which NJDEP directed Reichhold to submit a third BEE. After Reichhold prepared a work plan and performed additional sampling, it submitted a Supplemental BEE in November, 2008. In January, 2009, NJDEP directed Reichhold to "sample further into the Arthur Kill and adjacent areas to investigate the occurrence of metals."

USMRC challenges Reichhold's contention that the BEE requirement was caused by USMRC metals contamination. According to USMRC (1) the costs incurred to address the drainage ditch and the tidal flats were not related to metals and slag placed in these portions of the Site by USMRC; rather, Reichhold's own deposition of slag was a cause of contamination; (2) a significant portion of the sums expended was related to investigation of non-metals, for which USMRC was not responsible; (3) part of the BTL Parcel BEE was devoted to an analysis of contaminants in the drainage ditch bordering the Site into which Reichhold had buried 100 drums; and (4) there were other potential sources of contaminants that emptied into the drainage ditch.

An examination of NJDEP's directives concerning the BEEs demonstrates that metals contamination was the driving force behind these directives. USMRC was the source of the underlying contamination both in the central portions of the BTL Parcel and along the margins

bordering the Arthur Kill.  It is true, as found above, that the more recently deposited fill

contained metal contamination, but the contamination to which the BEE directives were addressed

consisted of much older metal pollution.  The drums to which USMRC refers were not leaching;

they did not contain metals; and the non-metallic contaminants were not the cause of the issuance

of the directives to perform the BEEs.  The cause was metals contamination of long standing,

attributable to USMRC.

## VII.  <u>Discussion</u>

This case is to be decided by application of CERCLA § 107 and the Spill Act as are

affected by the agreements of the parties in the Settlement Agreement.

To prevail in a § 107 case a plaintiff must prove: (1) that the defendant is a potentially

responsible party ("PRP"); (2) that hazardous substances were disposed of at a "facility"; (3) that

there has been a "release" or "threatened" release of hazardous substances from the facility into

the environment; and (4) that the release or threatened release has required or will require the

plaintiff to incur "response costs."  <u>N.J. Tpk. Auth. v. PPG Indus. Inc.</u>, 197 F. 3d 96, 103-04 (3d

Cir. 1999).  One PRP may recover from another PRP.  <u>United States v. Atl. Research Corp.</u>, 127

S. Ct. 2331 (2007).

USMRC is a PRP as the owner and operator of the Site at which the hazardous substances

were disposed.  In the case of each of the contaminations that are the subject of Reichhold's six

claims, there was a release and/or threatened release.  Each release or threatened release required

or will require Reichhold to incur response costs.

The Spill Act provides that "[w]henever one or more dischargers or persons cleans up and

removes a discharge of a hazardous substance, those dischargers and persons shall have a right of

contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance."  N.J. Stat. Ann. 58:10-23.11 f(a)(2)(a).  USMRC falls within the language of the Spill Act.

USMRC's liability under both CERCLA and the Spill Act was drastically curtailed by the 1994 Settlement Agreement between USMRC and Reichhold.  Under that Agreement, in exchange for a payment of $325,000, Reichhold agreed not to sue USMRC "with regard to the Site or Hazardous Substances at or beneath the Site."  In addition to the covenant not to sue, Reichhold agreed "to cover the exposed Slag on the Site in the area depicted on Figure 6.05 of the June 1991 Cleanup Plan . . . in a manner approved" by the NJDEP.

The Settlement Agreement, however, contained a Re-Opener Provision which described the claims from which Reichhold did not release USMRC.  This Provision is quoted at the beginning of this opinion.  In general terms it permits Reichhold to recover for the cost of a cleanup obligation at the Site imposed on it if (1) the cost is due to a change in the law promulgated subsequent to May 25, 1994, or due to an amendment or revision to the Cleanup Plan; (2) that requires Reichhold to further remediate groundwater or soils at the Site contaminated by USMRC; and (3) that satisfaction of the new obligation will result in an Increased Cost to Reichhold of $200,000.

In the foregoing sections of this opinion the court addressed each of the six claims that Reichhold advances to determine if Reichhold had proved that it fell within the terms of the Re-Opener Provision.  It found that each was a New Environmental Obligation, the cost of which was due to an amendment or revision of the Cleanup Plan.

78

It found that the costs incurred in connection with Site-wide analytical delineation, capping the Staflex Parcel, installing the new BTL Cap and conducting the BTL Baseline Ecological Evaluation in each case exceeded $200,000.  It found, however, that the costs incurred to remediate the CVOCs and the Delta Costs in neither case equaled $200,000.

Finally the court found that with respect to Site-wide analytical delineation, capping the Staflex Parcel, creating the BTL cap and conducting the BTL Baseline Ecological Evaluation, Reichhold was required to further remediate groundwater or soils at the Site contaminated by USMRC.

Contracts should be construed according to the plain and ordinary meaning of their terms. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted).  Thus, the court must give force to the intent of the parties by interpreting the Settlement Agreement between Reichhold and USMRC according to the plain meaning of its terms.  Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

As was noted in the court's opinion resolving the parties' cross-motions for summary judgment, if contractual language is "subject to only one reasonable interpretation," summary judgement may be appropriate.  Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999).  To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning." Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted).  If the meaning of a contract is ambiguous, it is not subject to summary judgment.  Although the Settlement Agreement requires close reading, all its terms

except one are subject to one reasonable interpretation.  The ambiguous term is "Cleanup Plan."
The meaning of that term had to be determined at trial.  It was so determined as set forth above
and as applied in this portion of the opinion.

USMRC has asserted a number of defenses.  Initially it contends that Reichhold's claims
are time-barred under both CERCLA's and the Spill Act's six year statutes of limitations.

An initial action for recovery of costs under CERCLA § 107 must be commenced:

> (A) for a removal action, within 3 years after completion of the
> removal action, except that such cost recovery action must be brought
> within 6 years after a determination to grant a waiver under section
> 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical
> on-site construction of the remedial action, except that, if the
> remedial action is initiated within 3 years after the completion of the
> removal action, costs incurred in the removal action may be recovered
> in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2).  The terms "remedy" or "remedial action" are defined in the statute as:

> those actions consistent with permanent remedy taken instead of or
> in addition to removal actions in the event of a release or threatened
> release of a hazardous substance into the environment, to prevent or
> minimize the release of hazardous substances so that they do not
> migrate to cause substantial danger to present or public health or
> welfare or the environment.  The term includes, but is not limited to,
> such actions at the location of the release as storage, confinement,
> perimeter protection using dikes, trenches, or ditches, clay cover,
> neutralization, cleanup of released hazardous substances and
> associated contaminated materials, recycling or reuse, diversion,
> destruction, segregation of reactive wastes, dredging or excavations,
> repair or replacement of leaking containers, collection of leachate and
> runoff, onsite treatment of incineration, provision of alternative water
> supplies, and any monitoring reasonably required to assure that such
> actions protect the public health and welfare and the environment. .
> . [T]he term includes offsite transport and offsite storage, treatment,

> destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

The parties used the language of § 9613(g)(2)(B) in the tolling provision of the Settlement Agreement, which states that Non-Released claims Reichhold may have against USMRC are tolled until "Reichhold is obligated to initiate physical on-site construction of a remedy" to address the Hazardous Substances at issue in the Non-Released claim.  (Settlement Agreement ¶ 5.)

The Spill Act does not contain a statute of limitations for private contribution actions.  In these circumstances, courts are directed to select a limitations period from among those periods applicable to actions seeking similar relief at common law.  See New W. Urban Renewal Co. v. Westinghouse Elec. Corp., 909 F. Supp. 219, 228 (D.N.J. 1995).  N.J. Stat. Ann. 2A:14-1 provides a six year statute of limitations for trespass to real property and tortuous injury to real property.  N.J. Stat. Ann. 2A:14-1.  "This six year statute of limitations is applicable to environmental tort actions at common law, and more specifically to environmental actions based on strict liability."  SC Holdings, Inc. v. A.A.A. Realty Co., 935 F.Supp. 1354, 1367 (D.N.J. 1996) (quoting Kemp Indus., Inc. v. Safety Light Corp., Civ. No. 92-0095, 1994 WL 532130, at *17 (D.N.J. Jan. 25, 1994)); Champion Labs., Inc. v. Metex Corp., Civ. No. 02-5284, 2005 WL 1606921 (D.N.J. July 8, 2005) ("A private cause of action for contribution under the Spill Act is most analogous to a common law environmental tort claim, for which the period of limitations is six years.").  The six year statute of limitations will be applied to Reichhold's claims under the Spill Act.

81

The six year statute of limitations will be applied separately to each of Reichhold's individual claims.  This action was commenced on January 31, 2003.  USMRC contends that the costs Reichhold claims to have incurred in connection with the Site-wide soil delineation and the CVOC investigation are time barred because Reichhold began these efforts more than six years prior to 2003.

USMRC's argument is defeated both by the language of CERCLA and by the tolling provision of the Settlement Agreement.  The applicable statute, 42 U.S.C. § 9613(g)(2)(b), requires that a CERCLA § 107 action be brought within six years "after initiation of physical on-site construction of the remedial action."  The tolling provision contained in § 5 of the Settlement Agreement provides that the statute of limitations for the Re-Opener provision is tolled until Reichhold is "obligated to initiate physical on-site construction of a remedy."

Actions such as visiting the Site, taking soil and water samples, and making engineering surveys are preliminary steps.  They do not start the statute of limitation running either under CERCLA or the tolling provision.  U.S. v. Findett Corp., 220 F.3d 842 (8th Cir. 2000).  They did not mark the point at which Reichhold was obligated to initiate physical on-site construction of a remedy.  None of Reichhold's six claims are barred by the statute of limitations of either CERCLA or the Spill Act.

As a further defense USMRC contends that Reichhold has failed to establish that the response costs that it incurred were "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).

> By the plain text of the statute, a party that seeks recovery for costs incurred in a cleanup that does not comport with the national contingency plan is without recourse.

82

E.I. DuPont DeNemours and Co. v. United States, 508 F.3d 126, 135 (3d Cir. 2007).

Reichhold's remediation efforts were hardly "unsupervised cleanups" referred to in E.I. DuPont. They resulted from continuing interaction with NJDEP and consultation with municipal and county authorities and the public. This ensured compliance with the national contingency plan. In any event, USMRC is also liable under the Spill Act, and national contingency plan compliance is not a requirement of the Spill Act.

USMRC asserts that by moving slag about the Site, Reichhold itself is a polluter and responsible for at least part of the cleanup required by virtue of the new environmental obligations. In United States v. CDMG Realty Co., 96 F. 3d 706 (3d Cir. 1996) the Court of Appeals held that "'Disposal' thus includes not only the initial introduction of contaminants onto a property but also the spreading of contaminants due to subsequent activity." Id. at 719. Thus disposal occurs and CERCLA liability arises when a subsequent owner of a previously contaminated property moves, releases or disperses the hazardous substances during landfill excavations or fillings. The court has found that the evidence has not established that Reichhold engaged in landfill excavations or fillings involving contaminants. The disturbance of contaminated substances, if any, caused by its investigatory activities did not constitute "disposal" under CERCLA because there is no evidence that these investigations were conducted negligently. Id. at 722. They were conducted by highly qualified professionals, and the resulting reports reflect the thoroughness and care with which they proceeded. c.f., White Oak Funding, Inc. v. Winning, 341 N.J. Super. 294 (App. Div. 2001 ("New Jersey courts have consistently interpreted the definition of 'discharge' to exclude the migration of hazardous substances already

present in the soil or in the groundwater." Id., at 299.)

USMRC has asserted a counterclaim pursuant to CERCLA § 113 seeking contribution on equitable principles and noting that once a party establishes a right to contribution, the "court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." Village of Ridgewood v. Shell Oil Co., 289 N.J. Super 181, 198 n.9 (App. Div. 1996) (citing N.J.S.A. 58:10-23.11f(a)(2). There is no occasion, however, to apply equitable principles. Of necessity, in order for the court to hold that USMRC was liable on a Reichhold claim, it had to have found that USMRC's operations were the cause of the contamination that Reichhold remediated. Under the terms of the Re-opener provision of the Settlement Agreement, Reichhold was entitled to seek recovery of the amount it expended on USMRC's behalf.

Special circumstances arise in the case of one of Reichhold's claims - reimbursement of costs incurred in connection with the most recent BTL Parcel Cap. There the court has found that the cap requirement had two causes - USMRC's use of large amounts of metals containing slag throughout the parcel and as fill in the southern part of the Parcel, and the subsequent owner's depositing 2 to 3 feet of metals containing fill over a substantial portion of the BTL Parcel. Each contamination alone would have caused NJDEP to require the additional BTL Cap. Together they constituted a single harm. The recent Supreme Court decision in Burlington N. & Santa Fe Ry. Co. v. United States, 129 S. Ct. 1870 (May 4, 2009) suggests that this situation might be addressed by apportionment rather than equitable principles. The Court stated:

> The seminal opinion on the subject of apportionment in CERCLA
> actions was written in 1983 by Chief Judge Carl Rubin of the United
> States District Court for the Southern District of Ohio. United States

84

v. Chem-Dyne Corp., 572 F. Supp. 802.  After reviewing CERCLA's history, Chief Judge Rubin concluded that although the Act imposed a "strict liability standard," id. at 805, it did not mandate "joint and several" liability in every case.  See id., at 807.  Rather, Congress intended the scope of liability to "be determined from traditional and evolving principles of common law[.]" Id. at 808.  The Chem-Dyne approach has been fully embraced by the Courts of Appeals."

129 S. Ct. at 1880-81           .

The Supreme Court then noted that "[f]ollowing Chem-Dyne, the courts of appeals have acknowledged that '[t]he universal starting point for divisibility of harm analyses in CERCLA cases' is § 433A of the Restatement (Second) of Torts." Id.  Under the Restatement, "when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he himself caused."

In the present case the metals contamination of the southern portion of the BTL Parcel was a distinct or single harm that USMRC and a third party caused.  There is a reasonable basis for division according to the contribution of each.  The measurement is not the exact amount of metals contamination for which each was responsible; USMRC was undoubtedly the source of most of it.  Rather, it is the circumstances that each was responsible for a sufficient amount of metals contamination that required the cap.

Under the Settlement Agreement the Re-Opener clause was triggered by an amendment to the Cleanup Plan that required Reichhold to further remediate soils contaminated by USMRC.  Capping the BTL Parcel falls within this provision, but because under CERCLA, USMRC would be responsible for only half these costs, Reichhold will be able to collect from USMRC only one - half of its past and future expenditures in connection with the BTL Parcel Cap.

## VIII.  <u>Conclusion</u>

A judgment will be entered in favor of Reichhold and against USMRC for costs incurred

to date on account of:

Site-wide Analytical Delineation in the amount of $279,512.

Capping the Staflex Parcel in the amount of $361,158.

The BTL Cap in the amount of $348,212.

The BTL Baseline Ecological Evaluation in the amount of $220,837.

Reichhold's demand for reimbursement of its costs incurred in connection with

remediation of CVOCs and Delta Costs will be denied.

A declaratory judgment will be entered to the effect that USMRC shall pay to Reichhold

(1) future costs Reichhold incurs in capping the Staflex Parcel, including reimbursement of the

$900,000 for which Reichhold will become liable under the Environmental Responsibility

Agreement with Port Reading Carteret, LLC and (2) one-half the future costs that Reichhold

incurs in capping the BTL Parcel.

USMRC's counterclaim will be dismissed with prejudice.


                                   ***s /Dickinson R. Debevoise***

Dated: June 22, 2009                      DICKINSON R. DEBEVOISE
                                      U.S.S.D.J.

